UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES of AMERICA and | ) |
| THE STATE OF INDIANA, <u>ex rel.</u> | ) CAUSE NO: 1:21-CV-00325  JMS-TAB |
| JOHN D. MCCULLOUGH and | ) |
| JAMES R. HOLDEN, | ) |
| | ) |
| Plaintiffs, | ) FILED UNDER SEAL PURSUANT |
| | ) TO 31 U.S.C. § 3730(b)(2) |
| v. | ) |
| | ) |
| ANTHEM INSURANCE COMPANIES, INC., | ) |
| MDWISE, INC., | ) |
| CARESOURCE INDIANA, INC., | ) |
| COORDINATED CARE CORPORATION, | ) |
| DXC TECHNOLOGY SERVICES, LLC | ) |
| UNION HOSPITAL, INC., | ) |
| INDIANA UNIVERSITY HEALTH, INC., | ) |
| MEMORIAL HOSPITAL OF SOUTH BEND, | ) |
|   INC., | ) |
| INDIANA UNIVERSITY HEALTH, BALL | ) |
|   MEMORIAL HOSPITAL, INC., | ) |
| REID HOSPITAL & HEALTH CARE | ) |
|   SERVICES, INC., | ) |
| INDIANA UNIVERSITY HEALTH NORTH | ) |
|   HOSPITAL, INC., | ) |
| ST. VINCENT HEART CENTER OF | ) |
|   INDIANA, LLC, | ) |
| THE METHODIST HOSPITALS, INC., | ) |
| COMMUNITY HOWARD REGIONAL | ) |
|   HEALTH, INC., | ) |
| HEALTH AND HOSPITAL CORPORTION | ) |
|   OF MARION COUNTY, | ) |
| PARKVIEW HOSPITAL, INC., | ) |
| COMMUNITY HOSPITAL SOUTH, INC., | ) |
| FRANCISCAN ALLIANCE, INC., | ) |
| COMMUNITY HEALTH NETWORK, INC., | ) |
| COMMUNITY HOSPITAL OF ANDERSON | ) |
|   AND MADISON COUNTY, INC., | ) |
| SAINT JOSEPH REGIONAL MEDICAL | ) |
|   CENTER-SOUTH BEND CAMPUS, INC., | ) |
| ORTHOPEADIC HOSPITAL AT | ) |
|   PARKVIEW NORTH, LLC | ) |

THE LUTHERAN FOUNDATION, INC.,          )
ST. MARY'S HEALTH, INC.,                )
INDIANA UNIVERSITY HEALTH               )
  BLOOMINGTON, INC.,              )
DEACONESS HOSPITAL, INC.,               )
TERRE HAUTE REGIONAL                    )
  HOSPITAL, L.P.,                 )
ST. CATHERINE HOSPITAL, INC,            )
FLOYD MEMORIAL HOSPITAL                 )
  AND HEALTH SERVICES,            )
VALLE VISTA, LLC,                       )
ST. VINCENT ANDERSON REGIONAL           )
  HOSPTIAL, INC.                  )
MUNSTER MEDICAL RESEARCH                 )
  FOUNDATION, INC.,               )
ELKHART GENERAL HOSPITAL, INC.,         )
ST. JOSEPH HEALTH SYSTEM, LLC,          )
PORTER HOSPITAL, LLC,                   )
RHN CLARK MEMORIAL                      )
  HOSPITAL, LLC,                  )
KINDRED HOSPITALS LIMITED               )
  PARTNERSHIP,                    )
REHABILITATION HOSPITAL OF              )
  INDIANA, INC.,                  )
INDIANA UNIVERSITY HEALTH               )
  ARNETT, INC.,                   )
BARTHOLOMEW COUNTY PUBLIC               )
  HOSPITAL,                       )
ABP NORTON HOSPITAL, LLC,               )
SELECT SPECIALTY HOSPITAL –             )
  BEECH GROVE, INC.,              )
INDIANA UNIVERSITY HEALTH WEST          )
  HOSPITAL, INC.,                 )
ST. JOSEPH HOSPITAL & HEALTH            )
  CENTER, INC.,                   )
UNIVERSITY MEDICAL CENTER, INC.,        )
ST. VINCENT CARMEL HOSPITAL, INC.,      )
HAMILTON CENTER, INC.,                  )
WELLSTONE REGIONAL HOSPITAL             )
  ACQUISITION, LLC,               )
REGENCY HOSPITAL OF NORTHWEST           )
  INDIANA, LLC,                   )
ST. VINCENT SETON SPECIALTY             )
  HOSPITAL, INC.                  )
MARION GENERAL HOSPITAL, INC.,          )

2

GOOD SAMARITAN HOSPITAL,                    )
BRENTWOOD MEADOWS, LLC,                     )
SYCAMORE SPRINGS, LLC,                      )
NORTH CENTRAL HEALTH                        )
  SERVICES, INC.                          )
JEWISH HOSPITAL, INC.                       )
HENDRICKS COUNTY HOSPITAL,                  )
ABOVE & BEYOND HOMECARE, INC.,              )
CSL CHARLESTOWN, LLC,                       )
ACCREDO HEALTH GROUP, INC.,                 )
WALGREEN CO,                                )
INDIANA UNIVERSITY HEALTH WHITE             )
  MEMORIAL HOSPITAL, INC.,                )
ST. VINCENT HOSPITAL AND HEALTH             )
  CARE CENTER, INC.,                      )
ALLISON TAYLOR, in her                      )
  individual capacity,                    )
D. SHANE HACHETT, in his                    )
  individual capacity,                    )
NANCY RENEE GALLAGHER, in her               )
  individual capacity,                    )
BECKY SELIG PAUL, in her                    )
  individual capacity,                    )
                                            )
        Defendants.                     )

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, John D. McCullough (hereinafter "Plaintiff McCullough") and James R.
Holden (hereinafter "Plaintiff Holden"), by counsel, on behalf of themselves, the Government of
the United States of America, and the State of Indiana, for their causes of action against
Defendants, allege and state as follows:

## I.    NATURE OF COMPLAINT

1.    This *qui tam* action is brought against Defendants for violations of the False
Claims Act, 31 U.S.C. § 3729 *et seq.* and the Indiana Medicaid False Claims and Whistleblower
Protection Act, § IC 5-11-5.7 *et seq.*

II.    **PARTIES**

A.    **Plaintiff-Relators**

2.    Plaintiff McCullough is a United States citizen who resides in Boone County, Indiana.

3.    Plaintiff Holden is a United States citizen who resides in Boone County, Indiana.

4.    Plaintiff McCullough and Plaintiff Holden shall be referred to collectively as Plaintiffs ("Plaintiffs").

B.    **Managed Care Entity Defendants**

5.    Anthem Insurance Companies, Inc. ("Defendant Anthem") is a publicly traded for-profit Indiana corporation headquartered in Indianapolis, Indiana.  Defendant Anthem is the largest for-profit managed health care company in the Blue Cross Blue Shield Association. As of 2019, the company had approximately 40 million members, $104 billion in annual revenue and assets of $78 billion.

6.    MDWISE, Inc. ("Defendant MDWISE") is an Indiana non-profit corporation founded in 1994 and headquartered in Indianapolis, Indiana.  Its parent organization is McLaren Health Care, a nonprofit integrated health system based in Michigan.

7.    CareSource Indiana, Inc. ("Defendant CareSource") is an Indiana non-profit corporation headquartered in Indianapolis, Indiana.  Its parent organization is CareSource, a non-profit corporation founded in 1968 and based in Dayton, Ohio.  CareSource is one of the nation's largest Medicaid managed care healthcare plans.

8.    Coordinated Care Corporation ("Defendant Coordinated Care") is a for-profit Indiana corporation, which does business as Managed Health Services or MHS.  Defendant Coordinated Care is headquartered in Indianapolis, Indiana, and is a wholly owned subsidiary of

Centene Corporation, a publicly traded Fortune 500 company based in Saint Louis, Missouri.

9.     Defendant Anthem, Defendant MDWISE, Defendant CareSource, and Defendant Coordinated Care shall be referred to collectively as the Managed Care Defendants ("Managed Care Defendants").

**C.     Defendant DXC Technology Services, LLC**

10.    DXC Technology Services, LLC ("Defendant DXC") is a foreign for-profit corporation headquartered in McLean, Virginia, with offices in Indianapolis, Indiana.

**D.     Provider Defendants**

11.    Union Hospital, Inc. ("Defendant Union Hospital"), is a for-profit Indiana corporation headquartered in Terre Haute, Indiana.

12.    Indiana University Health, Inc. ("Defendant IU Health"), is an Indiana non-profit corporation headquartered in Indianapolis, Indiana.  Defendant IU Health also does business as Riley Hospital for Children at IU Health.

13.    Memorial Hospital of South Bend, Inc. ("Defendant Memorial Hospital SB"), is an Indiana non-profit corporation headquartered in South Bend, Indiana.

14.    Indiana University Health Ball Memorial Hospital, Inc. ("Defendant IU Ball Memorial"), is an Indiana non-profit corporation headquartered in Muncie, Indiana.

15.    Reid Hospital & Health Care Services, Inc. ("Defendant Reid Hospital"), is an Indiana non-profit corporation headquartered in Richmond, Indiana.  Defendant Reid Hospital also does business as Reid Health.

16.    Indiana University Health North Hospital, Inc. ("Defendant IU North"), is an Indiana non-profit corporation headquartered in Carmel, Indiana.  Defendant IU North also does business as IU Health North Hospital, Inc.

17.     St. Vincent Heart Center of Indiana, LLC. ("Defendant St. Vincent Heart"), is an Indiana for-profit limited liability corporation headquartered in Carmel, Indiana.

18.     The Methodist Hospitals, Inc. ("Defendant Methodist Hospital"), is an Indiana non-profit corporation headquartered in Gary, Indiana.

19.     Community Howard Regional Health, Inc. ("Defendant Community Howard"), is an Indiana non-profit corporation headquartered in Kokomo, Indiana.

20.     The Health and Hospital Corporation of Marion County ("Defendant Eskenazi"), is an Indiana public corporation established pursuant to Indiana Code § 16-22-8-6.  Defendant Eskenazi does business as Eskenazi Health and is headquartered in Indianapolis, Indiana.

21.     Parkview Hospital, Inc. ("Defendant Parkview"), is an Indiana non-profit corporation headquartered in Fort Wayne, Indiana.  Defendant Parkview does business as Parkview Regional Medical Center.

22.     Community Hospital South, Inc. ("Defendant Community South"), is an Indiana non-profit corporation headquartered in Indianapolis, Indiana.

23.     Franciscan Alliance, Inc. ("Defendant Franciscan"), is an Indiana non-profit corporation headquartered in Mishawaka, Indiana.  Defendant Franciscan does business as Franciscan Health Indianapolis.

24.     Community Health Network, Inc. ("Defendant Community North"), is an Indiana non-profit corporation headquartered in Indianapolis, Indiana.  Defendant Community North does business as Community Hospital North, Community Hospital East and Community Hospitals of Indiana.

25.     Community Hospital of Anderson and Madison County, Inc. ("Defendant Community Hospital Anderson"), is an Indiana non-profit corporation headquartered in

Anderson, Indiana.  Defendant Community Hospital Anderson does business as Community Hospital of Anderson.

26.     Saint Joseph Regional Medical Center-South Bend Campus, Inc. ("Defendant SJRMC"), is an Indiana non-profit corporation headquartered in Mishawaka, Indiana.  Defendant Community Hospital Anderson does business as S.J.R.M.C. South Bend Campus, Inc.

27.     St. Mary's Health, Inc. ("Defendant St. Mary's") is an Indiana non-profit corporation headquartered in Evansville, Indiana.  Defendant St. Mary's does business as St. Vincent Evansville.

28.     Indiana University Health Bloomington, Inc. ("Defendant IU Health Bloomington") is an Indiana non-profit corporation headquartered in Bloomington, Indiana. Defendant IU Health Bloomington does business as IU Health Bloomington Hospital.

29.      St. Catherine Hospital, Inc. ("Defendant St. Catherine") is an Indiana non-profit corporation headquartered in East Chicago, Indiana.

30.     Floyd Memorial Health and Hospital Services ("Defendant Floyd Memorial") is an Indiana public corporation headquartered in New Albany, Indiana, and doing business as Floyd Memorial Hospital.

31.     Valle Vista, LLC ("Defendant Valle Vista") is a foreign limited liability corporation registered in Delaware and headquartered in Greenwood, Indiana.  Defendant Valle Vista does business as Valle Vista Health System.

32.     St. Vincent Anderson Regional Hospital, Inc. ("Defendant St. Vincent Anderson") is an Indiana non-profit corporation headquartered in Anderson, Indiana.

33.     Munster Medical Research Foundation, Inc. ("Defendant Munster Community") is an Indiana non-profit corporation headquartered in Munster, Indiana, and doing business as

7

Community Hospital.

34.    Elkhart General Hospital, Inc. ("Defendant Elkhart Hospital") is an Indiana non-profit corporation headquartered in Elkhart, Indiana.

35.    St. Joseph Health System, LLC ("Defendant St. Joseph Health") is a foreign limited liability corporation registered in Delaware and headquartered in Franklin, Tennessee.

36.    Porter Hospital, LLC ("Defendant Porter Hospital") is a foreign limited liability corporation registered in Delaware, headquartered in Franklin, Tennessee and doing business as Porter Regional Hospital.

37.    RHN Clark Memorial Hospital, LLC ("Defendant Clark Memorial") is a foreign limited liability corporation registered in Delaware, headquartered in Brentwood, Tennessee and doing business as Clark Memorial Hospital.

38.    Kindred Hospitals Limited Partnership ("Defendant Kindred Hospital") is a foreign limited partnership registered in Delaware, headquartered in Louisville, Kentucky and doing business as Kindred Hospital Indianapolis.

39.    Rehabilitation Hospital of Indiana, Inc. ("Defendant Rehabilitation Hospital") is an Indiana non-profit corporation headquartered in Indianapolis, Indiana.

40.    Indiana University Health Arnett, Inc. ("Defendant IU Health – Arnett") is an Indiana non-profit corporation headquartered in Lafayette, Indiana.

41.    Bartholomew County Public Hospital ("Defendant Bartholomew Hospital") is an Indiana public corporation headquartered in Columbus, Indiana and doing business as Columbus Regional Hospital.

42.    ABP Norton Hospital, LLC ("Defendant Norton Hospital") is an Indiana limited liability corporation headquartered in Indianapolis, Indiana and doing business as Norton

8

Hospital.

43.     Select Specialty Hospital – Beech Grove, Inc. ("Defendant Select Specialty") is a foreign for-profit corporation incorporated in Missouri and headquartered in Mechanicsburg, Pennsylvania.

44.     Indiana University Health West Hospital, Inc. ("Defendant IU Hospital West") is an Indiana non-profit corporation headquartered in Avon, Indiana.

45.     St. Joseph Hospital & Health Center, Inc. ("Defendant St. Joseph Hospital") is an Indiana non-profit corporation headquartered in Kokomo, Indiana and doing business as St. Vincent Kokomo.

46.     University Medical Center, Inc. ("Defendant University of Louisville Hospital") is a Kentucky non-profit corporation headquartered in Louisville, Kentucky and doing business as University of Louisville Hospital.

47.     St. Vincent Carmel Hospital, Inc. ("Defendant St. Vincent Carmel") is an Indiana non-profit corporation headquartered in Carmel, Indiana.

48.     Hamilton Center, Inc. ("Defendant Hamilton Center") is an Indiana non-profit corporation headquartered in Terre Haute, Indiana.

49.     Wellstone Regional Hospital Acquisition, LLC ("Defendant Wellstone") is an Delaware limited liability corporation headquartered in Mechanicsburg, Pennsylvania.

50.     Regency Hospital of Northwest Indiana, LLC ("Defendant Regency") is an Indiana limited liability corporation headquartered in

51.     St. Vincent Seton Specialty Hospital, Inc. ("Defendant St. Vincent Seton") is an Indiana non-profit corporation headquartered in Indianapolis, Indiana.

52.     Marion General Hospital, Inc. ("Defendant Marion Hospital") is an Indiana non-

9

profit corporation headquartered in Marion, Indiana.

53.    Good Samaritan Hospital ("Defendant Good Samaritan") is an Indiana public corporation headquartered in Vincennes, Indiana.

54.    Brentwood Meadows, LLC ("Defendant Brentwood") is an Indiana limited liability corporation headquartered in Newburgh, Indiana.

55.    Sycamore Springs LLC ("Defendant Sycamore Springs") is an Indiana limited liability corporation headquartered in Indianapolis, Indiana.

56.    North Central Health Services, Inc. ("Defendant North Central") is an Indiana non-profit corporation headquartered in Lafayette, Indiana and doing business as River Bend Hospital.

57.    Jewish Hospital, Inc. ("Defendant Jewish Hospital") is a Kentucky non-profit corporation headquartered In Louisville, Kentucky.

58.    Hendricks County Hospital ("Defendant Hendricks County Hospital") is an Indiana public corporation, headquartered in Hendricks County, Indiana.

59.    Above and Beyond Homecare, Inc. ("Defendant Above & Beyond"), is an Indiana for-profit corporation headquartered in Anderson, Indiana.

60.    CSL Charlestown, LLC ("Defendant CSL"), is a foreign for-profit corporation incorporated in Delaware and headquartered in Dallas, Texas.

61.    Accredo Health Group, Inc. ("Defendant Accredo"), is a foreign for-profit corporation incorporated in Delaware and headquartered in Saint Louis, Missouri.

62.    Walgreen Co ("Defendant Walgreen"), is a foreign for-profit corporation incorporated in Illinois and headquartered in Deerfield, Illinois.

63.    Indiana University Health White Memorial Hospital, Inc. ("Defendant IU White

Memorial") is an Indiana non-profit corporation headquartered in Monticello, Indiana.

64.    St. Vincent Hospital and Health Care Center, Inc. ("Defendant St. Vincent") is an Indiana non-profit corporation headquartered in Indianapolis, Indiana.  Defendant St. Vincent does business as St. Vincent Hospital and St. Vincent's Women's Hospital.

65.    Orthopaedic Hospital at Parkview North, LLC ("Defendant Parkview Orthopaedic") is an Indiana limited liability corporation headquartered in Fort Wayne, Indiana.

66.    The Lutheran Foundation, Inc. ("Defendant Lutheran") is an Indiana non-profit corporation headquartered in Fort Wayne, Indiana.  Defendant Lutheran does business as Lutheran Hospital of Indiana.

67.    Deaconess Hospital, Inc. ("Defendant Deaconess") is an Indiana non-profit corporation headquartered in Evansville, Indiana.

68.    Terre Haute Regional Hospital, L.P. ("Defendant Terre Haute Hospital") is a foreign limited partnership registered in Delaware and headquartered in Nashville, Tennessee.

69.    Defendant Union Hospital, Defendant IU Health, Defendant Memorial Hospital SB, Defendant IU Ball Memorial, Defendant Reid Hospital, Defendant IU North, Defendant St. Vincent Heart, Defendant Methodist Hospital, Defendant Community Hospital, Defendant Eskenazi, Defendant Parkview, Defendant Community South, Defendant Franciscan, Defendant Community North, Defendant Community Hospital Anderson, Defendant SJRMC, Defendant St. Mary's, Defendant IU Health Bloomington, Defendant St. Catherine, Defendant Floyd Memorial, Defendant Valle Vista, Defendant St. Vincent Anderson, Defendant Munster Community, Defendant Elkhart Hospital, Defendant St. Joseph Health, Defendant Port Hospital, Defendant Clark Memorial, Defendant Kindred Hospital, Defendant Rehabilitation Hospital, Defendant IU Health-Arnett, Defendant Bartholomew Hospital, Defendant Norton Hospital,

Defendant Select Specialty, Defendant IU Hospital West, Defendant St. Joseph Hospital, Defendant University of Louisville Hospital, Defendant St. Vincent Carmel, Defendant Hamilton Center, Defendant Wellstone, Defendant Regency, Defendant St. Vincent Seton, Defendant Marion Hospital, Defendant Goo Samaritan, Defendant Brentwood, Defendant Sycamore Springs, Defendant North Central, Defendant Jewish Hospital, Defendant Hendricks County Hospital, Defendant Above & Beyond, Defendant CSL, Defendant Accredo, Defendant Walgreen, Defendant IU White Memorial, Defendant St. Vincent, Defendant Parkview Orthopaedic, Defendant Lutheran, Defendant Deaconess, and Defendant Terre Haute Hospital are all enrolled Providers of healthcare services to Indiana Medicaid and shall be referred to collectively as the Provider Defendants ("Provider Defendants").

70.     All of the Provider Defendants are properly enrolled to provide medical, pharmacy or other healthcare services to eligible recipients of Indiana Medicaid in accordance with 405 Indiana Administrative Code (IAC) 1-1.4-3(a).

71.     All Provider Defendants are registered with the Indiana Secretary of State's Office, or its equivalent in a neighboring state.

**E.     Individual Defendants**

72.     Allison Taylor ("Defendant Taylor") is a United States citizen who resides in the State of Indiana.

73.     D. Shane Hatchett ("Defendant Hatchett") is a United States citizen who resides in the State of Indiana.

74.     Nancy Renee Gallagher ("Defendant Gallagher") is a United States citizen who resides in the State of Illinois.

75.     Beck Selig Paul ("Defendant Paul") is a United States citizen who resides in the

State of Indiana.

76.    Defendant Taylor, Defendant Hatchett, Defendant Gallagher, and Defendant Paul shall be referred to collectively as the Individual Defendants ("Individual Defendants").

## III.    JURISDICTION AND VENUE

77.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730, and for claims under state law, such as the Indiana Medicaid False Claims and Whistleblower Protection Act, § IC 5-11-5.7 *et seq.*

78.    Personal jurisdiction and venue are proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), and 31 U.S.C. § 3732(a), as each of the Defendants or their agents transact business or otherwise engaged in fraudulent conduct within the district.

79.    The events, transactions, and occurrences relevant to this lawsuit have arisen within the geographical environs of the Southern District of Indiana and this division, and therefore venue is proper in this Court and this division.

## IV.    BACKGROUND

### A.    Plaintiffs' Backgrounds and Knowledge of State Government

80.    Plaintiff McCullough was an employee of the State of Indiana for 16 years.  He served as Director of Program Integrity for Indiana's Medicaid Program from September 2014 to March 31, 2017, when he left State employment.  Plaintiff McCullough previously served as Provider Relations Director and Director of Medicaid Contract Management for Indiana Medicaid.  He also previously served as Chief of Staff for the Indiana Professional Licensing Agency and as a Mediator for the Office of Indiana Attorney General.  Plaintiff McCullough

13

currently works as a self-employed consultant.  He is a veteran of the United States Marine Corps.

81.    Plaintiff Holden was an employee of the State of Indiana for 15 years and previously served as Assistant Director of the State Lobby Registration Commission, Deputy Attorney General, and Deputy Insurance Commissioner.  He is a licensed attorney in the State of Indiana.  From January 2007 to June 2011 and again from November 2012 to November 2014, Plaintiff Holden served as Chief Deputy and General Counsel in the Office of the Indiana State Treasurer.  Plaintiff Holden left state employment on November 18, 2014 and is currently employed by the United States Department of Agriculture.  He is also an officer in the Indiana Army National Guard.

### B.    The Indiana Medicaid Program

82.    The Medicaid Program ("Medicaid") was created in 1965, when Title XIX was added to the Social Security Act.  Medicaid is a public assistance program providing payment of medical expenses for low-income patients. Funding for Medicaid is shared between the federal government and state governments that participate in the program.  Medicaid is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the U.S. Department of Health and Human Services.

83.    Indiana's Medicaid Program ("Indiana Medicaid") is overseen by the Indiana Family and Social Services Administration ("FSSA") and Office of Medicaid Policy and Planning ("OMPP").  The Secretary of the FSSA is appointed by the Governor of Indiana.  The Administrator of the OMPP is appointed by the Secretary of FSSA.  *See* Indiana Code § 12-8 *et. seq.*  The FSSA and OMPP are "agencies" of Indiana State Government pursuant to Indiana

Code § 4-13-2-1 and constitute the "state" for purposes of Indiana Code § 5-11-5.5-1. FSSA and OMPP maintain their primary offices in Indianapolis, Indiana.

84.     Indiana Medicaid provides health insurance for over 1,750,000 eligible Indiana residents ("Members"). The federal government provides approximately 71 per cent of the funding for Indiana Medicaid, while the State of Indiana provides the remainder, approximately 29 per cent.

85.     Hospitals, physicians, pharmacies, and other healthcare Providers may apply to become enrolled as Providers of healthcare services to Indiana Medicaid Members.

### C.     Indiana Medicaid's Anti-Fraud Statutes and Regulations

86.     Federal regulations contained in 42 Code of Federal Regulations (C.F.R.) § 455.14 provide that if the OMPP receives a complaint of Medicaid fraud or abuse from any source or identifies any questionable practices, it must conduct a preliminary investigation to determine whether there is sufficient basis to warrant a full investigation.

87.     Pursuant to 42 C.F.R. § 455.18, OMPP must provide that all Provider claims forms be imprinted in boldface type with the following statements, or with alternate wording that is approved by the Regional CMS Administrator: (1) "This is to certify that the foregoing information is true, accurate, and complete." (2) "I understand that payment of this claim will be from Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws." The statements may be printed above the claimant's signature or, if they are printed on the reverse of the form, a reference to the statements must appear immediately preceding the claimant's signature. According to 42 C.F.R. § 455.19, as an alternative to the statements required in 42 C.F.R. § 455.18, the agency may print the following wording above the claimant's endorsement on the reverse of checks or warrants

15

payable to each provider: "I understand in endorsing or depositing this check that payment will be from Federal and State funds and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws."

88.     In accordance with 42 C.F.R. § 401.305(a)(1), Provider that has received an overpayment must report and return the overpayment in the form and manner set forth in 42 C.F.R. Part 401.  According to 42 C.F.R. § 401.305(a)(2), a Provider has identified an overpayment when that Provider has, or should have through the exercise of reasonable diligence, determined that the Provider has received an overpayment and quantified the amount of the overpayment. A Provider should have determined that the Provider received an overpayment and quantified the amount of the overpayment if the Provider fails to exercise reasonable diligence and the Provider in fact received an overpayment.

89.     Under Indiana Code §§ 12-15-21-3(5), IC 12-15-21-3(7), and 405 IAC 1-1.4-9, the OMPP may recover payment from any provider for services rendered to an individual, or claimed to be rendered to an individual, if the office, after investigation or audit, finds that: (1) the services paid for cannot be documented by the provider as required by section 405 IAC 1-1.4-2; (2) the amount paid for such services has been paid from other sources or is subject to third party liability; (3) the services were provided to a person other than the person in whose name the claim was made and paid; (4) the service reimbursed was provided to a person who was not eligible for Medicaid at the time of the provision of the service; (5) the paid claim arises out of any act or practice prohibited by law or by rules of the office; (6) the overpayment resulted from: (A) an inaccurate description of services or an inaccurate usage of procedure codes; (B) the provider's itemization of services rather than submission of one (1) billing for a related group of services provided to a recipient (global billing) as set out in the office's medical policy;

(C) duplicate billing; or (D) claims for services or materials determined to have been not medically reasonable or necessary; or (7) the overpayment to the provider resulted from any other reason not specified in this subsection.

90.    Indiana Code § 12-15-24-1 provides that evidence that a person or provider received money or other benefits as a result of a violation of (1) a provision of Indiana Code 12-15 *et seq.* or (2) a rule established by the secretary of FSSA under Indiana Code § 12-15 *et seq.*; constitutes prima facia evidence, for purposes of Indiana Code § 35-43-4-2 (Indiana's criminal theft statute), that the person or provider intended to deprive the state of a part of the value of the money or benefits.

### D.    Indiana Medicaid Fee For Service (*i.e.* Traditional Medicaid)

91.    The State administers part of the Indiana Medicaid program as Fee For Service (FFS), *i.e.* "Traditional Medicaid." Approximately 319,000 Members are served through Indiana Medicaid's traditional FFS. This represents about 18 percent of Indiana Medicaid Members. The Members covered under the FFS program include those eligible for home and community-based services, those dually eligible for both Medicare and Medicaid, and those in nursing homes, intermediate care facilities for the intellectually disabled, and state-operated facilities.

92.    To deliver Indiana Medicaid's FFS program, FSSA and OMPP contract with Defendant DXC. Since 1991, Defendant DXC has performed claim processing, customer service and eligibility systems, as Indiana Medicaid's fiscal agent. Defendant DXC processes both paper and electronically submitted medical claims for FFS Medicaid programs. Defendant DXC is responsible for ensuring accurate and timely payment to FFS Medicaid Providers and the processing of FFS Provider claim disputes and appeals. Defendant DXC's contract also includes 177 pages of other requirements and key performance measures, including, but not limited to:

auditing claims, quality assurance, reporting errors related to bundling or unbundling of services, monitoring patient's date of death information and automatically identifying claims for service dates after the date of death, identifying overpayments and performing recoupment, and maintaining liability for the accuracy and appropriateness of claims payment amounts. Defendant DXC is reimbursed by Indiana Medicaid for payments made to Providers.  (excerpts of most recent contract between OMPP and Defendant DXC attached as Exhibit 1)

**E.    Role of Managed Care Entities in Administering Indiana Medicaid**

93.    Since the early 1980s, and particularly in recent years, states have increasingly used managed care ("MC") to deliver services to Medicaid beneficiaries. The dominant model is comprehensive managed care, in which states contract with Managed Care Entities ("MCEs") to provide comprehensive acute care and long-term services to Medicaid beneficiaries and pay the MCE a fixed monthly premium or "capitation rate" for each enrollee.

94.    Indiana Medicaid offers three MC health plans to eligible Indiana residents. These include: the Health Indiana Plan ("HIP"), Hoosier Healthwise ("HHW"), and Hoosier Care Connect ("HCC").

95.    HIP covers the healthcare costs of qualified low-income Indiana residents between 19 and 64 year of age.  As of December 2020, there were 622,130 Indiana residents enrolled in HIP.  FSSA has contracted with Defendant Anthem, Defendant MDWISE, Defendant CareSource, and Defendant Coordinated Care to provide MC services under HIP.

96.    HHW is a health care program for children up to age 19 and pregnant women. The program covers medical care such as doctor visits, prescription medicine, mental health care, dental care, hospitalizations, and surgeries at little or no cost to the member or the member's family.  The Children's Health Insurance Program (CHIP), a program for children up to age 19

whose families have slightly higher incomes, falls under the Hoosier Healthwise program.  As of December 2020, a total of 711,588 Indiana residents were enrolled in HHW.  FSSA has contracted with Defendant Anthem, Defendant MDWISE, Defendant CareSource, and Defendant Coordinated Care to provide MC services under HIP.

97.    HCC is a health care program for individuals who are aged 65 years and older, blind, or disabled and who are also not eligible for Medicare.  As of December 2020, there were 96,563 Indiana residents enrolled in HCC.  FSSA has contracted with Defendant Anthem and Defendant Coordinated Care to provide MC services under HIP.

98.    The total number of Indiana residents enrolled in Indiana Medicaid's managed care plans in December 2020 was 1,430,281, or approximately 88 per cent of Indiana Medicaid Members.

99.    New Indiana Medicaid Members enrolled in HIP, HHW, and HCC are randomly assigned to receive services from Defendant Anthem, Defendant MDWISE, Defendant CareSource, or Defendant Coordinated Care, as applicable.

100.    By contract, Indiana Medicaid delegates the following services to the Managed Care Defendants: provider network development (including contracting and credentialling), care management and disease management, member and provider contact centers, provider outreach and education, member outreach, claims processing, claim disputes and appeals, utilization management, pharmacy preferred drug list development, quality incentive programs, non-emergency medical transportation, program integrity and many other functions (excerpts of most recent contracts between OMPP and Defendant Anthem, attached as Exhibit 2; Defendant MDWISE, attached as Exhibit 3; Defendant CareSource, attached as Exhibit 4; Defendant Coordinated Care, attached as Exhibit 5).

19

101.    In exchange, Defendant Anthem, Defendant MDWISE, Defendant CareSource, and Defendant Coordinated Care, receive a contractually defined monthly capitation payment per Indiana Medicaid Member they serve.

102.    As part of its respective contracts with FSSA, Defendant Anthem, Defendant MDWISE, Defendant CareSource, and Defendant Coordinated Care, each agreed to have primary responsibility for the identification of all potential waste, fraud and abuse associated with services and billings generated as a result of the contracts.

103.    Defendant Anthem, Defendant MDWISE, Defendant CareSource, and Defendant Coordinated Care are each contractually obligated to maintain a program integrity plan, pursuant to 42 C. F. R. § 438.608, which sets program integrity requirements and administrative procedures.  This includes a mandatory compliance plan that describes in detail the manner in which the Managed Care Defendants will detect fraud and abuse.

104.    The Managed Care Defendants are each contractually and legally obligated, pursuant to 42 C.F.R. §§ 456.3, 456.4, and 456.23, to have surveillance and utilization control programs and procedures to safeguard Medicaid funds against improper payments and unnecessary or inappropriate use of Medicaid. The Managed Care Defendants shall have internal controls and policies and procedures in place that are designed to prevent, detect, and report known or suspected waste by Providers, vendors, subcontractors (including Pharmacy Benefits Managers) and the MCE itself.

105.    The Managed Care Defendants are also required, pursuant to 42 C.F.R. §§ 455.13, 455.14 and 455.21 to cooperate with all appropriate state and federal agencies, including the Indiana Attorney General's Medicaid Fraud Control Unit ("MFCU") and the FSSA/OMPP Program Integrity ("OMPP PI") Unit, in investigating fraud and abuse. The Managed Care

Defendants must have methods for identification, investigation, and referral of suspected fraud cases and shall provide an Audit Report to OMPP and the FSSA PI Unit.

106. According to the contract between the Managed Care Defendants and FSSA/OMPP, in cases involving wasteful or abusive provider billing or service practices (including overpayments) identified by the OMPP PI Unit, FSSA may recover any identified overpayment directly from the Provider **or** may require Contractor to recover the identified overpayment and repatriate the funds to the State Medicaid program as directed by the OMPP PI Unit.

107. The Managed Care Defendants' contracts also state that if a fraud referral from an MCE generates an investigation and/or corresponding legal action results in a monetary recovery to Indiana Medicaid, the reporting MCE will be contractually entitled to share in such recovery following final resolution of the matter (settlement agreement/final court judgment) and following payment of recovered funds to the State of Indiana.

108. However, by contract, if the State of Indiana or FSSA makes a recovery from a fraud investigation and/or corresponding legal action where the MCE has sustained a documented loss, but the case did not result from a referral made by the MCE, the State or FSSA shall not be contractually obligated to repay any monies recovered to MCE.

109. To conduct their anti-fraud operations, the Managed Care Defendants are contractually required to employ a Compliance and a Special Investigation Unit ("SIU") Manager, who shall be located in Indiana and dedicated full-time to Indiana Medicaid. The SIU Manager is responsible for directing the activities of SIU staff, attending meetings with FSSA and reducing or eliminating wasteful, fraudulent, or abusive healthcare billings and services. The

SIU Manager shall report to the Managed Care Defendant's Compliance Officer and meet with the FSSA PI Unit at a minimum of quarterly or more frequently as directed by the FSSA PI Unit.

**F.    IBM's Role as Fraud and Abuse Detection Services and Recovery Audit Contractor to Indiana Medicaid**

110.    Pursuant to 42 C.F.R. § 455.502(b), State Medicaid Agencies, including FSSA, are required to contract with State Medicaid Recovery Audit Contractors  (RAC)s to carry out the activities described in 42 C.F.R. § 455.506, namely: review claims submitted by Providers for which payment has been made to identify underpayments and overpayments and recoup overpayments for the States.  According to  42 C.F.R. § 455.506, States must make referrals of suspected fraud and/or abuse, as defined in 42 C.F.R. § 455.2, to the State's MFCU or other appropriate law enforcement agency.

111.    FSSA currently contracts with IBM Corporation's Watson Health ("IBM") to provide Fraud and Abuse Detection and overpayment recovery services ("FADS"), and to provide RAC services for Indiana Medicaid.  IBM's existing FADS contract, began on July 1, 2017 and expires on June 30, 2021.  As a result of corporate acquisitions, IBM and its predecessors in interest have provided these services to Indiana Medicaid since January 1, 2011, first as Thompson Reuters Corporation and then as Truven Health Analytics, LLC. The contract specifies that IBM is to be paid a not-to-exceed amount of $21,983,300.10 to perform these services over the course of the current contract term. (the most recent FADS contract between OMPP and IBM attached as Exhibit 6)

112.    IBM's FADS contract with FSSA obligates IBM to provide software as a service in the form of licensing, access, hosting, training, upgrades, enhancements, maintenance and support for the following suites of software: J-SURS, iSite, and DataProbe.

22

113.    IBM's FADS contract with FSSA also requires IBM to perform the following FADS services: fraud and abuse detection, overpayment recovery, pre-payment review, provider education, fraud call center, and certain calculations and reporting.

114.    In order to carry out its anti-fraud duties for Indiana Medicare, IBM utilizes sophisticated computer algorithms to detect fraud, abuse, and overpayments.  IBM then reports the results of these algorithms to FSSA so that FSSA can send audit letters to the Providers or the MCEs in an effort to recover the improper payments or overpayments. Between 2011 and 2017, IBM worked closely with FSSA's PI Unit to recover millions of dollars of improper payments and overpayments.

## G.    A New Administration Obstructs IBM's Anti-Fraud Efforts

115.    Eric J. Holcomb ("Holcomb") was elected Governor of the State of Indiana in 2016 and took office on January 9, 2017.  Holcomb was re-elected in 2020 and currently serves as the Governor of the State of Indiana.  Holcomb was heavily supported in his election campaigns by the healthcare and insurance industries, which made hundreds of thousands of dollars in contributions to his campaign committees.  This included $50,000 from Defendant Anthem, $17,000 from Defendant CareSource, $32,500 from Centene Corporation (the parent company of Defendant Coordinated Care), and others.  Friends of Indiana Hospitals Political Action Committee contributed $42,000.

116.    Soon after Holcomb took office, he began summarily terminating the employment of senior officials within FSSA (including the Secretary and Chief of Staff) and Indiana Medicaid (including the Administrator) and replacing them with new officials with close ties to the healthcare industry, including Defendant Taylor.

23

117.    Plaintiff McCullough's employment as the Director of Program Integrity was terminated on March 31, 2017, without prior notice.  His termination letter stated, "Based on anticipated changes within compliance and Program Integrity, your services are no longer needed."  Prior to his termination, Plaintiff McCullough had led efforts to greatly improve Indiana Medicaid fraud recoveries, including beginning a Statewide Fraud Initiative in February 2016.  Plaintiff McCullough also began holding monthly meetings with IBM, the MCEs and his FSSA PI Unit staff.  He also worked closely with IBM to increase the use of anti-fraud algorithms and data mining.

118.    Defendant Taylor was hired as Administrator of Indiana Medicaid in May 2017 and remains in that position until the present day, although she is still listed on FSSA's website as "Interim Administrator."  Defendant Taylor was previously an attorney with Hall Render Heath Killian & Lyman ("Hall Render") from 2008 to 2015.  Hall Render advertises itself as the nation's largest healthcare law firm and represents many Indiana hospitals and other healthcare companies.  Hall Render also maintains a significant presence as a registered lobbyist on behalf of healthcare clients and makes significant political contributions through its political action committee ("PAC"), The Hall Way PAC.  This PAC has donated over $10,000.00 to Holcomb's campaign committees.

119.    In 2019, Lindsey Lux Kleman ("Kleman") was hired as Chief of Staff and Deputy Director for Strategy at OMPP.  Kleman previously work for Defendant MDWISE from 2008-2019, serving most recently as Vice President for Member and Provider Services.

120.    Defendant Hackett served as the Deputy Director of OMPP from January 2015 to September 21, 2019.

121.    Defendant Gallagher served as the Director of OMPP's PI unit from July 18, 2018 to September 17, 2019.

122.    Defendant Paul served as Investigation and Coordination Manager for OMPP's PI unit from September 2013 to August 2019.

123.    Prior to Holcomb assuming office, IBM worked closely with Indiana Medicaid staff, including Plaintiff McCullough to identify waste, fraud and abuse and recover related overpayments for Indiana Medicaid.

124.    Following Holcomb's assumption of office and the hiring of Defendant Taylor at OMPP, Indiana Medicaid ceased cooperating with IBM, its own vendor, in discharging its contractually and legally mandated fraud detection and recovery activities.   IBM carefully documented these obstructions in an internal document dated February 25, 2019 as follows (an internal chronology document explaining the Individual Defendants' obstruction of IBM's anti-fraud activities are attached as Exhibit 7):

a.      "Blocked from encounter data validation efforts per letter from Deputy Medicaid Director, Shane Hatchett, dated 5/1/18. Letter specifies calendar year 2018. Direction for calendar year 2019 was placed on open items list on 12/12/2018, requested verbally and via email on 12/17/18. Clarification to request was given in-person on 1/14/2019."

b.      "Blocked from all MCE activities for SFY2019 per 9/14/2018 email from Becky Paul (Selig)."

c.      "Blocked from recovering overpayments from MCEs or MC providers due to having no established recovery process in place. Bi-weekly analytic meetings discussed the potential to recover possible MCE overpayments throughout the first year of the new contract and continued into revamped Projects meetings during algorithm delivery."

25

d.      "Discussions to address recovering MC potential overpayments identified by the "Inpatient-Only Procedures" algorithm took place in 7/24/18 with Managed Care SME, Jeff Neuman. The algorithm was again discussed on 9/4/18 and 9/18/18 FADS Projects meeting. The revised results were sent to PI on 10/1/18. IBM is waiting to hear from PI on how to proceed with MC recoveries for this algorithm."

e.      "IBM met with PI Director, Renee Gallagher, on 10/25/18 and discussed a plan to recover identified MCE overpayments, but permission to proceed was not provided during the meeting."

f.      "IBM brought up MCE recoveries on 1/15/19 and again on 1/28/19 and was told there was a disconnect. The PI team said they will discuss the matter internally and let IBM know how to proceed.  The next communication on the topic was provided at the 2/8/19 meeting where FSSA stated MCE recoveries haven't been occurring."

g.      "IBM re-sent the audit plan along with 18 additional MCE recovery ideas (additional algorithms) on 2/11/19 per request of PI and following up on the 2/8/19 discussion. IBM provided direction on the decision factors that need to be made to begin MCE recoveries on 2/13/19 as a response to PI questions on the recovery process."

h.      "Blocked from monthly MCE meetings from July 2018 to present per 9/14/18 message from Becky Paul which is were [*sic*] IBM would have addressed underutilization and utilization trends with the MCEs."

i.      "Blocked from holding QOC meetings starting on August 24, 2018. QOC meeting in August 2018 was cancelled via email right before the meeting started and all IBM/MSLC representatives were present.  PI Informed IBM that the meetings "*was cancelled for today and rescheduled for a later time.*" IBM inquired via email and in person various time

[*sic*] regarding the meeting status since the initial cancelation. As of 3/4/2019 the QOC meetings have not been reinstated. IBM was not permitted to update the financial claim flow charts for each MCE. Blocked from monthly MCE meetings from July 2018 to present per 9/14/18 email from Becky Paul."

j.      "Blocked from further collaboration meetings as of 7/17/18 when Becky Paul put meetings on hold. Meetings were officially cancelled on 8/17/18.  MCE meetings were also cancelled for July. Becky Paul's emails on 8/15/2019 and 9/14/18 suspended IBM participation in MCE activities and prevented MCE SME involved in any MCE functions. More recently Renee Gallagher's email on 3/1/19 blocked SMEs from collaborating in MCE efforts."

k.      "Blocked from further collaboration in this area as of 7/17/18 when Becky Paul put meetings on hold. Meetings were officially cancelled on 8/17/18.  MCE meetings were also cancelled for July. Becky Paul's emails on 8/15/2019 and 9/14/18 suspended IBM participation in MCE activities and prevented MCE SME involved in any MCE functions. More recently Renee Gallagher's email on 3/1/19 blocked SMEs from collaborating in MCE efforts."

l.      "Becky Paul email on 9/11/18 informing IBM *I saw you were included on the email for today's MFCU meeting but please do not plan on attending.  We're still defining what IBM's role will be in regards to supporting the state in overseeing the MCEs."* On another occasion IBM was informed not to reach out to MFCU without including PI in the communication."

m.      "State staff were blocked from attending most recent J-SURS User Group presentation by the State on 2/6/2019. State staff created their own J-SURS training manual. The State blocked MCE staff from attending the second semi-annual MCE training scheduled 10/22/2018."

27

125.    By the summer of 2018, the Individual Defendants had effectively blocked the performance of IBM's contractually mandated anti-fraud activities.  FADs meetings between Indiana Medicaid staff, IBM and the MCEs were discontinued.  The results of IBM's fraud detection algorithms were never followed up and audit/recoupment letters that should have been sent to Providers were not approved by Indiana Medicaid staff.  Millions of dollars in recoverable fraudulent billings were not recouped as a result.  Upon information and belief, this circumstance continues until the present (a Powerpoint presentation depicting IBM's FADS history with Indiana Medicaid is attached as Exhibit 8).

126.    The actions of the Individual Defendants were contrary to federal law, namely, 42 C.F.R.§  455.14, which requires that if the OMPP receives a complaint of Medicaid fraud or abuse from any source or identifies any questionable practices, it must conduct a preliminary investigation to determine whether there is sufficient basis to warrant a full investigation.

127.    IBM staff tried unsuccessfully from May 2017, when Defendant Taylor started as Administrator of OMPP, until January 2021, to schedule a meeting with Defendant Taylor to discuss IBM's anti-fraud function.  Despite the fact that IBM is a key vendor for OMPP, Defendant Taylor stonewalled IBM and never met with them.

128.    In late 2020, Defendant Taylor and Indiana Medicaid staff announced that the contract for FADS services currently performed by IBM was to be put up for bid via Request for Proposals ("RFP") 21-2355.  Responses to the RFP were due November 6, 2020.

129.    On January 7, 2021, IBM finally succeeded in securing a video conference with Defendant Taylor to discuss their anti-fraud activities and the fact that they had already identified millions of dollars in fraud that could be recovered to ease the state's COVID-19 induced budget

pressures.   In response, Defendant Taylor stated that she wanted to avoid any "provider abrasions."  No action was taken on IBM's recommendations.

130.    Despite submitting a timely RFP response, IBM was notified on January 22, 2021, that it was not selected to continue providing FADS services to Indiana Medicaid.  Instead, Deloitte Transactions and Business Analytics, LLP ("Deloitte") was chosen as the new FADS contractor.  Deloitte, and its affiliated companies, had donated $30,000.00 to Holcomb's election campaign committees.

131.    As a result of the actions of Individual Defendants, which served to purposely obstruct and frustrate Indiana Medicaid's anti-fraud activities, Medicaid fraud recoveries (FFS only) to the State of Indiana attributable to the OMPP PI Unit fell, from a peak of $12.84 million in 2016 under Plaintiff McCullough's PI Unit leadership, to a six-year low of $7.24 million in 2019.

132.    In late 2020, Plaintiffs came into possession of IBM internal documents, which indicated that IBM's attempts to recover fraudulent Medicaid payments had been frustrated by Individual Defendants.  These documents showed that IBM fraud algorithms had identified hundreds of millions of dollars in fraudulent claims to Indiana Medicaid that were not being acted upon.

## V.    ALLEGATIONS

### A.    Duplicate Inpatient Claims

133.    On February 5, 2019, IBM's FADS team completed a fraud detection algorithm using claims data to identify duplicate inpatient claims.  The purpose of this algorithm was to identify inpatient claims (both FFS and MC) with the same first date of service and/or same last

date of service as another inpatient claim for the same recipient, as this would be indicative of a duplicate claim (a detailed write-up of the algorithm's results is attached as Exhibit 9).

134.    IBM identified all inpatient claims (both FFS and MC) with service dates on/after August 1, 2012 and paid dates on/before January 31, 2018. The FADS team then excluded previously-audited claims as well as Medical Review Team (MRT), Pre-Admission Screening and Resident Review (PASRR), and First Steps claims.  The FADS team had conducted this fraud detection algorithm two times in the past, in 2011 and 2015.

135.    IBM identified 399 duplicate FFS claims totaling $1,778,724.01 billed by 128 unique Providers and paid by Indiana Medicaid through Defendant DXC.  The ten largest duplicate FFS claims came from: Defendant Union Hospital, 4 claims, $218,000.16; Defendant IU Health, 15 claims, $168,735.50; Defendant Memorial Hospital SB, 4 claims, $108,720.46; Defendant IU Ball Memorial, 6 claims, $86,363.48; Defendant IU Health dba Riley Hospital for Children at IU Health, 2 claims, $73,484.38; Reid Hospital, 7 claims, $64,184.97; Defendant IU North, 3 claims, $63,759.21; Defendant St. Vincent Heart, 1 claim, $54,256.02; Defendant Methodist Hospital, 1 claim, $50,954.53; and Defendant Community Howard, 4 claims, $47,034.99.  Some examples of such duplicate FFS claims are:

a.    Same Billing Provider, Same Claim Type.  On August 4, 2015, Eskenazi Health billed Medicaid for $1,250.00 for patient A.B.  The admit date was listed as September 10, 2016 and the discharge date was listed as September 15, 2016.  The primary diagnosis was "disturbance of skin sensation."  The claim type was "I."  On August 20, 2015, Eskenazi Health billed Medicaid for $1,250.00 for patient A.B.  The admit date was listed as September 10, 2016 and the discharge date was listed as September 15, 2016.  The primary diagnosis was

"disturbance of skin sensation."  The claim type was "I."  The only difference in the two claims was that each was submitted on a different date.

   b. <u>Same Billing Provider, Different Claim Type.</u>  On February 1, 2016, Community Hospital billed Medicaid for $185.00 for patient C.D.  The admit date was listed as August 20, 2015 and the discharge date was listed as August 28, 2015.  The primary diagnosis was "other postop infection."  The claim type was "A."  Also, on February 1, 2016, Community Health billed Medicaid for $3,700.00 for patient C.D.  The admit date was listed as August 21, 2015 and the discharge date was listed as August 28, 2015.  The primary diagnosis was also "other postop infection."  The claim type was "I."

   c. <u>Different Billing Provider, Same Claim Type.</u>  On February 10, 2017, Larue D. Carter Memorial Hospital billed Medicaid for $10,000.00 for patient E.F.  The admit date was listed as January 1, 2017 and the discharge date was listed as January 31, 2017.  The primary diagnosis was "episodic mood disorder nos."  The claim type was "I."  On April 18, 2017, Indiana University Health billed Medicaid for $50,000.00 for patient E.F.  The admit date was the same, January 1, 2017.  The discharge date was listed as January 28, 2017.  The diagnosis was "Influenza with Pneumonia."  The claim type was "I."

   d. <u>Different Billing Provider, Different Claim Type.</u>  On July 1, 2016, Madison State Hospital billed Medicaid for $3,500.00 for patient G.H.  The admit date was listed as June 19, 2016 and the discharge date was listed as June 30, 2016.  The primary diagnosis was "paranoid schizophrenia."  The claim type was "I."  On July 20, 2016, King's Daughters Health billed Medicaid for $1,300.00 for patient G.H.  The admit date was listed as June 19, 2016 and the discharge date was listed as June 31, 2016.  The primary diagnosis was "sepsis, unspecified organ."  The claim type was "A."

136.    IBM also identified 199 duplicate claims that were billed once as FFS and once as MC.  These duplicate claims were submitted by 44 unique Providers and totaled $4,104,818.74 (using the amount that FFS would have paid for all FFS claims and MC encounters) in duplicate claims billed by Providers and paid by Indiana Medicaid through Defendant DXC and the Managed Care Defendants.  This includes 162 claims totaling $3,525,766 that had exactly the same first and last dates of service as another inpatient claim.  The ten largest duplicate inpatient FFS/MC claims came from: Defendant Eskenazi, 4 claims, $897,708.43; Defendant IU Health dba Riley Hospital for Children at IU Health, 4 claims, $548,383.85; Defendant IU Health, 16 claims, $383,014.49; Defendant Parkview, 14 claims, $270,542.03; Community South, 5 claims, $194,947.70; Defendant Franciscan, 16 claims, $178,571.95; Community North, 4 claims, $149,622.33; Defendant Community Hospital Anderson, 6 claims, $149,449.57; Defendant Memorial Hospital SB, 4 claims, $113,737.31; Defendant SJRMC, 2 claims, $109,066.16; and Defendant Methodist Hospital, 8 claims, $104,789.78.

137.    Some examples of such duplicate FFS/MC claims are:

a.    Same Billing Provider, Same Dates.  On May 25, 2016, Franciscan Health Indianapolis billed Medicaid for $19,000.00 for patient I.J.  The admit date was listed as April 8, 2016 and the discharge date was listed as April 10, 2016.  The primary diagnosis was "septicemia nos."  The claim type was FFS.  On January 15, 2017, Franciscan Health Indianapolis billed Medicaid for $11,000.00 for patient I.J.  The admit date was also listed as April 8, 2016 and the discharge date was also listed as April 10, 2016.  The primary diagnosis was "septicemia nos."  The claim type was MC.

b.    Same Billing Provider, Different Dates.  On August 20, 2016, Riley Hospital for Children billed Medicaid for $25,000.00 for patient K.L.  The admit date was listed

as August 5, 2016 and the discharge date was listed as December 12, 2016. The primary diagnosis was "twin liveborn infant." The claim type was FFS. On February 2, 2017, Riley Hospital for Children billed Medicaid for $270,000.00 for patient K.L. The admit date was listed as August 5, 2016 and the discharge date was listed as December 20, 2016. The primary diagnosis was "twin liveborn infant." The claim type was MC.

138.    IBM also identified 46,188 duplicate inpatient claims that were billed twice as MC encounters and paid to the Providers by the Managed Care Defendants. These duplicate claims were submitted by 339 unique Providers and totaled at least $269,697,168.18 (using the MC payment amount to the Provider) billed by Providers and paid by the Managed Care Defendants on behalf of Indiana Medicaid. This amount would be $418,783,981.33 using the amount FFS would have paid for the MC encounters). This includes 45,515 inpatient MC encounter claims that had exactly the same first and last dates of service as another inpatient MC encounter claim.

139.    IBM determined that the duplicate MC inpatient claims received and paid were attributed to the MCEs as follows: Defendant Anthem: 17,110 MC encounter claims totaling $151,051,276.71. Defendant MDWISE: 12,868 MC encounter claims totaling $115,660,941.86. Defendant Coordinated Care: 16,116 MC encounter claims totaling $2,151,311.23. Defendant CareSource: 86 MC encounter claims totaling $833,638.38.

140.    The largest duplicate inpatient MC claims (using the MC payment amount to the Provider) came from: Defendant Eskenazi, 2,469 claims, $28,621,240.20; Defendant IU Health, 2,332 claims, $25,027,955.84; Defendant St. Vincent, 1,331, $10,442,401.04; Defendant Parkview, 2,138 claims, $10,948,056.03; Defendant Franciscan, 830 claims, $8,283,780.16; Defendant St. Mary's, 1,097 claims, $7,714,461.09; Defendant IU Ball Memorial, 1,143 claims,

$5,987,875.35; Defendant IU Health Bloomington, 927 claims, $5,386,057.45; Defendant Community North, 1,227, $5,389,266.07; Defendant Lutheran, 614, $4,953,417.19; Defendant SJRMC, 879 claims, $4,946,042.08; Defendant Methodist Hospital, 907 claims, $4,105,091.01; Defendant Deaconess, 905 claims, $4,076,590.14; Defendant Terre Haute Hospital, 706 claims, $4,604,352.50; Defendant Reid Hospital, 619, $4,284,896.77; Defendant Community North, 586, $4,377,777.48; Defendant Memorial SB, 645 claims, $3,081,218.06; Defendant IU Health, 409 claims, $1,647,015.41; Defendant Franciscan, 694 claims, $3,032,605.99; Defendant St. Catherine, 756 claims, $3,450,702.50; Defendant Floyd Memorial, 528 claims, $3,399,741.97; Defendant Valle Vista, 1,199 claims, $1,591,354.67; Defendant Union Hospital, 550 claims, $3,405,727.73; Defendant St. Vincent Anderson, 742 claims, $2,573,524.08; Defendant Munster Community, 565 claims, $3,737,717.19; Defendant Elkhart Hospital, 512 claims, $1,699,414.22; Defendant St. Joseph Health, 469 claims, $3,097,388.49; Defendant Port Hospital, 433 claims, $2,669,962.04; Defendant St. Mary's, 403 claims, $3,203,841.11; Defendant Community Hospital Anderson, 366 claims, $2,733,669.78; Defendant Clark Memorial, 519 claims, $2,258,441.34; Defendant Kindred Hospital, 112 claims, $2,234,035.71; Defendant Community South, 363 claims, $2,375,305.22; Defendant Franciscan, 333 claims, $2,549,129.39; Defendant Rehabilitation Hospital, 133 claims, $1,413,998.16; Defendant IU Health – Arnett, 306 claims, $1,900,411.13; Defendant Bartholomew Hospital, 447 claims, $1,179,605.88; Defendant Norton Hospital, 231 claims, $791,941.41; Defendant Methodist Hospital, 317 claims, $1,032,267.27; Defendant Select Specialty, 85 claims, $867,560.96; Defendant IU Hospital West, 287 claims, $1,543,599.48; Defendant Community North, 290 claims, $1,290,746.85; Defendant St. Joseph Hospital, 404 claims, $2,088,387.22; Defendant St. Vincent Heart, 121 claims, $1,571,851.54, Defendant University of Louisville Hospital, 168 claims, $1,287,151.08; Defendant St. Vincent

34

Carmel, 186 claims, $1,349,627.47; Defendant Parkview Orthopaedic, 73 claims, $1,914,445.34; Defendant Hamilton Center, 396 claims, $1,738,273.20; Defendant Wellstone, 542 claims, $422,313.51; Defendant St. Vincent, 183 claims, $1,469,198.06; Defendant Regency, 70 claims, $1,024,675.07; Defendant Franciscan (Dyer), 217 claims, $1,583,797.64; Defendant Franciscan (Crown Point), 253 claims, $1,465,970.78; Defendant Eskenazi (Midtown), 58 claims, $1,136,689.94; Defendant St. Vincent (Stress Center), 382 claims, $987,700.21; St. Vincent Seton, 48 claims, $795,753.48; Defendant Marion Hospital, 245 claims, $1,064,129.80; Defendant Good Samaritan, 241 claims, $873,990.68; Defendant IU Health (Riley Hospital for Children), 53 claims, $773,353.14; Defendant Brentwood, 327 claims, $1,236,288.68; Defendant Sycamore Springs, 271 claims, $1,154,554.80, Defendant North Central, 347 claims, $576,358.55; 71 claims, $646,923.74; Defendant Hendricks County Hospital, 201 claims, $524,147.25; Defendant Community Howard, 209 claims, $923,492.12 and Defendant IU North, 143 claims, $987,010.60.  (a detailed list of all Providers submitting duplicate claims detected by this algorithm is attached as Exhibit 10)

141.    Some examples of such duplicate MC claims are:

a.    <u>Same Billing Provider, Same Dates.</u>  On August 26, 2017, St. Catherine Hospital billed Defendant Anthem for $6,500.00 under HIP for patient M.N.  The admit date was listed as August 26, 2017 and the discharge date was September 3, 2017.  The diagnosis was "other specified anxiety."   On February 13, 2018, St. Catherine Hospital billed Defendant Anthem for another $6,500.00 under HIP for patient M.N.  The admit date was August 26, 2017 and the discharge date was September 3, 2017.  The primary diagnosis was also "other specified anxiety."

b.    <u>Different Billing Provider, Same Dates.</u>    On August 5, 2017, Indiana University Health (Provider ID: 100380380A) billed Defendant Coordinated Care for $9,500.00 under HIP for patient O.P.  The admit date was listed as July 13, 2017 and the discharge date was listed as July 17, 2017.  The diagnosis was "other pulmonary embolism."  On January 13, 2018, Indiana University Health (Provider ID: 200119790A) billed Defendant Coordinated Care for $9,500.00 under HIP for patient O.P.  The admit date was listed as July 13, 2017 and the discharge date was listed as July 17, 2017.  The diagnosis was also listed as "other pulmonary embolism."  This claim is also notable because Provider ID 100380380A is enrolled as a transportation provider, not an inpatient hospital facility.

c.    <u>Same Billing Provider, Different Dates.</u>    On March 9, 2013, Porter Regional Hospital billed Defendant MDWISE $2,000.00 for Member Q.R.  The admit date was listed as January 17, 2013 and the discharge dates was listed as January 19, 2013.  The diagnosis was "previous C-section delivered."  On April 25, 2013, Porter Regional Hospital billed Defendant MDWISE another $2,000.00 for Member Q.R.  The admit date was listed as January 17, 2013 and the discharge date was listed as January 22, 2013.  The diagnosis was "previous C-section delivered."

142.    IBM transmitted its Duplicate Inpatient Claims report to OMPP staff on or before February 5, 2019.  OMPP took no action to recover the duplicate payments identified in IBM's report.  These amounts remain unrecovered.  Upon information and belief, claims of this type continue to be fraudulently submitted to Indiana Medicaid and paid without proper oversight or recoupment.

**B.    Services After Death**

143.   On November 17, 2020, IBM's FADS team completed a fraud detection algorithm using claims data to identify payments on claims to Indiana Medicaid for services rendered after the date of death of the Member.  The purpose of this algorithm was to identify such payments for services that occurred at least one day after the Member's death, as well as to identify MC monthly capitation payments made to MCEs after a Member's death (a detailed write-up of the algorithm's results is attached as Exhibit 11).

144.   IBM identified claims for services rendered after the date of death of the Member between March 1, 2017 and February 29, 2020.  Deceased Members were identified and dates of death were determined by using the birth and death dates on file with Indiana Medicaid and/or the Social Security Administration's Death Master File ("DMF").   The FADS team had conducted a version of this fraud detection algorithm on at least five previous occasions.

145.   IBM determined that Defendant DXC paid 2,282 FFS claims on behalf of Indiana Medicaid for services rendered (pharmacy and non-pharmacy) after the Member's date of death. These were submitted by 202 unique Providers and totaled $225,484.32.  The dates of service ranged from 1 day after the Member's date of death to a maximum of 31,774 days after the Member's date of death.

146.   The top two Providers submitting non-pharmacy FFS claims of this type were: Defendant Above & Beyond, 206 claims, $34,873.87; Defendant CSL, 11 claims, $22,806.40. The top two Providers submitting pharmacy claims of this type were: Defendant Accredo, 4 claims, $26,940.37 and Defendant Walgreen, 1 claim, $24,307.48.

147.   IBM determined that MCEs paid 605 MC claims totaling $74,097.66.  IBM determined that these services after death MC claims received and paid were attributed to the MCEs as follows:   Defendant Anthem: 445 MC claims totaling $56,434.64.   Defendant

MDWISE:  120 MC claims totaling $13,403.56.  Defendant Coordinated Care:  35 MC claims totaling $3,340.79.  Defendant CareSource:  5 MC claims totaling $918.67.  The dates of service for these MC claims ranged from 1 day after the Member's date of death to a maximum of 13,267 days after the Member's date of death.

148.    The top Provider submitting pharmacy claims of this type was: Defendant IU White Memorial, 1 claim, $23,304.40.  (a detailed list of all Providers submitting false claims detected by this algorithm is attached as Exhibit 12).

149.    IBM also discovered that $2,994,402.43 in patient monthly capitation payments were made to the Managed Care Defendants by Indiana Medicaid on behalf of deceased Members, after the Members' dates of death.  These capitation payments were for 2,092 total unique recipients and ranged from 1 month to 66 months after the Member's death.  IBM determined that these capitation payments paid to the Managed Care Defendants after Member death were attributed to the Managed Care Defendants as follows:  Defendant Anthem: 707 MC claims totaling $1,485,663.06.  Defendant MDWISE:  432 MC claims totaling $744,742.42.  Defendant Coordinated Care:  278 MC claims totaling $633,070.40.  Defendant CareSource:  54 MC claims totaling $109,767.54.  It was also determined that Defendant DXC received $115.28 for 2 unique recipients.  A total of $21,043.72 in payments representing 648 unique recipients were paid to other non-parties under this category.  The timing of these capitation payments ranged from 1 day after the Member's date of death to a maximum of 13,267 days after the Member's date of death.  (a detailed list of all MCEs receiving capitation payments after Members' death detected by this algorithm is attached as Exhibit 13).

150.    IBM transmitted its Services After Death report to Indiana Medicaid staff on November 17, 2020.  OMPP took no action to recover the fraudulent payments identified in

IBM's report.  These amounts remain unrecovered.  Upon information and belief, claims of this type continued to be fraudulently submitted to Indiana Medicaid and paid without proper oversight or recoupment.

### C.    Services While Incarcerated

151.    On November 13, 2018, IBM's Fraud and Abuse Detection System (FADS) team completed a fraud detection algorithm using claims data to identify non-inpatient claims for patients who were incarcerated.  Pursuant to Indiana Code § 12-15-1-20.4 and Medicaid policies, Indiana Medicaid covers only inpatient services for Indiana Medicaid-eligible inmates admitted as inpatients to an acute care hospital, nursing facility, or intermediate care facility. Indiana Medicaid policy states that any service provided on an outpatient basis, before inpatient admission or after discharge, will not be reimbursed.  (a detailed write-up of the algorithm's results is attached as Exhibit 14).

152.    IBM analyzed FFS and MC professional, outpatient, pharmacy, and crossover claims with dates of service between March 1, 2012 and August 31, 2017. These claims were cross-referenced with the most recent Department of Corrections ("DOC") data from the Enterprise Data Warehouse ("EDW") to find claims with dates of service that fall between a recipient's incarceration beginning and ending dates.

153.    IBM identified 2,784 improper FFS claims for incarcerated offenders totaling $281,666, billed by 267 unique Providers and paid on behalf of Indiana Medicaid by Defendant DXC.  Of these claims, 1,301 were for outpatient procedures, 1,248 were submitted on a CMS/1500 form used by non-institutional providers or suppliers, 193 were pharmacy claims, and 23 were dental.  The bulk of these claims occurred in 2016 and 2017.  The top two Providers

submitting FFS claims for incarcerated offenders were: Defendant IU Health, 191 claims, $46,169.04 and Defendant Eskenazi, 200 claims, $29,217.29.

154.    IBM also identified 280 MC claims totaling $22,688.05 paid by Managed Care Defendants for prohibited services for patients who were incarcerated.  IBM determined that claims received and paid were attributed to the Managed Care Defendants as follows:  Defendant Anthem: 200 MC claims totaling $15,821.35.  Defendant MDWISE:  26 MC claims totaling $1,521.96.  Defendant Coordinated Care:   22 MC claims totaling $3,207.79.  Defendant CareSource:  32 MC encounter claims totaling $2,136.95.  The top Provider submitting MC claims for incarcerated offenders was: Defendant Eskenazi, 9 claims, $2,329.28.  (a detailed list of all Providers receiving improper payments for incarcerated patients detected by this algorithm is attached as Exhibit 15)

155.    IBM transmitted its Services While Incarcerated report to Indiana Medicaid staff on February 11, 2019.  OMPP took no action to recover the fraudulent payments identified in IBM's report.  These amounts remain unrecovered.  Upon information and belief, claims of this type continue to be fraudulently submitted to Indiana Medicaid and paid without proper oversight or recoupment.

### D.    Duplicate Drug Billing

156.    On May 14, 2020, IBM's FADS team completed a fraud detection algorithm using claims data to identify instances where a pharmacy Provider and a medical Provider both submitted claims to Indiana Medicaid for the same drug or other substance for the same patient on the same date of service (plus or minus one day) (*i.e.* duplicate drug claims).

157.    IBM analyzed FFS and MC claims with dates of service between September 1, 2016 and August 31, 2019.  IBM determined that Defendant DXC paid 628 duplicate FFS drug

claims on behalf of Indiana Medicaid, which were submitted by 264 unique Providers and totaled $255,134.63.  The top two Providers submitting FFS duplicate drug claims were: Defendant IU Health, 6 claims, $154,247.04 and Defendant Eskenazi, 9 claims, $49,210.79.  (a detailed write-up of the algorithm's results is attached as Exhibit 16).

158.    IBM determined that Managed Care Defendants paid 8,663 duplicate MC drug claims totaling $268,851.24.  IBM determined that these MC duplicate drug claims received and paid were attributed to the Managed Care Defendants as follows:  Defendant Anthem: 2,701 MC claims totaling $69,858.42.  Defendant MDWISE:  2,821 MC claims totaling $149,584.38. Defendant Coordinated Care:  2,534 MC claims totaling $34,272.39.  Defendant CareSource: 607 MC claims totaling $15,136.05.  The majority of MC duplicate drug claims were submitted by: Defendant Eskenazi, 70 claims, totaling $197,817.67.  (a detailed list of all Providers receiving improper payments for duplicate drug billing detected by this algorithm is attached as Exhibit 17).

159.    IBM previously utilized a version of this algorithm to detect duplicate drug billing on two occasions, in June 2017 and July 2015.  The 2017 version of the algorithm resulted in total identified overpayments by Indiana Medicaid of $151,163.  The 2015 algorithm resulted in total identified overpayments by Indiana Medicaid of $387,621.  One common trend IBM discovered through the previous use of this algorithm was a practice known as "brown bagging." "Brown Bagging" involves a Member bringing a prescribed drug he or she has obtained from a pharmacy through Indiana Medicaid to a physician's office or hospital.  The physician or hospital administers the drug (sometimes in combination with other drugs supplied by the physician or hospital), but then submits a claim to Indiana Medicaid for the drug supplied by the patient.  This results in Indiana Medicaid paying twice for the same drug.

41

160.    IBM transmitted its Duplicate Drug Billing report to Indiana Medicaid staff on May 14, 2020.  OMPP took no action to recover the fraudulent payments identified in IBM's report.  These amounts remain unrecovered.  Upon information and belief, claims of this type continue to be fraudulently submitted to Indiana Medicaid and paid without proper oversight or recoupment.

**E.    Hospital Transfer Overbilling**

161.    On May 29, 2018, IBM's FADS team completed a fraud detection algorithm using claims data to identify FFS and MC inpatient claims with a patient status discharge code other than "transfer," but with criteria that indicated a same-day transfer to another hospital, resulting in a full payment to both facilities rather than a prorated daily rate.  To accomplish this task, IBM identified patient claim pairs for the same recipient, same discharge date (for the first claim) and admission date (for the second claim), and where the billing provider was different between the two claims, and without a "transfer" patient status discharge code (for the first claim).  (a detailed write-up of the algorithm's results is attached as Exhibit 18).

162.    IBM analyzed FFS and MC claims with dates of service between September 1, 2011 and February 28, 2017.  IBM determined that Defendant DXC paid 172 FFS claims on behalf of Indiana Medicaid that included hospital transfer overbilling, which were submitted by 65 unique Providers and totaled $2,537,498.93.  The estimated overpayment subject to recovery by Indiana Medicaid is $1,220,353.84.

163.    IBM determined that the Managed Care Defendants paid 8,663 MC claims that included hospital transfer overbilling totaling $855,370.70.  IBM determined that these MC hospital overbilling claims received and paid were attributed to the Managed Care Defendants as follows:  Defendant Anthem: 38 MC claims totaling $281,202.42.  Defendant MDWISE:  69 MC

claims totaling $386,362.81. Defendant Coordinated Care: 31 MC claims totaling $187,805.47. The total estimated overpayment subject to recovery by Indiana Medicaid is $437,472.45. The top five Providers submitting MC hospital transfer overbilling claims were (based on estimated overbilling): Defendant IU Health, 17 claims, $184,659.85; Defendant IU Health (dbd Riley Hospital for Children) 8 claims, $143,858.81; Defendant St. Vincent, 13 claims, $94,106.62; Defendant Eskenazi, 9 claims, $71,393.07; Defendant IU Ball Memorial, 6 claims, $70,085.87; and Defendant SJRMC, 2 claims, $51,496.97. (a detailed list of all Providers receiving improper payments for hospital transfer overbilling detected by this algorithm is attached as Exhibit 19)

164.    IBM previously utilized a version of this algorithm to detect hospital transfer overbilling on two occasions, in 2014 and 2012. The 2014 version of the algorithm resulted in total identified overpayments by Indiana Medicaid of $1,563,955. The 2012 algorithm resulted in total identified overpayments by Indiana Medicaid of $601,596.

165.    IBM transmitted its Hospital Transfer Overbilling report to Indiana Medicaid staff on February 11, 2019. OMPP took no action to recover the fraudulent payments identified in IBM's report. These amounts remain unrecovered. Upon information and belief, claims of this type continued to be fraudulently submitted to Indiana Medicaid and paid without proper oversight or recoupment.

F.    **Inpatient Only Procedures**

166.    On September 4, 2018, IBM's FADS team completed a fraud detection algorithm using claims data to identify FFS and MC outpatient claims with an inpatient-only procedure code. Inpatient-only procedures are those which Medicare has determined that a patient requires at least 24 hours of postoperative care due to the nature of the procedure or the underlying condition of the patient. Indiana Medicaid follows Medicare guidance regarding codes that are

reimbursed only in the inpatient setting, commonly referred to as "inpatient-only" codes.  (a detailed write-up of the algorithm's results is attached as Exhibit 20)

167.    According to the Medicare Claims Processing Manual, Chapter 4 Section 180.7 "Inpatient-only Services" (Rev. 3941, 12-22-17): "**There is no payment under the OPPS for services that CMS designates to be "inpatient-only" services** [emphasis added]. Excluding the handful of exceptions discussed below, CMS does not pay for an "inpatient-only" service furnished to a person who is registered in the hospital as an outpatient and reports the service on the outpatient hospital bill type (TOB 13X). **CMS also does not pay for all other services on the same day as the "inpatient only" procedure** [emphasis added]."

168.    To detect these fraudulent payments, IBM analyzed paid FFS and MC outpatient facility (UB-04) and crossover claims with service dates between January 1, 2012 and June 30, 2017. Medicare's Inpatient-Only (IPO) list of procedure codes was imported and cross-referenced with the outpatient facility claims. IBM excluded First Steps, Medical Review Team, and Pre-Admission Screening and Resident Review claims as well as previously-audited claims/claim lines. The remaining claim lines are inpatient-only procedures billed on an outpatient facility claim.

169.    IBM determined that Defendant DXC paid 712 FFS claims on behalf of Indiana Medicaid that included fraudulent outpatient claims for inpatient-only procedures, which were submitted by 110 unique Providers and totaled $1,760,826.22.   The top eight Providers submitting this type of fraudulent claim were: Defendant IU Health, 68 claims, $197,878.51; Defendant St. Vincent, 57 claims, $144,501.51; Defendant IU Health (dba Riley Hospital for Children), 40 claims, $112,790.51; Defendant Parkview Orthopedic, 25 claims, $99,107.72;

Defendant Lutheran, 31 claims, $79,711.49; Defendant Parkview, 25 claims, $73,378.51; Defendant Eskenazi, 32 claims, $66,833.80; and Defendant SJRMC, 22 claims, $57,936.52.

170.    IBM determined that Managed Care Defendants paid 2,183 MC claims that included fraudulent outpatient claims for inpatient-only procedures totaling $2,205,792.10.  IBM determined that these MC hospital overbilling claims received and paid were attributed to the Managed Care Defendants as follows:   Defendant Anthem: 1,011 MC claims totaling $918,464.75.   Defendant MDWISE:   750 MC claims totaling $600,451.77.   Defendant Coordinated Care:  422 MC claims totaling $686,875.58.

171.    The top 5 Providers submitting this type of fraudulent MC claim were: Defendant Lutheran, 133 claims, $257,446.76; Defendant IU Health (dba Riley Hospital for Children), 229 claims, $194,155.85; Defendant IU Health, 131 claims, $163,194.30; Defendant St. Vincent, 89 claims, $85,583.80; Defendant Parkview, 88 claims, $78,130.04.  (a detailed list of all Providers receiving improper payments for impatient only procedures detected by this algorithm is attached as Exhibit 21)

172.    IBM transmitted its Inpatient Only Procedures report to Indiana Medicaid staff on February 11, 2019.  OMPP took no action to recover the fraudulent payments identified in IBM's report.  These amounts remain unrecovered.  Upon information and belief, claims of this type continued to be fraudulently submitted to Indiana Medicaid and paid without proper oversight or recoupment.

**G.    Respiratory Assist Device Supply Overbilling**

173.    On February 20, 2018, IBM's FADS team completed a fraud detection

algorithm using claims data to identify FFS and MC claims for respiratory assist device (RAD) supplies that overlapped the rental of a CPAP or BiPAP device between July 1, 2011 and December 31, 2016.  (a detailed write-up of the algorithm's results is attached as Exhibit 22)

174.    The IHCP reimburses providers for three types of respiratory assist devices (RADs): 1) Continuous positive airway pressure (CPAP) devices, 2) Bi-level positive airway pressure (BiPAP) devices with a backup rate feature, 3) and BiPAP devices without a backup rate feature.  When a Member is renting a CPAP/BiPAP device, supplies and accessories are included in the reimbursement rate for the RAD. Providers are responsible for servicing and supplying the RAD, and therefore should not bill supplies and accessories within a month of renting a CPAP/BiPAP. This algorithm identified RAD supplies billed within a month of a CPAP/ BiPAP rental by the same billing provider for a recipient.

175.    The Indiana Medicaid Provider Manual, Chapter 8 *Billing Instructions*, Version 10.0 (policies and procedures as of August 26, 2010), addresses capped rental DME items such as RADs as follows: "As indicated above, [Indiana Medicaid] makes rental payments through the 15th month. At the end of the 15-month rental period, [Indiana Medicaid] considers the DME/HME equipment purchased, and in accordance with 405 IAC 5-19-8, the equipment becomes the property of the OMPP. **During the capped rental period, the equipment supplier must supply and service the item for as long as the member continues to need it at no additional charge to the IHCP** [emphasis added]. However, subject to prior approval parameters, for repairs not covered by warranty, Indiana Medicaid does not reimburse more frequently than six months after the 15th month and every six months thereafter, for as long as the equipment is medically necessary."

176.    IBM determined that Defendant DXC paid 18,438 FFS claims lines on behalf of Indiana Medicaid that included fraudulent outpatient claims for improperly billed RAD supplies, which were submitted by 146 unique Providers and totaled $1,015,180.00.

177.    IBM also determined that Managed Care Defendants paid 33,753 MC claim lines that included fraudulent outpatient claims for improperly billed RAD supplies totaling $26,086. IBM determined that these MC improper RAD claims received and paid were attributed to the Managed Care Defendants as follows:  Defendant Anthem: 19,552 MC claim lines totaling $11,135.00.  Defendant MDWISE:  8,252 MC claim lines totaling $11,396.00.  Defendant Coordinated Care:  5,241 MC claim lines totaling $3,076.00.  708 claims were paid by a non-party.  (a detailed list of all Providers receiving improper payments for respiratory assist device supply overbilling detected by this algorithm is attached as Exhibit 23)

178.    IBM transmitted its RAD supplies overbilling report to Indiana Medicaid staff on February 20, 2018.  OMPP took no action to recover the fraudulent payments identified in IBM's report.  These amounts remain unrecovered.  Upon information and belief, claims of this type continued to be fraudulently submitted to Indiana Medicaid and paid without proper oversight or recoupment.

## VI.    CAUSES OF ACTION AGAINST MANAGED CARE DEFENDANTS

### COUNT I

### Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B)

179.    Plaintiffs hereby incorporate by reference the previous paragraphs of their complaint as if the same were set forth at length herein.

180.    This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

181.    Through the acts described above, Managed Care Defendants have knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

182.    Through the acts described above, Managed Care Defendants have knowingly made, used, or caused to be made or used, false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

183.    As a result of the Managed Care Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

184.    As a consequence of the foregoing, Managed Care Defendants are liable for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of Managed Care Defendants under 31 U.S.C. § 3729(a). Managed Care Defendants are further liable for reasonable expert and attorney fees and costs under 31 U.S.C. § 3730.

## COUNT II

### Federal False Claims Act
### 31 U.S.C. § 3729(A)(1)(G)

185.    Plaintiffs hereby incorporate by reference the previous paragraphs of their complaint as if the same were set forth at length herein.

186.    This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

187.    Through the acts described above, Managed Care Defendants have knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the federal government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

188.    As a result of the Managed Care Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

189.    As a consequence of the foregoing, Managed Care Defendants are liable for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of Managed Care Defendants under 31 U.S.C. § 3729(a). Managed Care Defendants are further liable for reasonable expert and attorney fees and costs under 31 U.S.C. § 3730.

### COUNT III

**Indiana Medicaid False Claims and Whistleblower Protection Act**
**Indiana Code §§ 5-11-5.7-2(b)(1) and (b)(2)**

190.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

191.    This is a claim for treble damages and penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act, Indiana Code §§ 5-11-5.7, *et seq.*

192.    Through the acts described above, Managed Care Defendants have knowingly presented or caused to be presented false or fraudulent claims to officers, employees or agents of the State of Indiana, within the meaning of Indiana Code § 5-11-5.7-2(b)(1).

193.    Through the acts described above, Managed Care Defendants have knowingly made, used, or caused to be made or used, false or fraudulent records and statements to get false and fraudulent claims paid or approved, within the meaning of Indiana Code 5-11-5.7-2(b)(2).

194.    As a result of Managed Care Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

195.    Pursuant to Indiana Code § 5-11-5.7-2(a), Managed Care Defendants are liable to the state for a civil penalty of at least five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000), as adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note, Public Law 101-410), and for up to three (3) times the amount of damages sustained by the state. In addition, Managed Care Defendants are liable to the state for the costs of a civil action brought to recover a penalty or damages.

## COUNT IV

### Indiana Medicaid False Claims and Whistleblower Protection Act
### Indiana Code § 5-11-5.7-2(b)(6)

196.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

197.    This is a claim for treble damages and penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act, Indiana Code §§ 5-11-5.7, *et seq.*

198.    Through the acts described above, Managed Care Defendants have knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or

decreased an obligation to pay or transmit money or property to the State of Indiana, within the meaning of Indiana Code § 5-11-5.7-2(b)(6).

199.    As a result of Managed Care Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

200.    Pursuant to Indiana Code § 5-11-5.7-2(a), Managed Care Defendants are liable to the state for a civil penalty of at least five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000), as adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note, Public Law 101-410), and for up to three (3) times the amount of damages sustained by the state. In addition, Managed Care Defendants are liable to the state for the costs of a civil action brought to recover a penalty or damages.

## VII.    CAUSES OF ACTION AGAINST DEFENDANT DXC

### COUNT I

**Federal False Claims Act**
**31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B)**

201.    Plaintiffs hereby incorporate by reference the previous paragraphs of their complaint as if the same were set forth at length herein.

202.    This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

203.    Through the acts described above, Defendant DXC has knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

204.    Through the acts described above, Defendant DXC has knowingly made, used, or caused to be made or used, false or fraudulent records and statements, and omitted material facts,

to get false and fraudulent claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

205.    As a result of the Defendant DXC's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

206.    As a consequence of the foregoing, Defendant DXC is liable for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the acts of Defendant DXC under 31 U.S.C. § 3729(a).  Defendant DXC is further liable for reasonable expert and attorney fees and costs under 31 U.S.C. § 3730.

## COUNT II

### Federal False Claims Act
### 31 U.S.C. § 3729(A)(1)(G)

207.    Plaintiffs hereby incorporate by reference the previous paragraphs of their complaint as if the same were set forth at length herein.

208.    This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

209.    Through the acts described above, Defendant DXC has knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the federal government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

210.    As a result of the Defendant DXC's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

211.    As a consequence of the foregoing, Defendant DXC is liable for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the acts of Defendant DXC under 31 U.S.C. § 3729(a).  Defendant DXC is further liable for reasonable expert and attorney fees and costs under 31 U.S.C. § 3730.

## COUNT III

### Indiana Medicaid False Claims and Whistleblower Protection Act
### Indiana Code §§ 5-11-5.7-2(b)(1) and (b)(2)

212.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

213.    This is a claim for treble damages and penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act, Indiana Code §§ 5-11-5.7, *et seq.*

214.    Through the acts described above, Defendant DXC knowingly presented or caused to be presented false or fraudulent claims to officers, employees or agents of the State of Indiana, within the meaning of Indiana Code § 5-11-5.7-2(b)(1).

215.    Through the acts described above, Defendant DXC has knowingly made, used, or caused to be made or used, false or fraudulent records and statements to get false and fraudulent claims paid or approved, within the meaning of Indiana Code 5-11-5.7-2(b)(2).

216. As a result of Defendant DXC's acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

217.    Pursuant to Indiana Code § 5-11-5.7-2(a), Defendant DXC is liable to the state for a civil penalty of at least five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000), as adjusted by the federal Civil Penalties Inflation Adjustment Act of

1990 (28 U.S.C. 2461 note, Public Law 101-410), and for up to three (3) times the amount of damages sustained by the state. In addition, Defendant DXC is liable to the state for the costs of a civil action brought to recover a penalty or damages.

### COUNT IV

**Indiana Medicaid False Claims and Whistleblower Protection Act**
**Indiana Code § 5-11-5.7-2(b)(6)**

218.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

219.    This is a claim for treble damages and penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act, Indiana Code §§ 5-11-5.7, *et seq.*

220.    Through the acts described above, Defendant DXC has knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the State of Indiana, within the meaning of Indiana Code § 5-11-5.7-2(b)(6).

221.    As a result of Defendant DXC's acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

222.    Pursuant to Indiana Code § 5-11-5.7-2(a), Defendant DXC is liable to the state for a civil penalty of at least five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000), as adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note, Public Law 101-410), and for up to three (3) times the amount of damages sustained by the state. In addition, Defendant DXC is liable to the state for the costs of a civil action brought to recover a penalty or damages.

## VIII.   CAUSES OF ACTION AGAINST PROVIDER DEFENDANTS

## COUNT I

### Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B)

223.    Plaintiffs hereby incorporate by reference the previous paragraphs of their complaint as if the same were set forth at length herein.

224.    This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

225.    Through the acts described above, Provider Defendants have knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

226.    Through the acts described above, Provider Defendants have knowingly made, used, or caused to be made or used, false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

227.    As a result of the Provider Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

228.    As a consequence of the foregoing, Provider Defendants are each liable for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of Provider Defendants under 31 U.S.C. § 3729(a). Provider Defendants are each further liable for reasonable expert and attorney fees and costs under 31 U.S.C. § 3730.

## COUNT II

## Federal False Claims Act
## 31 U.S.C. § 3729(A)(1)(G)

229.    Plaintiffs hereby incorporate by reference the previous paragraphs of their complaint as if the same were set forth at length herein.

230.    This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

231.    Through the acts described above, Provider Defendants have knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the federal government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

232.    As a result of the Provider Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

233.    As a consequence of the foregoing, Provider Defendants are each liable for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of Provider Defendants under 31 U.S.C. § 3729(a). Provider Defendants are each further liable for reasonable expert and attorney fees and costs under 31 U.S.C. § 3730.

## COUNT III

## Indiana Medicaid False Claims and Whistleblower Protection Act
## Indiana Code §§ 5-11-5.7-2(b)(1) and (b)(2)

234.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

235.    This is a claim for treble damages and penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act, Indiana Code §§ 5-11-5.7, *et seq.*

236.    Through the acts described above, Provider Defendants have knowingly presented or caused to be presented false or fraudulent claims to officers, employees or agents of the State of Indiana, within the meaning of Indiana Code § 5-11-5.7-2(b)(1).

237.    Through the acts described above, Provider Defendants have knowingly made, used, or caused to be made or used, false or fraudulent records and statements to get false and fraudulent claims paid or approved, within the meaning of Indiana Code 5-11-5.7-2(b)(2).

238.    As a result of Provider Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

239.    Pursuant to Indiana Code § 5-11-5.7-2(a), Provider Defendants are each liable to the state for a civil penalty of at least five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000), as adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note, Public Law 101-410), and for up to three (3) times the amount of damages sustained by the state. In addition, Provider Defendants are each liable to the state for the costs of a civil action brought to recover a penalty or damages.

## COUNT IV

### Indiana Medicaid False Claims and Whistleblower Protection Act
### Indiana Code §§ 5-11-5.7-2(b)(6)

240.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

241.    This is a claim for treble damages and penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act, Indiana Code §§ 5-11-5.7, *et seq.*

242.    Through the acts described above, Provider Defendants have knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the State of Indiana, within the meaning of Indiana Code § 5-11-5.7-2(b)(6).

243.    As a result of Provider Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

244.    Pursuant to Indiana Code § 5-11-5.7-2(a), Provider Defendants are each liable to the state for a civil penalty of at least five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000), as adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note, Public Law 101-410), and for up to three (3) times the amount of damages sustained by the state. In addition, Provider Defendants are each liable to the state for the costs of a civil action brought to recover a penalty or damages.

## IX.   CAUSES OF ACTION AGAINST INDIVIDUAL DEFENDANTS

### COUNT I

**Federal False Claims Act**
**31 U.S.C. § 3729(A)(1)(G)**

245.    Plaintiffs hereby incorporate by reference the previous paragraphs of their complaint as if the same were set forth at length herein.

246.    This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

247.    Through the acts described above, Individual Defendants have knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or

decreased an obligation to pay or transmit money or property to the federal government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

248.    As a result of the Individual Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

249.    As a consequence of the foregoing, Individual Defendants are each liable for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the acts of Individual Defendants under 31 U.S.C. § 3729(a). Individual Defendants are each further liable for reasonable expert and attorney fees and costs under 31 U.S.C. § 3730.

## COUNT IV

### Indiana Medicaid False Claims and Whistleblower Protection Act
### Indiana Code § 5-11-5.7-2(b)(6)

250.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

251.    This is a claim for treble damages and penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act, Indiana Code §§ 5-11-5.7, *et seq.*

252.    Through the acts described above, Individual Defendants have knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the State of Indiana, within the meaning of Indiana Code § 5-11-5.7-2(b)(6).

253.    As a result of Individual Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

254.    Pursuant to Indiana Code § 5-11-5.7-2(a), Individual Defendants are each liable to the state for a civil penalty of at least five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000), as adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note, Public Law 101-410), and for up to three (3) times the amount of damages sustained by the state. In addition, Individual Defendants are each liable to the state for the costs of a civil action brought to recover a penalty or damages.

## <u>REQUESTED RELIEF</u>

WHEREFORE, Plaintiffs, by counsel, respectfully request that this Court find for them and order the Defendants to:

1.    Be enjoined from any further violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* and the Indiana Medicaid False Claims and Whistleblower Protection Act, § IC 5-11-5.7 *et seq*.

2.    Reimburse the United States Government and the State of Indiana for each and every false claim it has submitted for reimbursement;

3.    Pay penalties for violation of the False Claims Act and the Indiana Medicaid False Claims and Whistleblower Protection Act of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus three times the amount of damages which the Government sustains because of the act of Defendant under 31 U.S.C. § 3729(a).

4.    Pay to Plaintiffs an award under the False Claims Act, 31 U.S.C. § 3730(d) and Indiana Medicaid False Claims and Whistleblower Protection Act, § IC 5-11-5.7 *et seq*.;

5.    Pay pre- and post-judgment interest to Plaintiffs;

60

6.      Pay Plaintiffs' attorneys' fees and costs incurred in litigating this action;

7.      Pay to Plaintiffs any and all other legal and/or equitable damages that this Court

determines appropriate and just to grant.


Respectfully submitted,


/s/  Christopher S. Wolcott
/s/ Christopher S. Wolcott
Christopher S. Wolcott
The Wolcott Law Firm LLC
450 East 96th Street Suite 500
Indianapolis, IN 46240
Tel (317) 500-0700
Fax (317) 732-1196
Email: indy2buck@hotmail.com

*Counsel for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs, by counsel, respectfully request a jury trial as to all issues in this matter

deemed so triable.

Respectfully submitted,


/S/  Christopher S. Wolcott
/s/ Christopher S. Wolcott
Christopher S. Wolcott
The Wolcott Law Firm LLC
450 East 96th Street Suite 500
Indianapolis, IN 46240
Tel (317) 500-0700
Fax (317) 732-1196
Email: indy2buck@hotmail.com

*Counsel for Plaintiffs*