## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES of AMERICA and | ) |
| THE STATE of INDIANA, <u>ex rel.</u> | ) CAUSE NO:  1:21-CV-00325  JMS-TAB |
| JOHN D. MCCULLOUGH and | ) |
| JAMES R. HOLDEN, | ) |
| | ) |
| Plaintiffs, | ) FILED UNDER SEAL PURSUANT |
| | ) TO 31 U.S.C. § 3730(b)(2) |
| v. | ) |
| | ) |
| ANTHEM INSURANCE COMPANIES, INC., | ) |
| MDWISE, INC., | ) |
| CARESOURCE INDIANA, INC., | ) |
| COORDINATED CARE CORPORATION, | ) |
| INDIANA UNIVERSITY HEALTH, INC., | ) |
| ASCENSION HEALTH, INC., | ) |
| COMMUNITY HEALTH NETWORK, INC., | ) |
| HEALTH AND HOSPITAL CORPORATION | ) |
|   OF MARION COUNTY, | ) |
| LUTHERAN HEALTH NETWORK, INC., and | ) |
| PARKVIEW HEALTH SYSTEM, INC. | ) |
| | ) |
| | ) |
| Defendants. | ) |

## SECOND AMENDED *QUI TAM* COMPLAINT

## <u>TABLE OF CONTENTS</u>

I.     Introduction …................................................................................................ 1

II.    Jurisdiction and Venue................................................................................... 5

III.   The Parties …................................................................................................. 6

IV.    The Federal and the Indiana False Claims Acts............................................ 11

V.     The Medicaid Program and the Medicaid Compliance Obligations of
       the MCE Defendants and the Hospital Defendants ....................................... 14

       A.     Medicaid ............................................................................................ 14

       B.     The MCE Defendants' Medicaid Compliance Obligations ................ 19

       C.     The Hospital Defendants' Medicaid Compliance Obligations ........... 20

VI.    The MCE Defendants Routinely and Knowingly Misused Medicaid Funds to Pay
       Improper Claims in Violation of Medicaid Billing Requirements .................. 22

       A.     The MCE Defendants Routinely and Knowingly Misused Medicaid Funds to
              Pay Hospital Claims in Violation of Medicaid Hospital Billing Rules .............. 22

              1.    Medicaid Prohibited Paying Hospital Claims Not in Compliance with Billing
                    Rules for Readmissions, Hospital Transfers and 24-Hour Stays .................. 22

              2.    The MCE Defendants Knew the Importance of Complying with Medicaid
                    Hospital Billing Rules for Readmissions, Hospital Transfers, and
                    24-Hour Stays ........................................................................................... 25

              3.    Each MCE Defendant Routinely and Knowingly Misused Medicaid Funds to
                    Pay Separate In-Patient Claims Despite Immediate Readmissions ............... 26

              4.    Defendants MDwise, Coordinated Care, and Anthem Routinely and
                    Knowingly Misused Medicaid Funds to Pay Hospital Claims
                    Without the Transfer Code............................................................................ 27

              5.    The MCE Defendants Routinely and Knowingly Misused Medicaid Funds to
                    Pay In-Patient Claims Without 24-Hour Hospital Stays............................... 28

       B.     The MCE Defendants Routinely and Knowingly Misused Medicaid Funds to
              Pay Claims That Were Clearly Unallowable ....................................................... 30

              1.    Medicaid Clearly Prohibited Paying Claims for Services Supposedly Provided
                    After Patients' Deaths and Duplicate Claims for the Same Service ............. 30

              2.    The MCE Defendants Knew the Importance of Complying with Medicaid
                    Billing Rules Against Claims After Deaths and Duplicate Claims ............... 32

              3.    MCE Defendants Anthem and MDwise Routinely and Knowingly Misused
                    Medicaid Funds to Pay Claims After Beneficiaries' Deaths ......................... 33

    4.   Each MCE Defendant Knowingly Obtained and Retained Capitated Payments from Medicaid After Beneficiaries' Deaths .................................................... 34

    5.   Each MCE Defendant Routinely and Knowingly Misused Medicaid Funds to Pay Duplicate Claims for the Same Treatment ............................................... 35

C.    The MCE Defendants Routinely and Knowingly Misused Medicaid Funds to Pay Chiropractic, Dental, and Opioid Treatment Claims in Violation of Applicable Medicaid Billing Requirements ........................................................... 39

    1.   Medicaid Clearly Prohibited Paying Chiropractic, Dental, and Opioid Treatment Claims That Did Not Comply with Billing Requirements .......... 39

    2.   The MCE Defendants Knew the Importance of Complying with Medicaid Billing Requirements for A Chiropractic, Dental, and Opioid Treatment Claims ................................................................................. 42

    3.   Each MCE Defendants Routinely and Knowingly Misused Medicaid Funds to Pay Chiropractic Office Visit Claims in Violation of Medicaid Billing Requirements ............................................................................................ 43

    4.   Each MCE Defendant Routinely and Knowingly Misused Medicaid Funds to Pay Standalone Dental Claims in Violation of Billing Requirements ............ 44

    5.   Each MCE Defendant Routinely and Knowingly Misused Medicaid Funds to Pay Standalone Addiction Treatment Claims in Violation of Billing Requirements ............................................................................................ 46

VII.   The Hospital Defendants Improperly Obtained Medicaid Funds by Knowingly and Routinely Submitting Claims in Violation of Clear Medicaid Billing Requirements ...... 47

A.    The Hospital Defendants Routinely and Knowingly Submitted Claims to Medicaid That That Violated Medicaid Hospital Billing Rules ........................... 47

    1.   The Hospital Defendants Knew the Importance of Complying with Medicaid Hospital Billing Rules for Readmissions, Hospital Transfers, and 24-Hour Stays ........................................................................... 47

    2.   Each Hospital Defendant Routinely and Knowingly Submitted Separate In-Patient Claims to Medicaid Despite Immediate Readmissions ....................... 48

    3.   Each Hospital Defendant Routinely and Knowingly Submitted Claims in Contravention of Medicaid Billing Rules on Hospital Transfers .................... 51

    4.   Each Hospital Defendant Routinely and Knowingly Submitted In-Patient Claims to Medicaid Without 24-Hour Hospital Stays ..................................... 54

B.    The Hospital Defendants Routinely and Knowingly Submitted Claims to Medicaid That Were Clearly Unallowable ........................................................... 56

    1.   The Hospital Defendants Knew the Importance of Complying with Medicaid Hospital Billing Rules Against Claims for Services After Deaths and Duplicate Claims ...................................................................................... 56

2.  Defendants IU Health, Ascension, Community, and Parkview Knowingly Submitted Medicaid Claims for Services Supposedly Given After Patients' Death ................................................................................ 58

3.  Each Hospital Defendant Routinely and Knowingly Submitted Duplicate Claims to Medicaid ........................................................................... 59

C.  Hospital Defendants Eskenazi, Parkview, IU Health, Community, and Lutheran Routinely, Knowingly, and Improperly Billed Medicaid for Injection Services That Were Duplicative of Their Treatment Room Visit Claims .......................... 62

1.  Defendants Eskenazi, Parkview, IU Health, Community, and Lutheran Knew the Importance of Not Submitting Injection Claims to Medicaid That Were Duplicative of Treatment Room Visit Claims .............................. 62

2.  Defendants Eskenazi, Parkview, IU Health, Community, and Lutheran Routinely, Knowingly, and Improperly Billed Medicaid for Injection Services That Were Duplicative of Their Treatment Room Visit Claims ...... 63

VIII.  Claims for Relief ......................................................................................... 65

## Index to the False Claims Scenarios

| False Claims Scenarios | Defendants Involved | Allegations in the SAC |
|---|---|---|
| Improper separate hospital in-patient claims despite readmissions within 72 hours | All MCE Defendants<br><br>All Hospital Defendants | Section  VI.A.3<br><br>Section  VII.A.2 |
| Improper hospital transfer claims | MCE Defendants MDwise, Coordinated Care, and Anthem<br><br>All Hospital Defendants | Section  VI.A.4<br><br><br>Section  VII.A.3 |
| Improper in-patient claims without 24-hour hospital stays | All MCE Defendants<br><br>All Hospital Defendants | Section  VI.A.5<br><br>Section  VII.A.4 |
| Improper claims for services supposedly rendered after beneficiaries' deaths | MCE Defendants Anthem and MDwise<br><br>Hospital Defendants IU Health, Ascension, Community, and Parkview | Section  VI.B.3<br><br>Section  VII.B.2 |
| Improper retention of capitated payments after Medicaid beneficiaries' deaths | All MCE Defendants | Section  VI.B.4 |
| Duplicate claims for the same service | All MCE Defendants<br><br>All Hospital Defendants | Section  VI.B.5<br><br>Section  VII.B.3 |
| Improper chiropractic office visit claims | All MCE Defendants | Section  VI.C.3 |
| Improperly unbundled dental claims | All MCE Defendants | Section  VI.C.4 |
| Improperly unbundled opioid treatment claims | All MCE Defendants | Section  VI.C.5 |
| Improperly injection service claims duplicative of treatment room claims | Hospital Defendants Eskenazi, Parkview, IU Health, Community, and Lutheran | Section  VII.C.2 |

**Second Amended Complaint Exhibits List**

| Exhibit No. | Exhibit Description |
|:---:|:---|
| 1 | July 1, 2020 IBM Waston IN FADS 2020 Update |
| 2 | Feb. 25, 2019 IBM MCE Oversight Chronology |
| 3 | 2017 Anthem Indiana MCE Contract excerpts |
| 4 | 2017 MDWise Indiana MCE Contract excerpts |
| 5 | June 13, 2015 All Association Meeting Indiana Medicaid Program Integrity presentation |
| 6 | Hospital Transfer Write-up |
| 7 | July 15, 2016 Example Bi-Weekly Report |
| 8 | Feb. 2017 Monthly MCE Meeting Agenda for CareSource |
| 9 | Summary of Additional MC Fraud Algorithms |
| 10 | Inappropriately Billed Hospital Readmissions – Managed Care |
| 11 | Hospital Transfer Overbilling MC Claims Provider Detail |
| 12 | Inpatient Stays under 24 Hours Write-up |
| 13 | Services After Death Write-up |
| 14 | Capitation Payments After Death Write-up |
| 15 | Duplicate In-patient claims Write-up |
| 16 | Feb. 2017 Monthly MCE Meeting Agenda for MHS |
| 17 | Duplicate Managed Care In-patient claims details |
| 18 | Summary of Additional Managed Care Fraud Algorithms |
| 19 | Hard Duplicates Claims Provider Detail – Managed Care |
| 20 | Chiropractic Office Visit Overbilling – Managed Care |
| 21 | Unbundled Dental Claims – Managed Care |
| 22 | Unbundled Opioid Treatment – Managed Care |
| 23 | Inappropriately Billed Hospital Readmissions – Fee-for-Service |
| 24 | Services After Death MC Claims |
| 25 | Hard Duplicates Claims Provider Detail – Fee-for-Service |
| 26 | Unbundled Revenue Code 260 Write-up |
| 27 | Unbundled Revenue Code 260 Provider Details |
| 28 | Indiana Medicaid Provider Agreement |
| 29 | CMS-64 Form Certification Page |
| 30 | Summary of Additional Fee-for-Service Fraud Algorithms |

Relators John D. McCullough ("McCullough") and James R. Holden ("Holden", and, together with McCullough, "Relators"), acting on their own behalf and on behalf of the United States of America (the "Government") and the State of Indiana (the "State") pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), and the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.7 *et seq.* ("Indiana Medicaid FCA"), hereby allege as follows for their second amended complaint against defendants Anthem Insurance Companies, Inc. ("Anthem"); CareSource Indiana, Inc. ("CareSource"); Coordinated Care Corp. ("Coordinated Care"); MDwise, Inc. ("MDwise" and, collectively with Anthem, CareSource, and Coordinated Care, the "MCE Defendants");[1] and Indiana University Health, Inc. ("IU Health"); Ascension Health, Inc. ("Ascension"); Community Health Network, Inc. ("Community"); Health and Hospital Corporation of Marion County ("Eskenazi"); Lutheran Health Network, Inc. ("Lutheran"); and Parkview Health System, Inc. ("Parkview" and, collectively with IU Health, Ascension, Community, Eskenazi, and Lutheran, the "Hospital Defendants"):

## I.   INTRODUCTION

1.      This is a civil action on behalf of the Government and the State to recover treble damages and civil penalties for Medicaid fraud. Specifically, each of the MCE Defendants has knowingly and improperly misused tens, likely hundreds, of millions of dollars of Medicaid funds to pay claims that A) violated basic hospital billing rules such as those disallowing two separate in-patient claims when the patient is readmitted right away for the same condition, B) were clearly not payable because they were for services after patients' death or were duplicative of already-paid claims, and C) contravened Medicaid billing requirements for chiropractic, dental, and opioid treatments. Each of the Hospital Defendants, in turn, knowingly and improperly obtained tens of

---

[1]    The MCE Defendants each has operated one or more Medicaid managed care plans as part of Indiana's Medicaid program. *See* https://www.in.gov/medicaid/members/member-resources/managed-care-health-plans/.

1

millions of dollars from Medicaid by submitting thousands of false claims that either A) violated basic hospital billing rules or B) were clearly not payable. This misconduct by the MCE Defendants and Hospital Defendants, moreover, has contributed to the "nearly $1 billion budget shortfall" for Indiana Medicaid that emerged in December 2023, which has led to significant cuts to services for the elderly and disabled children in Indiana.[2]

2.      *First*, as operators of Medicaid managed care plans in Indiana, the MCE Defendants have long known that they have a legal duty both to understand common improper Medicaid billing practices and to ensure that Medicaid funds are not misused to pay improper claims. For example, in their contracts with Indiana Medicaid, each of the MCE Defendants expressly agreed to "comply with all federal and state requirements regarding fraud and abuse," to "have surveillance and utilization control programs and procedures [] to safeguard Medicaid funds against improper payments," and to "have adequate staffing and resources" for "preventing and detecting potential fraud and abuse activities." *See infra* ¶¶ 73–77.

3.      Pursuant to these contractual requirements as well federal and state Medicaid regulations, guidance, and past audits, the MCE Defendants were well aware of their obligation to detect, and to prevent payment of, improper claims like paying for two separate hospital stays when a Medicaid beneficiary was readmitted to the same hospital for the same medical condition immediately after being discharged, paying for in-patient treatment when a beneficiary was never admitted to a hospital for at least 24 hours, paying for treatment supposedly rendered *after* a beneficiary has died, and paying duplicate claims for the same treatment. For example, in regularly conducted trainings by Indiana Medicaid, each of the MCE Defendants was forewarned about these common scenarios giving rise to improper claims. *See infra* ¶¶ 97–101, 140–44, 190–94, .

---

[2]    *See*, *e.g.*, https://www.indystar.com/story/news/health/2024/01/23/amid-1-billion-medicaid-shortfall-indiana-cuts-aid-to-aged-and-disabled/72280956007/.

4.     Further, the MCE Defendants understood the importance of having in place procedures—including pre- and post-payment claim analysis algorithms—designed to detect and prevent payment of improper claims like paying for two separate hospital stays when the patient was immediately readmitted and paying duplicate claims for the same treatment. Indeed, in meetings with State officials like Relator McCullough in 2016 and 2017, each of the MCE Defendants affirmed its commitment to implement such "automated pre-payment [and post-payment] claims edits," *i.e.*, claim-processing algorithms, to detect and prevent payment for common types of improper Medicaid claims. *See infra* ¶¶ 101, 144, 194.

5.     However, despite their written undertaking to have "programs and procedures to safeguard against … improper payments," and despite their assurances to Indiana Medicaid officials that they were implementing algorithms to detect and prevent common types of improper Medicaid claims, the MCE Defendants knowingly disregarded this duty. Specifically, as analysis by IBM Watson Health ("IBM" or "IBM Watson") makes clear, each of the MCE Defendants failed to implement effective automated claims edits or to maintain adequate staffing and resources to detect and prevent improper payments. *See infra* ¶¶ 85–217.

6.     As a result, each of the MCE Defendants has routinely and knowingly accepted, and misused Medicaid funds to pay, thousands of readily-recognizable improper claims like claims for separate hospital stays despite immediate readmission, in-patient claims without 24-hour hospital stays, claims for treatment supposedly rendered after death, and duplicate claims for the same treatment. The knowing misconduct by each of the MCE Defendants has caused tens, likely hundreds, of millions of dollars in Indiana Medicaid funds to be misused to pay for improper claims that should not have been paid. Further, the MCE Defendants have continued to misuse Medicaid funds to pay such improper claims.

7.     *Second*, the Hospital Defendants are all long-standing participants in Indiana

Medicaid. To enroll in the program, each of the Hospital Defendants agreed to abide by all Medicaid billing requirements, including not to bill for two separate hospital stays when the patient was immediately readmitted after discharge, not to bill for in-patient treatment without 24-hour hospital admission, not to bill for treatment after a beneficiary's death, and not to submit duplicate claims for the same service. *See infra* ¶¶ 78–82.

8.      Each of the Hospital Defendants also had ample awareness of their obligation to avoid submitting these types of improper claims to Medicaid. For example, Indiana Medicaid frequently issued bulletins, "banner" alerts, and updates to healthcare providers like the Hospital Defendants regarding these types of common improper billing practices. Further, the Hospital Defendants attended regular training sessions offered by Indiana Medicaid that emphasized the obligation of healthcare providers to refrain from submitting improper claims to Medicaid like billing for two separate hospital stays despite immediate readmission, billing for in-patient care without 24-hour hospital admission, billing for services after death, and submitting duplicate claims for the same service. *See infra* ¶¶ 219–23, 259–63, 288–93.

9.      In addition, the Hospital Defendants also understood that submitting these types of improper claims would violate material conditions of payment for Medicaid. This was regularly highlighted by Indiana Medicaid to the Hospital Defendants through ongoing audits and payment reviews that targeted common improper billing scenarios like billing for two separate hospital stays despite immediate readmission, billing for in-patient care without 24-hour hospital admission, billing for services after death, and submitting duplicate claims. *See id.*

10.     Notwithstanding their written assurances to Indiana Medicaid, and despite their awareness and understanding of their obligation to avoid submitting these types of materially improper Medicaid claims, IBM's analysis shows that each of the Hospital Defendants knowingly and repeatedly submitted thousands of false claims to Medicaid where the hospital sought payment

for separate hospital stays despite immediate readmission, sought payment for in-patient treatment without 24-hour hospital admission, sought payment for treatment that supposedly occurred after patient had died, and sought duplicate payments for the same service. Further, the Hospital Defendants have continued to knowingly submit these types of improper claims to improperly obtain Medicaid payments. *See infra* ¶¶ 218–306.

11.    As a result of their knowing misconduct, the Hospital Defendants have improperly obtained millions of dollars in payments from Indiana Medicaid, thereby enriching themselves at the expense of the State, the Government, and millions of taxpayers.

## II.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action under (i) 31 U.S.C. § 3732, which confers jurisdiction on this Court over FCA actions; (ii) 28 U.S.C. § 1331, which confers federal question jurisdiction; and (iii) 28 U.S.C. § 1345, because the Government is a party.

13.    This Court has jurisdiction over the state law claims asserted in this action under 31 U.S.C. § 3732(b). This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14.    This Court has personal jurisdiction over each of the Defendants under 31 U.S.C. § 3732(a), which authorizes nationwide service of process and because each Defendant has at least minimum contacts with the United States. Further, each of the Defendants can be found in, reside, or transact or has transacted business in this District.

15.    This action is not based upon prior public disclosures of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government is a party; in a Congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or from the news media. To the extent there has been a public disclosure unknown to Relators, they are the original source under 31 U.S.C. § 3730(e)(4) and similar state statutes.

The facts and information set forth herein are based upon Relators' personal observation and investigation. Relators have information that is independent of and materially adds to any publicly disclosed allegations or transactions and have voluntarily provided this information to the government before filing this *qui tam* action.

16.    Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts and omissions giving rise to the allegations and claims asserted herein substantially occurred in this District.

## III.    PARTIES

### A.  The Relators

17.    Relator McCullough is a United States citizen and resides in Boone County, Indiana. From 2001 until 2017, Relator McCullough was an employee of the State of Indiana, including, as relevant here, serving as the Director of Provider Relations for Indiana Medicaid from 2008 to 2013 and as the Director of Program Integrity for Indiana's Medicaid from September 2014 to March 31, 2017.

18.    Relator Holden is a United States citizen who resides in Boone County, Indiana. From 1999 to 2014, Relator Holden was an employee of the State of Indiana, including serving as the Chief Deputy and General Counsel in the Office of the Indiana State Treasurer from January 2007 to June 2011, and again from November 2012 to November 2014.

19.    Relators McCullough and Holden came into possession of the IBM Watson reports concerning improper Medicaid payments made by the MCE Defendants and obtained by the Hospital Defendants in 2020, *i.e.*, well after the end of their respective tenures as employees of the State of Indiana.

### B.  The MCE Defendants

20.    Defendant Anthem is a publicly traded for-profit Indiana corporation headquartered

in Indianapolis, Indiana. Anthem is the largest for-profit managed health care company in the Blue Cross Blue Shield Association.

21.   Defendant MDwise, Inc. is an Indiana non-profit corporation founded in 1994 and headquartered in Indianapolis, Indiana. MDwise is a subsidiary of McLaren Health Care, a non-profit integrated health system based in Michigan.

22.   Defendant CareSource Indiana, Inc. is an Indiana non-profit corporation headquartered in Indianapolis, Indiana. CareSource is a subsidiary of CareSource, a non-profit corporation based in Dayton, Ohio, which is one of the nation's largest Medicaid MCEs.

23.   Defendant Coordinated Care is a for-profit Indiana corporation headquartered in Indianapolis, Indiana. Coordinated Care is a subsidiary of Centene Corporation, a publicly traded Fortune 500 company headquartered in Saint Louis, Missouri.

**C.  The Hospital Defendants**

24.   Defendant IU Health is an Indiana non-profit corporation headquartered in Indianapolis, Indiana. Among other facilities, IU Health operates IU Health West Hospital in Avon, the IU Health Bloomington Hospital in Bloomington, the IU Health North Hospital in Carmel, the IU Health Methodist Hospital and the IU Health University Hospital in Indianapolis, the IU Health Arnett Hospital in Lafayette, the IU Health Ball Memorial Hospital in Muncie, the IU Health White Memorial Hospital in Monticello,[3] as well as the Riley Hospital for Children with locations in Carmel and Indianapolis.[4]

25.   Defendant Ascension is a Missouri non-profit corporation headquartered in St. Louis, Missouri. In Indiana, Ascension operates, among other facilities, the Saint Vincent Heart Anderson Regional Hospital in Anderson, Saint Vincent Carmel Hospital in Carmel, the Saint Vincent

---

[3]   https://iuhealth.org/find-locations (last visited August 6, 2024).
[4]   https://www.rileychildrens.org/contact-and-locations (last visited August 6, 2024).

Hospital and the Saint Vincent Seton Specialty Hospital in Indianapolis, and the Saint Vincent

Kokomo Hospital in Kokomo.[5]

26.   Defendant Community is an Indiana non-profit corporation headquartered in

Indianapolis, Indiana. Through its non-profit and for-profit subsidiaries and affiliates, Community

operates acute care and specialty hospitals, immediate care centers, ambulatory care centers, and

surgery centers. As relevant here, Community operates the Community Hospital of Anderson in

Anderson, the Community Hospital North, Community Hospital East, and Community Hospital

in Indianapolis, and the Community Howard Regional Health Center in Kokomo.[6]

27.   Defendant Eskenazi is the public hospital division of the Health & Hospital

Corporation of Marion County,[7] an Indiana non-profit corporation headquartered in Indianapolis,

Indiana. Among other facilities, Eskenazi operates the Sidney & Lois Eskenazi Hospital, which is

commonly referred to as the Eskenazi Hospital, in Indianapolis.

28.   Defendant Lutheran is an Indiana for-profit corporation headquartered in Fort

Wayne, Indiana. Among other facilities, Lutheran operates the Lutheran Children's Hospital, the

Lutheran Downtown Hospital, and the Lutheran Hospital in Fort Wayne.[8]

29.   Defendant Parkview is an Indiana for-profit corporation headquartered in Fort

Wayne, Indiana. Among other facilities, Parkview operates the Parkview Hospital and the

Parkview North Hospital (also known as the Parkview Regional Medical Center) in Fort Wayne.

**D.  Non-Party IBM Watson as Indiana Medicaid's Fraud Detection Contractor**

30.   Between 2011 and 2021, IBM Watson (including its corporate predecessors) served

---

[5]   https://healthcare.ascension.org/find-care/location/hospitals/indianapolis--indiana (last visited August 6, 2024).

[6]   https://healthcare.ascension.org/find-care/location/hospitals/indianapolis--indiana (last visited August 6, 2024).

[7]   https://www.eskenazihealth.edu/about (last visited August 6, 2024).

[8]   https://www.lutheranhealth.net/hospitals (last visited August 6, 2024).

as a fraud and abuse detection system ("FADS") contractor for Indiana Medicaid in accordance with federal Medicaid requirements. *See* 42 C.F.R. § 455.502(b).

31.    Pursuant to its FADS contract with Indiana Medicaid, IBM Watson agreed to perform fraud and abuse detection and overpayment recovery services, including fraud and abuse detection, overpayment recovery, pre-payment review, and provider education.

32.    To carry out its responsibilities as a FADS contractor for Indiana Medicaid, IBM Watson developed, refined, and implemented a series of sophisticated computer algorithms to detect fraud, abuse, and overpayments.

33.    Based on its fraud detection algorithms, IBM Watson helped Indiana Medicaid uncover and recoup millions of dollars each year in overpayments relating to FFS Medicaid claims between 2011 and 2016. In the typical case, once IBM's analysis identified overpayments, the Program Integrity staff at Indiana Medicaid would review the findings with IBM. When the Program Integrity staff agreed with IBM's analysis, they would issue letters to Medicaid providers to recoup the overpayments. *See*, *e.g.*, Ex. 7 at 1-2 (listing recoupment letters "Mailed to Providers" based on IBM's analysis). In 2016, for example, IBM Watson's algorithms led to more than $8.9 million in such recoveries.

34.    IBM Watson's ongoing refinement of its fraud detection algorithms also ensured their accuracy in identifying improper Medicaid payments. Between 2011 and 2020, less than 1% of Indiana Medicaid's recoupment demands based on IBM Watson's analysis were overturned on appeal. *See* Ex. 1 at 4 (July 1, 2020 IBM Watson IN FADS Update).

35.    The findings of IBM Watson's algorithmic audits—including the reports and detailed breakdowns attached as exhibits to this pleading—were provided directly to Indiana Medicaid's Program Integrity team. Therefore, those reports and breakdowns are not publicly available.

36.    Starting in late 2017, and bowing to political pressure exerted by the health insurers' and the hospitals' lobby, a senior executive at Indiana Medicaid improperly directed the Program Integrity team to significantly curtail its efforts to utilize IBM Watson's analysis and findings to recoup improper Medicaid overpayments by MCE Defendants and to the Hospital Defendants.[9]

37.    Specifically, as a result of improper political pressure from the MCE Defendants and Hospital Defendants, the Program Integrity Director who was appointed to replace Relator McCullough repeatedly refused to give IBM "permission to proceed" with "a plan to recover identified MCE overpayments." *See* Ex. 2 at 2 (summarizing a meeting on October 25, 2018 between IBM and then-Program Integrity Director and subsequent efforts by IBM to move forward with MCE overpayment recoveries).

38.    This change, however, was not due to concerns about the accuracy or reliability of IBM's analysis and findings. As noted above, recoupment demands based on IBM's overpayment analysis had a 99%-plus success rate when providers challenged them on appeal. *See* Ex. 1 at 4. Further, the Program Integrity team at Indiana Medicaid never criticized or questioned IBM about either the reliability of its overpayment analysis or the accuracy of its findings.

39.    The decision not to recoup overpayments identified by IBM also did not reflect a change in law. Neither the MCE Defendants' contractual and regulatory obligations to detect and prevent payment of improper Medicaid claims like those at issue here, nor the Hospital Defendants' obligation to avoid submitting such improper claims to Medicaid had changed at all. Further, the decision by certain Indiana Medicaid officials not to recoup overpayments identified

---

[9]    Public disclosures show that the MCE Defendants, the Hospital Defendants, and lobbyists on their behalf have spent hundreds of thousands of dollars on political contributions to recent state elections. As a result of those political contributions and direct lobbying, an attorney from one of Indiana's largest healthcare lobbyist firms was appointed as the Administrator of Indiana Medicaid in 2017. After leaving Indiana Medicaid in June 2023, she became Defendant Ascension's "Chief Advocacy and Public Policy Officer." *See* https://about.ascension.org/about-us/leadership/indiana-leadership (last visited Aug. 7, 2024).

by IBM did not reflect a formal policy change that would have given rise to a reasonable belief on any of the Defendants' part that they were released from their legal obligations to avoid, detect, prevent, and/or rectify overpayments. Specifically, Indiana Medicaid has never publicly or, on information and belief, privately stated that any of the MCE Defendants and the Hospital Defendants was no longer subject to those basic obligations to Medicaid.

40.     Indiana Medicaid's Program Integrity efforts flagged following the directive to stand down on pursuing overpayment recoveries based on the IBM analysis. In 2019, for example, Medicaid fraud recoveries had fallen from $12.84 million in 2016 to just $7.24 million. This reflected the fact that the Program Integrity team at Indiana Medicaid did not pursue recoupment based on a number of valid overpayment findings generated by IBM between 2018 and 2021— including the findings at issue in this *qui tam* action.

## IV.    THE FEDERAL FALSE CLAIMS ACT AND THE INDIANA MEDICAID FALSE CLAIMS ACT

### A.  The FCA

41.     The federal False Claims Act was originally enacted during the Civil War. Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States Government to recover losses sustained as a result of fraud. The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

42.     As amended, the FCA imposes civil liability on any person who, *inter alia*: (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or

approval;" (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" or (3) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to … the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to … the Government." 31 U.S.C. §§ 3729(a)(l)(A), (B), (G).

43.   The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that—(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]" 31 U.S.C. § 3729(b)(2). This includes claims for Medicare and Medicaid funds, including when made to private entities who provide managed care benefits sponsored by federal and state funds (such as the MCE Defendants).

44.   The FCA defines the terms "knowing" and "knowingly" to mean "that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id*. § 3729(b)(1)(A). The FCA does not require proof of specific intent to defraud. *See id*. § 3729(b)(l)(B).

45.   The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id*. § 3729(b)(4).

46.   The FCA defines "obligation" to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship,

from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Id*. § 3729(b)(3).

47.   Any person who violates the FCA is liable for a mandatory civil penalty for each claim, plus three times the damages sustained by the Government. *Id*. § 3729(a)(l).

48.   The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery. The FCA requires the complaint to be filed under seal for a minimum of 60 days (without service on the defendant) to allow the Government time to conduct its own investigation and to determine whether to join the suit. *Id*. § 3729(b)(2). The Government may move the court for extensions of the seal. *Id*. § 3729(b)(3).

### B.  The Indiana Medicaid FCA

49.   The Indiana Medicaid FCA was enacted to impose liability on persons who knowingly present false or fraudulent claims or deceptively conceal or avoid payments relating to the Indiana Medicaid program.

50.   Like the federal FCA, the Indiana Medicaid FCA broadly defines "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the state has title to the money or property that—(i) is presented to an officer, employee, or agent of the state or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the state's behalf or to advance a state program or interest, and if the state—(i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]" Ind Code. § 5-11-5.7-1(b)(1).

51.   The Indiana Medicaid FCA also broadly defines "knowing" to include "actual knowledge," "deliberate ignorance," and "reckless disregard." *See id*. § 5-11-5.7-1(b)(4).

52.     Further, as with the federal FCA, the Indiana Medicaid FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id*. § 5-11-5.7-1(b)(5).

53.     In addition, the Indiana Medicaid FCA defines "obligation" to mean "an established duty, whether or not fixed, arising from," as relevant here, "an express or implied contractual relationship," "a statute," "a rule or regulation," or "the retention of an overpayment." *Id*. § 5-11-5.7-1(b)(6).

## V.    THE MEDICAID PROGRAM, THE MEDICAID COMPLIANCE OBLIGATIONS OF THE MCE AND THE HOSPITAL DEFENDANTS, AND INDIANA MEDICAID'S BILLING REQUIREMENTS

### A.   Medicaid

54.     The Medicaid program was established in 1965 as a joint federal and state program to provide financial assistance to individuals with low income to enable them to receive medical care pursuant to the provisions of Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq*.

55.     Under Medicaid, each state establishes its own eligibility standards, benefit packages, payment rates, and program administration rules in accordance with certain federal statutory and regulatory requirements. Under the fee-for-service ("FFS") model, a state directly pays healthcare providers for services rendered to Medicaid recipients. Under the managed care model, the state contracts with private health plans (like the MCE Defendants) to administer its Medicaid program.

56.     The state obtains the federal share of the Medicaid payment from accounts which draw on the United States Treasury. *See* 42 C.F.R. § 430.0 *et seq*. Specifically, the federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Federal funding under Medicaid is provided only when there is a corresponding state expenditure for a covered Medicaid service to a Medicaid recipient. The federal government pays

to the state the statutorily established share of the "total amount expended … as medical assistance under the State plan." 42 U.S.C. § 1396b(a)(1).

57.    Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter. CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter. The state then draws down federal funding as actual provider claims are presented for payment.

58.    After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). *See* 42 C.F.R § 430.30. Specifically, to obtain federal share of Medicaid expenditures, state Medicaid agencies are required to submit to CMS a Quarterly Medicaid Statement of Expenditures, also known as the CMS-64 form ("CMS-64").

59.    During all relevant times, the expenditures reported in each of the CMS-64s submitted by Indiana's state Medicaid agency (as well as other state Medicaid agencies) have included the Medicaid payments made by the MCE Defendants and to the Hospital Defendants at issue in this case. Under federal rules and regulations, Indiana Medicaid is permitted to seek the federal share of only those expenditures that were incurred in accordance with applicable state statutes, regulations, and policies. *See generally* OMB Circular A-87. Further, during all relevant times, the first page of each version of the CMS-64 that Indiana Medicaid submitted to CMS contained an express certification that the "report only includes expenditures … that are allowable in accordance with applicable implementing federal, state, and local statutes, regulations, [and] policies[.]" *See* Ex. 29 (first page of 2013 version of CMS-64).

60.    Federal law requires any person who "provides health care services for which payment may be made (in whole or in part)" under Medicaid to "assure" that the services are

"medically necessary" and "supported by evidence of medical necessity." 42 U.S.C. § 1320c-5(a).

61.    Providers who participate in the Medicaid program must sign enrollment agreements with their states that certify compliance with the state and federal Medicaid requirements. As relevant here, Indiana Medicaid's provider enrollment agreement has required the prospective Medicaid provider to agree that he or she will comply with all state and federal laws and Medicaid rules and regulations in billing the state Medicaid program for services or supplies furnished.

62.    In Indiana, Medicaid providers must affirmatively certify, as a condition of payment of the claims submitted for reimbursement by Medicaid, compliance with applicable federal and state laws and regulations as well as Indiana Medicaid policies. *See* Ex. 28 at 6 ("AS A CONDITION OF PAYMENT," a provider must "ABIDE BY AND COMPLY WITH ALL THE STIPULATIONS [AND] CONDITIONS SET FORTH HEREIN," including to comply with applicable laws and regulations and Indiana Medicaid policies) (capitalizations in original).

63.    In addition, pursuant to federal and state Medicaid rules, Indiana Medicaid required providers, including the Hospital Defendants, to certify in connection with each claim to Medicaid that the submitted "information is true, accurate, and complete" and that the providers "understand that the payment of this claim will be from Federal and State Funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws." *See*, *e.g.*, 42 C.F.R. § 455.18.[10]

64.    To ensure that Medicaid providers, including the Hospital Defendants, knew and understood their compliance obligations, including their obligations to comply with Medicaid billing requirements, Indiana Medicaid offered a wide array of public guidance and in-person and

---

[10]   Indiana Code § 12-15-21-3(6) and 405 IAC § 1-1.4-9(j) provide that Providers found to have received an overpayment from Indiana Medicaid are liable for interest, accruing from the date of overpayment, on amounts paid to the Provider in excess of the amount subsequently determined to be due the Provider as a result of an audit, a reimbursement cost settlement, or a judicial or administrative proceeding.

online training sessions. For example, Indiana Medicaid regularly published bulletins and "banner pages" to clarify, update, and reiterate billing requirements. Further, Indiana Medicaid conducted quarterly and monthly trainings for providers that covered, among other topics, basic Medicaid billing requirements. Finally, Indiana Medicaid held annual meetings with representatives of all healthcare industry participants to explain, among other issues, Medicaid billing requirements and Medicaid providers' obligation to comply with those requirements. *See, e.g.*, Ex. 5.

65.    In Indiana, the state Medicaid agency has offered three managed care health plans to beneficiaries—1) the Health Indiana Plan ("HIP"), which covers the healthcare costs of qualified low-income Indiana residents between 19 and 64 years of age and enrolled approximately 778,000 Indiana residents as of December 2023; 2) Hoosier Healthwise ("HHW"), which covers Medicaid-eligible children up to age 19 and pregnant women and enrolled approximately 786,000 Indiana residents as of December 2023; and 3) Hoosier Care Connect ("HCC"), which covers Medicaid-eligible individuals who are aged 65 years and older, blind, or disabled and who are also not eligible for Medicare and enrolled approximately 95,000 Indiana residents as of December 2023. In other words, as of December 2023, HIP, HHW, and HCC together enrolled approximately 2 million Medicaid beneficiaries, or approximately 88 percent of Medicaid beneficiaries in Indiana.

66.    New Indiana Medicaid beneficiaries enrolled in HIP, HHW, and HCC are randomly assigned to receive managed care coverage from MCE Defendants Anthem, CareSource, Coordinated Care, or MDwise, as applicable.

67.    For each assigned beneficiary, the MCE Defendants agreed by contract to provide a range of services, including provider network development (including contracting and credentialing), care management and disease management, member and provider contact centers, provider outreach and education, member outreach, claims processing, claim disputes and appeals, utilization management, pharmacy preferred-drug list development, quality incentive programs,

non-emergency medical transportation, and, as relevant here, program integrity. *See generally* Ex.
3 at 53-79 (section in Defendant Anthem's MCE contract detailing covered services).

68.     In return, the MCE Defendants receive a contractually defined monthly capitation
payment from Indiana Medicaid for each Medicaid beneficiary they serve. The starting point, and
key determinant, of the capitated payment rate for Medicaid MCEs are their "baseline costs."[11]

69.     In Indiana, the primary data source used by Indiana Medicaid to calculate the baseline
costs for the MCE Defendants was the historical encounter data that the MCE Defendants
submitted on an ongoing basis to report their claims and payments. Therefore, where, as is the case
here, an MCE Defendant's encounter data reflects inflated expenditures due to improper payment
of claims in violation of Medicaid billing rules, this leads to higher baseline costs—and higher
capitated payments—for the MCE Defendants in subsequent years than what they would receive
if they had fulfilled their legal obligations to detect, prevent, and recoup improper overpayments.
In other words, the MCE Defendants have an incentive to submit encounter data showing higher
costs—even if some of claims that should never have been paid in the first place.

70.     To ensure the accuracy and completeness of the encounter data it received from the
MCE defendants, Indiana Medicaid required the MCE Defendants to expressly promise in their
contracts to "implement policies and procedures to ensure that [their] encounter data claims
submissions are accurate" and to "have in place a system for monitoring and reporting the
completeness of claims and encounter data received from providers." *See*, *e.g.*, Ex. 3 at 162.

71.     Providers submit claims for payment to MCEs for services provided to Medicaid
beneficiaries enrolled in the managed care plan. Claims for payment submitted to MCEs are
deemed to be "claims" under the FCA since the managed care plan is a "contractor, grantee, or

---

[11]  *See generally* MACPAC, *Medicaid Managed Care Capitation Rate Setting* (Mar. 2022) (available at:
https://www.macpac.gov/publication/medicaid-managed-care-capitation-rate-setting/).

other recipient," the money is being used "to advance a Government program or interest," and the Government provides or has provided a portion of the money requested and/or will reimburse the MCE for a portion of the money requested. 31 U.S.C. § 3729(b)(2)(A). In their agreements with providers, MCEs require providers to comply with the rules and regulations of the Medicaid program and with their own plan requirements.

72.    As with Medicaid providers, *see supra* ¶ 64, Indiana Medicaid offered a wide array of public guidance and in-person and online training sessions to the MCE Defendants to ensure that they knew and understood their compliance obligations with Medicaid billing requirements. Those included the regularly-published bulletins, "banner pages," the annual meetings with representatives of all healthcare industry participants, and—between fall 2016 and early 2018— monthly meetings between the Program Integrity team at Indiana Medicaid (including IBM Watson as the RAC) and each of the MCE Defendants. During those monthly meetings, the Program Integrity team and IBM Watson regularly discussed common improper billing scenarios with the MCE Defendants and advised MCE Defendants how they could detect, prevent, and recoup improper Medicaid payments resulting from those scenarios.

**B.  The MCE Defendants' Medicaid Compliance Obligations**

73.    Pursuant to federal Medicaid regulations, the MCE Defendants each took on the "delegated responsibility" to "implement and maintain arrangements or procedures that are designed to prevent fraud, waste, and abuse" as a condition for their operating Medicaid managed care plans. 42 C.F.R. § 438.608(a).

74.    Further, in their contracts with Indiana Medicaid, the MCE Defendants all expressly agreed to "comply with all federal and state requirements regarding fraud and abuse" and to establish a Program Integrity Plan that included, *inter alia*, a set of "procedures designed to prevent and detect abuse and fraud in the administration and delivery of services" and a set of "specific

controls in place for prevention and detection of potential or suspected fraud and abuse." *See* Ex. 3 at 147-149.

75.    The "specific controls" that each MCE Defendant agreed to maintain for purposes of detecting and preventing potential fraud and abuse must include, among other things, both "automated pre-payment claims edits" and "automated post-payment claims edits." *Id*. at 148.

76.    In addition, each MCE Defendant agreed in its contract with Indiana Medicaid to "deploy [] capabilities" such as "data mining, analytics, and predictive modeling for the identification of potential overpayments and aberrant payments" to ensure "the effective reduction of Medicaid waste, fraud and abuse." *Id*. at 150.

77.    Pursuant to their contracts with Indiana Medicaid, the MCE Defendants further expressly agreed to report any capitation or other overpayment made by the State within 30 days of discovery and to "return any capitation or other overpayment … to the State" within 14 days of reporting.[12] *Id*. at 178. Further, pursuant to federal regulations, an MCE that has received an overpayment must report and return the overpayment. *See* 42 C.F.R. Part 401. Specifically, a MCE has identified an overpayment when it has, or should have through the exercise of reasonable diligence, determined that it has received an overpayment and quantified the amount of the overpayment; and an MCE should have determined that it received an overpayment and quantified the amount of the overpayment if it failed to exercise reasonable diligence and the Provider, in fact, received an overpayment. *See* 42 C.F.R. § 401.305(a)(2).

### C.  The Hospital Defendants' Medicaid Compliance Obligations

78.    As a condition for their submitting claims "to receive reimbursement under Medicaid," each Hospital Defendant was required to "be enrolled to participate as a provider" in

---

[12]    Federal regulations required the MCE Defendants to "report annually to the State on their recoveries of overpayments." 42 C.F.R. § 438.608(d)(3)

the Indiana Medicaid program. *See* 405 Ind. Admin Co. § 1-1.4-3(a).

79.     As part of the enrollment process, each Hospital Defendant was further required to have "signed and returned a Medicaid provider agreement." *See id*. § 1-1.4-3(a)(3).

80.     By executing the Indiana Medicaid provider agreement, each Hospital Defendant expressly agreed to "comply with all federal and state statutes and regulations pertaining to [Indiana Medicaid]." *See* Ex. 28 at 2. Further, each Hospital Defendant attested to understanding that, as a condition of payment from Medicaid, they must comply with all applicable federal and state laws and regulations as well as Indiana Medicaid policies. *See id*. at 6.

81.     In their Indiana Medicaid provider agreements, the Hospital Defendants also agreed to familiarize themselves with Indiana Medicaid billing policies and to "abide by the state's Medical Policy Manual and IHCP Provider Reference Modules as amended from time to time, as well as all provider bulletins, banner pages, and notices." *See id*. at 2.

82.     In addition, federal statutes and regulations required each Hospital Defendant—by virtue of its receipt of $5 million or more in annual Medicaid payments—to establish a written policy with detailed provisions regarding its procedures for detecting fraud, waste, and abuse affecting Medicaid.[13] Further, pursuant to federal regulations, any Hospital Defendant that has received an overpayment must report and return the overpayment. *See* 42 C.F.R. Part 401. Specifically, a Hospital Defendant has identified an overpayment when it has, or should have through the exercise of reasonable diligence, determined that it has received an overpayment and quantified the amount of the overpayment; and a Hospital Defendant should have determined that it received an overpayment and quantified the amount of the overpayment if it failed to exercise reasonable diligence and the Provider, in fact, received an overpayment. *See* 42 C.F.R. §

---

[13]     *See*     https://www.cms.gov/Regulations-and-Guidance/Legislation/DeficitReductionAct/downloads/ checklist1.pdf (last visited August _, 2024).

401.305(a)(2).

## VI.   THE MCE DEFENDANTS ROUTINELY AND KNOWINGLY MISUSED MEDICAID FUNDS TO PAY IMPROPER CLAIMS IN VIOLATION OF MEDICAID BILLING REQUIREMENTS

83.    As detailed below, the MCE Defendants each has knowingly and improperly misused tens, likely hundreds, of millions of dollars of Medicaid funds to pay claims that A) violated basic hospital billing rules such as those disallowing two separate in-patient claims when the patient is readmitted right away for the same condition, *see infra* ¶¶ 85–129; B) were clearly not payable because they were for services after patients' death or were duplicative of already-paid claims, *see infra* ¶¶ 130–173; and C) contravened Medicaid billing requirements for chiropractic, dental, and opioid treatments, *see infra* ¶¶ 174–217.

84.    The MCE Defendants knowingly misused Medicaid funds to pay these improper claims, instead of fulfilling their obligation to detect and prevent such improper payments, because they knew reporting higher expenditures in the encounter data they submitted to Indiana Medicaid would allow them to obtain higher capitated payments in subsequent years. *See supra* ¶¶ 68–70.

### A.   The MCE Defendants Routinely and Knowingly Misused Medicaid Funds to Pay Hospital Claims in Violation of Medicaid Hospital Billing Rules

#### 1)   Medicaid Prohibited Paying Hospital Claims Not in Compliance with Billing Rules for Readmissions, Hospital Transfers, and 24-Hour Stays

85.    For purposes of reimbursing hospital claims, Indiana Medicaid regulations adopted the diagnosis-related group ("DRG") system that CMS utilizes for Medicare.[14] *See* 405 Ind. Admin. C. § 1-10.5-2(h). To implement this system, Indiana Medicaid promulgated, publicized, and enforced a number of hospital billing rules, including to A) prohibit separate in-patient claims when the patient was readmitted within 72 hours of discharge; B) require the use of transfer status

---

[14]    *See*   https://www.in.gov/medicaid/providers/business-transactions/billing-and-remittance/diagnosis-related-group-inpatient-reimbursement/ (last visited August 8, 2024).

code when hospitals submitted claims for patients who were transferred to other hospitals; and C) disallow in-patient claims without 24-hour hospital stays.

86.   First, in cases where a Medicaid beneficiary is discharged from hospital and then readmitted within 72 hours, Indiana Medicaid policy specified that the hospital "should bill one inpatient claim when a patient is admitted to their facility … for the same diagnosis or related diagnosis" under the DRG system. *See* Indiana HCP Inpatient Hospital Services Module (Rev. 6.0) at 26 (available at https://www.in.gov/medicaid/providers/files/modules/inpatient-hospital-services.pdf).

87.   In other words, Indiana Medicaid's hospital billing rules prohibited hospitals from submitting two separate in-patient hospital claims—and getting paid twice under the DRG system—when a patient is readmitted to the hospital immediately after an earlier discharge for the same medical condition.

88.   To detect improper submissions of separate in-patient hospital claims for the same medical condition in cases of immediate readmissions, IBM Watson regularly conducted audits to identify such policy violations. Those audits consistently enabled Indiana Medicaid to recoup improper payments received by hospital providers in cases involving "less than twenty-four (24) hour stays."

89.   Second, from at least 2008 until 2019, Indiana Medicaid had "[s]pecial payment policies [for] transfer cases paid using the DRG methodology." *See, e.g.*, IHCP Hospital Provider Manual, Chap. 8 (2011 version). Specifically, while the receiving hospital was eligible for reimbursement according to the DRG methodology, the transferring hospital is reimbursed a DRG-prorated daily rate for each day." *See id*.

90.   To avoid Medicaid funds from being misused to pay the full DRG rate—rather than the prorated daily rate—to transferring hospitals, Indiana Medicaid further required the use of the

appropriate patient status discharge code to identify the transferring hospital on the institutional claim. *See id*.

91.    To detect submissions of improper claims by transferring hospitals, Indiana Medicaid directed IBM Watson to conduct algorithmic audits to identify claims without the appropriate "transfer" patient status discharge code. In 2012, for example, IBM's algorithmic audit identified "129 inpatient claims" from "63 billing providers" that involved an unreported transfer. Based on IBM's 2012 algorithmic audit results, Indiana Medicaid recovered an estimated $601,596. *See* Ex. 6 at 6.

92.    In 2014, a "re-run" of IBM's algorithmic audit identified "191 inpatient claims that possibly ended in a transfer but were not billed with a 'transfer' status code." As result of this 2014 audit, Indiana Medicaid recovered an estimated $1.56 million. *See* Ex. 6 at 6.

93.    Third, Indiana Medicaid specified by regulation that "hospitals will be paid under the outpatient reimbursement methodology[,]" instead of the DRG system, for stays of less than 24 hours. *See* 405 Ind. Admin. C. §§ 1-10.5-3(z).

94.    In the typical case, federal healthcare reimbursement for a procedure performed on an out-patient basis is lower than for an in-patient procedure. Billing an out-patient procedure as an in-patient procedure, thus, can result in the provider receiving a higher reimbursement from Indiana Medicaid than what it is entitled to.

95.    To detect improper submissions of in-patient claims with less than 24-hour hospital stays, IBM Watson regularly conducted audits to identify such policy violations.

96.    Those audits, moreover, consistently produced results for Indiana Medicaid in terms of enabling the program to recoup improper payments received by hospital providers. In early July 2016, for example, Indiana Medicaid recouped over $7,100 from a regional medical center based on IBM's audit for "one-day inpatient stays." *See* Ex. 7 at 1.

2) <u>The MCE Defendants Knew the Importance of Complying with Medicaid Hospital Billing Rules for Readmissions, Hospital Transfers, and 24-Hour Stays</u>

97.    Medicaid regulations and the MCE Defendants' contracts with Indiana Medicaid required them to familiarize themselves with Medicaid hospital billing rules, including those prohibiting separate in-patient hospital claims in cases of immediate readmissions for the same medical condition, requiring the use of the hospital transfer status code, and disallowing in-patient hospital claims without a 24-hour hospital stay. *See* 42 C.F.R. § 438.608(a); Ex. 3 at 147.

98.    Further, to ensure that Medicaid MCEs in Indiana understood these hospital billing rules, Indiana Medicaid also repeatedly trained the MCE Defendants on the importance of complying with these rules when they processed Medicaid claims.

99.    For example, when Relator McCullough gave a presentation to representatives of all health industry participants in June 2015 on the 2015 audit strategy for the Program Integrity team, he specifically highlighted that Indiana Medicaid routinely audited claims for, among other common improper payment scenarios, "Hospital Transfers," "Outpatient During Inpatient," and "Hospital Readmissions." *See* Ex. 5 at 4.

100.    In addition, between fall 2016 and early 2018, the Indiana Medicaid Program Integrity team met monthly with each of the MCE Defendants to discuss their fraud and abuse detection and prevention responsibilities. Relator McCullough, along with a representative from IBM Watson, attended each of these meetings up to February 2017. *See*, *e.g.*, Ex. 8 (agenda for February 2017 monthly meeting with Defendant CareSource).

101.    During those monthly meetings, Relator McCullough repeatedly discussed with the MCE Defendants the fact that they must implement detection and prevention procedures to identify, prevent, and recoup improper payments relating to claims that fail to comply with Medicaid hospital billing rules, including, as relevant here, separate in-patient hospital claims for

the same condition in cases of immediate readmissions, claims without the hospital transfer status code, and in-patient hospital claims without a 24-hour stay. In response, each MCE Defendant assured Relator McCullough that they were implementing those procedures.

   3)  Each MCE Defendant Routinely and Knowingly Misused Medicaid Funds to Pay Separate In-Patient Claims Despite Immediate Readmissions

102. In 2019, IBM Watson conducted an algorithmic audit to identify claims for beneficiaries who were discharged and then subsequently readmitted within 72 hours at the same facility for the same condition, but for which two separate claims were created. *See* Ex. 10 at 1.

103. Specifically, IBM Watson focused on managed care claims for the period of July 2015 through December 2018 that involved a beneficiary's readmission to the same facility with the same condition within 72 hours of the discharge date on an earlier claim. *Id.*

104. IBM determined that the MCE Defendants paid a total of nearly $11.5 million on 1,681 claims satisfying these criteria. Ex. 10 at 6.

105. In Anthem's case, for example, IBM Watson determined that Anthen had misused Medicaid funds to make payments on 1,004 claims for beneficiaries who were readmitted to the same facility for the same condition within 72 hours of the discharge date on the initial claim. *Id.* The full payments on these claims totaled nearly $6.4 million. *Id.*

106. Similarly, according to IBM Watson's analysis, MDwise had misused Medicaid funds to make payments on 470 claims for beneficiaries who were readmitted to the same facility within 72 hours of the discharge date on the initial claim. *Id.* The full payments on these claims totaled more than $3.3 million. *Id.*

107. Further, IBM Watson found that Coordinated Care (operating as Managed Health Services or MHS) had misused Medicaid funds on payments for 165 claims with immediate readmission totaling $1.4 million. *Id.*

108.  Finally, IBM Watson found that CareSource had misused Medicaid funds to make payments on 42 claims with immediate readmission totaling more than $357,700. *Id.*

109.  The MCE Defendants not only were aware of their obligation to detect and prevent payment on claims for Medicaid beneficiaries whose readmission to the same facility for the same condition occurred within 72 hours of discharge on the initial claim, but assured Relator McCullough in late 2016 and early 2017 that they were fulfilling this requirement by implementing pre-payment and post-payment claim analysis algorithms. However, as the IBM analysis makes clear, the MCE Defendants did not fulfill that promise or their legal obligation.

110.  The MCE Defendants, therefore, knowingly misused Medicaid funds to pay claims that should have been consolidated when the patient was readmitted to the same facility for the same condition within 72 hours of the discharge date on the initial claim.

4) <u>Defendants MDwise, Coordinated Care, and Anthem Regularly and Knowingly Misused Medicaid Funds to Pay Hospital Claims Without the Transfer Code</u>

111.  In 2018, IBM Watson conducted an algorithmic audit "to identify fee-for-service (FFS) and managed care (MC) inpatient claims with patient status discharge code other than 'transfer,'" but otherwise met "criteria that indicated a same-day transfer may have occurred, resulting in a full DRG payment [to the transferring hospital], rather than the DRG-prorated daily rate." Ex. 6 at 4.

112.  Specifically, IBM Watson focused on managed care and fee-for-service claims from the period of September 2011 to February 2017 and "identified inpatient claim pairs for the **same** recipient, **same** discharge date (for claim 1) and admission date (for claim 2)," with "**different**" billing providers, and "**without** a 'transfer' patient status discharge code []for claim 1[.]" *Id.* (emphasis added). Further, to target claims with DRG-based payments, IBM focused on "claim pairs where the first claim was reimbursed according to []DRG[] methodology[.]" *Id.*

113.  Based on this analysis, IBM Watson found that MDwise, Coordinated Care, and Anthem regularly made full DRG payments to transferring hospitals in cases of hospital transfers where the transferring hospitals failed to use the "transfer" patient status discharge code.

114.  In MDwise's case, for example, IBM Watson found that MDwise misused Medicaid funds to make 69 full DRG payments to transferring hospitals that had failed to include the transfer code. The full payments for those claims totaled more than $380,000, with more than $233,000 as the likely overpayments. *See* Ex. 6 at 10.

115.  Similarly, according to IBM's analysis, Coordinated Care (operating as MHS) misused Medicaid funds to make 31 full DRG payments totaling more than $187,000, with more than $91,000 as the likely overpayments. *See id*.

116.  Finally, IBM found that Anthem misused Medicaid funds to make 38 full DRG payments totaling more than $280,000, with more than $100,000 as the likely overpayments. *Id*.

117.  MDwise, Coordinated Care, and Anthem not only were aware of their obligation to detect and prevent payment of hospital transfer claims without the correct transfer code, but they also had assured Relator McCullough in late 2016 and early 2017 that they were fulfilling this requirement. However, as the IBM analysis makes clear, MDwise, Coordinated Care, and Anthem did not fulfill that promise or their legal obligation.

118.  MDwise, Coordinated Care, and Anthem, therefore, knowingly misused Medicaid funds to pay hospital transfer claims that lacked the proper transfer status code and, thereby, violated Medicaid hospital billing rules.

5) <u>Each MCE Defendant Routinely and Knowingly Misused Medicaid Funds to Pay In-Patient Claims Without 24-Hour Hospital Stays</u>

119.  In 2020, IBM Watson conducted an algorithmic audit "to identify inpatient claims and encounters where the patient may have been admitted for less than 24 hours." Ex. 12 at 4.

120.   Specifically, IBM Watson focused on, *inter alia*, paid managed care facility in-patient claims for the period of May 2017 through April 2020 "where the inpatient length of stay was one or two days."[15] *Id.* IBM limited its analysis to specific patient status codes and claims reimbursed using DRG methodology and excluded claims that did not fit those criteria as well as claims that had already been subjected to prior audits. *Id.* at 10.

121.   Based on this analysis, IBM Watson determined that the MCE Defendants regularly accepted and paid in-patient stays on claims that had the same admission and discharge date where the length of stay was clearly under 24 hours. *Id.* at 14.

122.   Specifically, IBM found that the MCE Defendants made payments on 499 in-patient claims with the ***same*** admission and discharge date. *Id.* The full payments on these claims totaled more than $5.9 million. *Id.*

123.   In addition, IBM determined that a large volume of two-day in-patient claims—totaling 22,699 and involving more than $237.5 million in Medicaid payments—likely involved a length of stay under 24 hours, depending on the time of day the patient was admitted and discharged. *Id.*

124.   In Anthem's case, for example, IBM Watson determined that Anthem likely misused Medicaid funds by making payments on up to 9,165 in-patient claims for beneficiaries who may have had a length of stay under 24 hours. *See id.* at 16. The full payments for these claims totaled more than $105.2 million. *Id.*

125.   Similarly, according to IBM Watson's analysis, MDwise likely misused Medicaid funds to make payments on up to 7,745 in-patient claims for beneficiaries who may have had a length of stay under 24 hours. *Id.* The full payments on these claims totaled nearly $72 million. *Id.*

---

[15]   As discussed below, *see infra* ¶ 247, IBM Watson also analyzed fee-for-service claims.

126.  Further, IBM Watson determined that Coordinated Care (operating as MHS) likely misused Medicaid funds to make payments on up to 4,800 in-patient claims for beneficiaries who may have had a length of stay under 24 hours. *Id.* The full payments on these claims totaled nearly $51 million. *Id.*

127.  Finally, IBM Watson found that CareSource likely misused Medicaid funds to make payments on up to 1,488 in-patient claims totaling nearly $15.4 million. *Id.*

128.  The MCE Defendants not only were aware of their obligation to detect and prevent payment on in-patient claims for Medicaid beneficiaries whose length of stay was under 24 hours, but assured Relator McCullough in late 2016 and early 2017 that they were fulfilling this requirement. However, as the IBM analysis makes clear, the MCE Defendants did not fulfill that promise or their legal obligation.

129.  The MCE Defendants, therefore, knowingly misused Medicaid funds to pay in-patient claims for beneficiaries whose length of stay was under 24 hours. These claims should have been billed as outpatient claims.

   **B.  The MCE Defendants Routinely and Knowingly Misused Medicaid Funds to Pay Claims That Were Clearly Unallowable**

   1)  Medicaid Clearly Prohibited Paying Claims for Services Supposedly Provided After Patients' Deaths and Duplicate Claims for the Same Service

130.  Medicaid provides coverage for treatment that is "medically necessary" and "supported by evidence of medical necessity." 42 U.S.C. § 1320c-5(a). Medicaid, thus, does not cover treatments supposedly provided after beneficiaries' deaths—by definition, such treatments are not "medically necessary" or "supported by evidence of medical necessity."

131.  Because the medical necessity requirement is a cornerstone of Medicaid coverage, Indiana Medicaid has repeatedly taken steps to ensure that Medicaid funds are not being improperly used to pay for treatment supposedly given to beneficiaries after their deaths.

132.  Between in or about 2012 and 2018, for example, IBM Watson conducted four rounds of algorithmic audits of Medicaid claims data on behalf of Indiana Medicaid to identify payments for services that occurred at least one day after a beneficiary's death and to identify capitation payments received by MCEs after beneficiaries' deaths. *See* Ex. 13 at 6. Based on those audits, Indiana Medicaid recouped payments to providers after beneficiaries' deaths. *See id*.

133.  Under federal Medicaid regulations, MCEs are only entitled to capitated payments for providing coverage to Medicaid-eligible beneficiaries. *See* 42 C.F.R. § 438.3(c)(2). Thus, MCEs are not entitled to any capitated payment for beneficiaries who are deceased.

134.  The Office of Inspector General for the U.S. Department of Health and Human Services ("HHS-OIG") has conducted numerous audits to ensure that Medicaid MCEs are not obtaining and retaining capitated payments after beneficiaries' deaths.

135.  In November 2017, for example, HHS-OIG published an analysis of capitated payments to Medicaid MCEs in Texas, which found, among other things, that MCEs had retained approximately $1.8 million in capitated payments for periods after beneficiaries' deaths.[16] In response to this finding, Texas Medicaid undertook to recover those unallowable payments and to "refund the $1,038,875 (Federal share) to the Federal Government" within a year.[17]

136.  Similarly, in January 2020, HHS-OIG published a sampling-based audit of capitated payments to Medicaid MCEs in Indiana, which produced an estimate of "at least $1.1 million" in capitated payments to MCEs "on behalf of deceased beneficiaries during [the] audit period."[18] In

---

[16]  HHS-OIG, *Texas Managed Care Organizations Received Medicaid Capitation Payments After Beneficiary's Death* (available at: https://oig.hhs.gov/oas/reports/region6/61605004.pdf).

[17]  See id.

[18]  HHS-OIG, *Indiana State Medicaid Agency Made Capitation Payments to Managed Care Organizations After Beneficiaries' Deaths* (available at: https://oig.hhs.gov/oas/reports/region5/51900007.pdf).

response to this audit, Indiana Medicaid promised to "recoup the capitation payments from [MCEs] identified in the audit" and "return[] federal share of $862,097[.]"[19]

137.  Finally, as a basic principle, federal healthcare programs like Medicaid and Medicare do not pay duplicate claims for the same treatment. To implement this principle in the Medicare context, for example, CMS has authorized recovery audit contractors to conduct automated post-payment review algorithms to detect and recoup facility duplicate claims[20] and duplicate claims for professional services.[21]

138.  Similarly, Indiana Medicaid has repeatedly implemented fraud and abuse detection efforts to find duplicate Medicaid claims, including claims for in-patient treatment in hospitals, and recoup payments obtained improperly based on such claims. In 2011, for example, IBM Watson created an algorithm for an audit that targeted duplicate Medicaid fee-for-service claims submitted by hospitals for in-patient treatment. *See* Ex. 15 at 6.

139.  In 2015, moreover, IBM Watson created an algorithm called "Duplicate Claims" for an audit that targeted duplicate Medicaid fee-for-service claims for out-patient treatment. *See id*.

2)  <u>The MCE Defendants Knew the Importance of Complying with Medicaid Billing Rules Against Claims After Deaths and Duplicate Claims</u>

140.  Medicaid regulations as well as the MCE Defendants' contracts with Indiana Medicaid required them to familiarize themselves with Medicaid billing rules and requirements, including the rules against paying claims for treatment supposedly rendered after beneficiaries' deaths, obtaining and retaining capitated payments after beneficiaries' deaths, and paying duplicate claims for the same treatment. *See* 42 C.F.R. § 438.608(a); Ex. 3 at 146-147(MCE SOW).

---

[19]  See id.

[20]  *See*   https://www.cms.gov/research-statistics-data-and-systems/monitoring-programs/medicare-ffs-compliance-programs/recovery-audit-program/approved-rac-topics-items/0064-facility-duplicate-claims.

[21]  *See*   https://www.cms.gov/research-statistics-data-and-systems/monitoring-programs/medicare-ffs-compliance-programs/recovery-audit-program/approved-rac-topics-items/0091-exact-duplicate-claims.

141.  Further, to ensure that Medicaid MCEs in Indiana understood these rules, Indiana Medicaid also repeatedly warned them about these types of improper claims.

142.  In June 2015, for example, Relator McCullough gave a presentation on the 2015 audit strategy for the Program Integrity team at Indiana Medicaid to representatives of all health industry participants, including the MCEs. During that presentation, Relator McCullough highlighted that Indiana Medicaid routinely audited claims for, among other issues, "Services After Date of Death." *See* Ex. 5 at 4.

143.  In addition, between fall 2016 and early 2018, the Indiana Medicaid Program Integrity team met monthly with each of the MCE Defendants to discuss their fraud and abuse detection and prevention responsibilities. Relator McCullough, along with a representative from IBM Watson, attended each of these meetings up to February 2017. *See*, *e.g.*, Ex. 8 (agenda for February 2017 monthly meeting with Defendant CareSource).

144.  During those monthly meetings, Relator McCullough repeatedly advised the MCE Defendants that they must implement detection and prevention procedures to identify, prevent, and recoup improper payments relating to claims after beneficiaries' deaths and duplicate claims. In response, each of the MCEs assured Relator McCullough that they were implementing those procedures.

3)  <u>MCE Defendants Anthem and MDwise Routinely and Knowingly Misused Medicaid Funds to Pay Claims After Beneficiaries' Deaths</u>

145.  In late 2020, IBM Watson conducted an algorithmic audit "to identify payments for services that occurred at least one day after a recipient['s] death[.]" Specifically, IBM Watson began with "recipients with death dates in the [Indiana Medicaid] recipient database and flagged all services that occurred at least one day after the recipient's death date." Ex. 13 at 4.

146.  Based on this analysis, IBM Watson shows that Anthem and MDwise routinely paid claims for medical services that supposedly were rendered after beneficiaries' deaths.

147.  In Anthem's case, for example, IBM Watson found that Anthem paid more than 400 claims between March 2017 and February 2020 to dozens of providers totaling more than $55,000. *See* Ex. 13 at 15.

148.  Similarly, according to IBM's analysis, MDwise paid more than 100 claims to more than 30 providers totaling more than $13,000. *See id*.

149.  Anthem and MDwise not only were aware of their obligation to detect and prevent payment of claims seeking reimbursement for services that supposedly were rendered after beneficiaries' deaths, but they also had assured Relator McCullough in late 2016 and early 2017 that they would fulfill this requirement. However, as the IBM analysis makes clear, MDwise and Anthem did not fulfill that promise or their legal obligation.

150.  Anthem and MDwise, therefore, knowingly misused Medicaid funds to pay hundreds of claims for services that supposedly were rendered after beneficiaries' deaths.

4) Each MCE Defendant Knowingly Obtained and Retained Capitated Payments from Medicaid After Beneficiaries' Deaths

151.  In addition to analyzing claims paid by the MCE Defendants for services supposedly rendered after beneficiaries' deaths, IBM Watson also audited the capitated payments received by the MCE Defendants between March 2017 and February 2020 "to identify managed care capitated payments after a recipient's death." Ex. 13 at 4.

152.  IBM's algorithm "looked for managed care capitated payments made on behalf of [Indiana Medicaid] to an MCE for capitation periods after the recipient's death date." *Id*. at 18.

153.  By doing the data comparison, IBM was able to identify "**2,092 recipients** with capitation payments occurring after [their] death[s];" and the MCE Defendants, together, obtained

approximately "**$2.9M in capitation payments** on behalf of the deceased recipients[.]" *Id.* (emphasis in original).

154. For example, Anthem obtained more than $1.6 million in capitated payments from Indiana Medicaid on behalf of more than 600 deceased beneficiaries. In many cases, Anthem continued to accept and retain capitated payments for the deceased beneficiaries for months, even years, after their deaths. *See id.*

155. MDwise also obtained more than more than $700,000 in capitated payments from Indiana Medicaid on behalf of approximately 400 deceased beneficiaries—often accepting and retaining such payments for dozens of months after their deaths. *See id.*

156. Further, Coordinated Care (operating as Managed Health Services) obtained more than more than $600,000 in capitated payments from Indiana Medicaid on behalf of more than 200 deceased beneficiaries. *See id.*

157. Finally, CareSource obtained more than more than $600,000 in capitated payments from Indiana Medicaid on behalf of scores of deceased beneficiaries. *See id.*

158. Each of the MCE Defendants not only was aware of its obligation not to retain capitated payments after beneficiaries' deaths, but they also had assured Relator McCullough in late 2016 and early 2017 that they would fulfill that obligation. However, as the IBM analysis makes clear, the MCE Defendants did not fulfill that promise or their legal obligation.

159. Each of the MCE Defendants, therefore, knowingly and improperly retained Medicaid capitated payments they received after beneficiaries' deaths.

5) Each MCE Defendant Routinely and Knowingly Misused Medicaid Funds to Pay Duplicate Claims for the Same Treatment

160. In early 2019, IBM Watson conducted an algorithmic audit to identify duplicate in-patient claims from hospitals that MCEs paid using Medicaid funds (as well as duplicate fee-for-

service claims).

161.  Specifically, because a Medicaid recipient is not expected to have "multiple inpatient claims … with the same admission or discharge date," IBM Watson designed its algorithm "to identify inpatient claims … with the same first date of service and/or same last date of service as another inpatient claim for the same recipient." Ex. 15 at 4.

162.  To conduct this analysis, IBM Watson utilized the encounter data that the MCE Defendants submitted pursuant to their contracts with Indiana Medicaid. More specifically, IBM focused on encounter data for in-patient claims "with service dates on/after 8/1/2012 and paid dates on/before 1/31/2018" and excluded "previously-audited" claims. *Id*.

163.  IBM's analysis shows that each of the MCE Defendants routinely misused Medicaid funds to pay duplicate claims for the same in-patient hospital treatment.

164.  In Anthem's case, IBM found that Anthem paid more than 17,000 potentially duplicate hospital in-patient claims that involved over $151 million in Medicaid funds. *See* Ex. 15 at 18. For example, Anthem's encounter data shows that Anthem paid two separate $6,500 claims from St. Catherine's Hospital—one in August 2017 and the second in February 2018—for treating "other unspecified anxiety" for the same Medicaid beneficiary who was admitted on August 26, 2017, and discharged on September 3, 2017. *Id*. at 16.

165.  In Coordinated Care's case, IBM found that Coordinated Care (operating as MHS) paid more than 16,000 potentially duplicate hospital in-patient claims that involved over $2.1 million in Medicaid funds. *See id*. at 18. For example, Coordinated Care's encounter data shows that Coordinated Care paid two separate $9,500 claims from IU Health (using two different provider codes)—one in August 2017 and the second in January 2018—for treating "other pulmonary embolism" for the same Medicaid beneficiary who was admitted on July 13, 2017, and discharged on Jul 17, 2017. *Id*. at 16.

166. In MDwise's case, IBM found that MDwise paid more than 12,000 potentially duplicate hospital in-patient claims that involved over $115.6 million in Medicaid funds. *See id*. at 18. For example, MDwise's encounter data shows that MDwise paid two separate $2,000 claims from Porter Regional Hospital—one in March 2013 and the second in April 2013—for an in-patient C-section procedure for the same Medicaid beneficiary in January 2013. *See id*. at 17.

167. Finally, in CareSource's case, IBM found that CareSource paid 86 potentially duplicate hospital in-patient claims that involved over $833,000 in Medicaid funds. *See id*. at 18.

168. Additional data analysis performed by IBM Watson in early 2020 further corroborated the 2019 analysis showing that the MCE Defendants had a practice of routinely misusing Medicaid funds to pay duplicate claims.

169. This 2020 algorithm sought to identify "hard duplicates," *i.e.*, two or more claims with ***matching*** data in nine separate fields—i) recipient ID, ii) billing provider ID, iii) servicing provider ID, iv) date of service, v) procedure code, vi) modifiers, vii) revenue code, viii) amount paid, and ix) quantity allowed, in the MCE Defendants' encounter data from the period of August 1, 2016, to June 30, 2019. *See* Ex. 9 at 2.[22]

170. According to IBM's 2020 hard duplicates analysis, each of the MCE Defendants continued to misuse Medicaid funds to pay duplicate claims on a routine basis in 2018 and 2019. More specifically, IBM found that Anthem made more than $75 million in potential overpayments involving over 1 million hard duplicate claims, Coordinated Care made more than $44 million in potential overpayments involving over 465,000 hard duplicate claims, MDwise made more than $42 million in potential overpayments involving over 490,000 hard duplicate claims, and

---

[22]   IBM's definition of "hard duplicates" is set forth in Exhibit 30 (FAC Ex. 37).

CareSource made nearly $9 million in potential overpayments involving over 168,000 hard duplicate claims. *See* Ex. 18 at 2.

171. Further, unlike its 2019 duplicate in-patient claims analysis, IBM did not limit the 2020 algorithm solely to hospital claims. Thus, IBM's 2020 analysis shows that in addition to duplicate hospital claims, the MCE Defendants also routinely paid duplicate claims submitted by ambulatory surgical centers, physicians' practices, and laboratories. *See* Ex. 19 at 3-4 (payments of thousands of duplicate claims from, among other providers, Senate Street Surgery Center in Indianapolis, Oncology Hematology Associates in Newburgh, and Lab Corp. of America).

172. The MCE Defendants not only were aware of their basic obligation not to pay duplicate claims for the same treatment for the same Medicaid beneficiary, but each also assured Relator McCullough in late 2016 and early 2017 that it had procedures for fulfilling this obligation. However, as the IBM analysis makes clear, the MCE Defendants did not fulfill that promise or their legal obligation.

173. Each of the MCE Defendants, therefore, has routinely, knowingly, and improperly disregarded its obligation to detect and prevent the payment of duplicate claims.[23]

---

[23] As IBM acknowledged in its 2019 report, the full extent of its 2019 duplicate hospital in-patient claims findings may be overstated due to "duplicate inpatient encounters" in the data that the MCE Defendants submitted to Indiana Medicaid. Specifically, if "the MCEs did not submit the void records" to clarify that "previous iterations of [an] encounter were actually voided," it would create false positives. Ex. 15 at 9.

However, the consistent findings from IBM's 2019 and 2020 duplicate claims analyses, considered together with the fact that MCE Defendants expressly agreed to submit accurate encounter data to Indiana Medicaid, clearly demonstrate the MCE Defendants' practice of routinely paying duplicate claims.

**C.  The MCE Defendants Routinely and Knowingly Misused Medicaid Funds to Pay Chiropractic, Dental, and Opioid Treatment Claims in Violation of Applicable Medicaid Billing Requirements**

1)  <u>Medicaid Clearly Prohibited Paying Chiropractic, Dental, and Opioid Treatment Claims That Did Not Comply with Medicaid Billing Requirements</u>

174.  To prevent duplicative billing and improper over-utilization of medical services, Indiana Medicaid promulgated specific billing requirements for certain types of procedures, including, as relevant here, A) to require the use of "modifier 25"—indicating "a significant, separately identifiable evaluation and management [E/M] service"—if a chiropractor submits an office visit claim on the same day as a manipulative treatment claim; B) to disallow separate claims for opioid treatment because those services were paid on "a daily bundled rate" for addiction treatment that "includes payment for opioid treatment;" and C) to prohibit separate dental claims for procedures like sutures when Medicaid already paid bundled dental payments for the same patients on the same days that included those procedures.

175.  <u>First</u>, Indiana Medicaid has only allowed a chiropractic claim for an office visit on the same day as a manipulative treatment or a physical medicine service if the office visit is "above and beyond the usual preservice and post-service work associated with a manipulation or physical medicine service." IHCP Chiropractic Services Provider Reference Module at 2 (available at: https://www.in.gov/medicaid/providers/files/modules/chiropractic-services.pdf). In other words, Medicaid funds should not be used to pay for a chiropractic office visit on the same day as a chiropractic treatment unless it is sufficiently distinct from the treatment.

176.  To ensure compliance with this policy, Indiana Medicaid required that a claim for a chiropractic office visit on the same day as a manipulative treatment or a physical medicine service must include "modifier 25–Significant, separately identifiable E/M" to indicate that the office visit "constitutes a significant, separately identifiable evaluation and management (E/M)." *Id.*

177. Further, this Indiana Medicaid billing requirement accords with the CMS's billing standards for Medicaid programs, which states that "[i]n general, E&M services performed on the same date of service as a minor surgical procedure are included in the payment for the procedure" and that "a significant and separately identifiable E&M service unrelated to the decision to perform the minor surgical procedure is separately reportable with modifier 25." Medicaid NCCI 2021 Coding Policy Manual, Chap. 1 at 17 (available at: https://www.medicaid.gov/medicaid/program-integrity/downloads/nccimanual2021-chapterone.pdf).

178. Finally, to prevent improper payments for chiropractic services, federal healthcare programs have implemented predictive algorithms and audits. By 2017, for example, CMS had created several chiropractic models in its Fraud Prevention System to analyze chiropractic claims to detect potential fraud, waste, and abuse.

179. Second, to prevent duplicative billing, Indiana Medicaid has expressly disallowed separate claims for certain dental procedures—including sutures, bitewing radiographs, and prophylaxis —on the same day as other dental procedures that encompassed them.

180. For example, sutures "are considered a part of a general extraction." Thus, claims for sutures should not be billed for the same date of service as … extractions," unless unique circumstances are present that rendered the sutures "**unrelated** to the extraction." IHCP Dental Services Provider Reference Module at 11 (available at: https://www.in.gov/medicaid/providers/files/modules/dental-services.pdf) (emphasis in original).

181. Similarly, because "a full-mouth complete series of radiograph images … is inclusive of bitewing [] radiographs," Indiana Medicaid does not cover a claim for "bitewing [] radiographs … for the same date of service as a full-mouth [radiograph] series[.]" *Id*. at 20.

182. In addition, because prophylaxis is duplicative of full-mouth debridement and full-mouth scaling, a claim for prophylaxis "could not be billed for the same date of service" as a claim

for either a full-mouth debridement and a full-mouth scaling claim. *See id*. at 19.

183.  Further, both HHS-OIG and CMS have taken steps to enforce these Medicaid billing requirements against submitting "unbundled" dental claims.

184.  As early as 2016, for example, CMS offered a training on "Medicaid Compliance for the Dental Professional," which emphasized, among other billing issues, improper "unbundling" of dental claims in violation of state Medicaid rules.[24]

185.  Similarly, Indiana Medicaid directed IBM Watson to run algorithmic audits to identify improperly unbundled dental claims and sought recoupment based on IBM's analysis. In July 2016, for example, Indiana Medicaid had 16 outstanding recoupment demands based on the improperly unbundled dental claim analysis performed by IBM. *See* Ex. 8 at 2.

186.  Further, in 2021, HHS-OIG obtained a $40,460.34 civil monetary penalty on a healthcare provider for improperly "submitting claims for unbundled dental procedures" in violation of the Civil Monetary Penalties Law.[25]

187.  <u>Third</u>, starting in September 2017, Indiana Medicaid established a policy to reimburse "Addiction Services/OPT providers … [at] a daily bundled rate that includes payment for required opioid treatment services." IHCP Bulletin BT 201755 at 2 (available at: https://provider.indianamedicaid.com/ihcp/Bulletins/BT201755.pdf).

188.  Pursuant to this Medicaid policy, providers were required to "bill one unit of Healthcare Common Procedure Coding System (HCPCS) code H0020 – Alcohol and/or drug

---

[24]   https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Provider-Education-Toolkits/Downloads/dental-medcompliance-presentation-handout.pdf (last visited August _, 2024).

[25]   https://oig.hhs.gov/fraud/enforcement/neighborhood-healthcare-agreed-to-pay-40000-for-allegedly-violating-the-civil-monetary-penalties-law-by-submitting-claims-for-unbundled-dental-procedures/ (last visited August _, 2024).

services; methadone administration and/or service (provision of the drug by a licensed program) for each day [that a Medicaid beneficiary] presents for treatment." *Id*.

189.  Indiana Medicaid further specified that the daily bundled rate for addiction services included 13 different types of services (including daily methadone treatment, daily pharmacologic management, one hour of case management service per week, monthly drug testing, and hepatitis testing). *See id*. In other words, addiction services providers were not allowed to separately bill for those services while also receiving the daily bundled rate for the same Medicaid beneficiary.

### 2)  The MCE Defendants Knew the Importance of Complying with the Medicaid Billing Requirements for Chiropractic, Dental, and Opioid Treatment Claims

190.  Both Medicaid regulations and the MCE Defendants' contracts with Indiana Medicaid required them to familiarize themselves with Medicaid billing requirements, including those requiring the modifier 25 for chiropractic office visit claims on the same day as manipulative treatment, disallowing standalone dental procedure claims separate from bundled dental procedures, and prohibiting standalone addiction service claims separate from the bundled daily rate for opioid treatment. *See* 42 C.F.R. § 438.608(a); Ex. 3 at 146-147 (MCE SOW).

191.  Further, to ensure that Medicaid MCEs in Indiana understood these hospital billing rules, Indiana Medicaid also repeatedly trained the MCE Defendants on the importance of complying with these rules when they processed Medicaid claims.

192.  For example, when Relator McCullough gave a presentation to representatives of all health industry participants in June 2015 on the 2015 audit strategy for the Program Integrity team, he specifically highlighted that Indiana Medicaid routinely audited claims for, among other common improper payment scenarios, "Add-on Standalone Services." *See* Ex. 5 at 4.

193.  In addition, between fall 2016 and early 2018, the Indiana Medicaid Program Integrity team met monthly with each of the MCE Defendants to discuss their fraud and abuse

detection and prevention responsibilities. Relator McCullough, along with a representative from IBM Watson, attended each of these meetings up to February 2017. *See*, *e.g.*, Ex. 8, 16 (agenda for February 2017 monthly meeting with Defendants CareSource and Coordinated Care).

194.  During those monthly meetings, Relator McCullough repeatedly discussed with the MCE Defendants the fact that they must implement detection and prevention procedures to identify, prevent, and recoup improper payments relating to claims that fail to comply with Medicaid billing requirements, including, as relevant here, standalone chiropractic office visit claims without the required modifier 25, standalone dental claims separate from bundled dental procedures, and standalone addiction treatment claims separate from the bundled opioid treatment claims.  In response, each MCE Defendant assured Relator McCullough that they were implementing such procedures.

3) <u>Each MCE Defendant Routinely and Knowingly Misused Medicaid Funds to Pay Chiropractic Office Visit Claims in Violation of Medicaid Billing Requirements</u>

195.  In August 2020, IBM Watson conducted an algorithmic audit to identify improper payments by the MCE Defendants to "chiropractors who billed office visit evaluation and management (E/M) codes on the same day as manipulation treatment or physical medicine services (*i.e.*, chiropractic services)" when "no modifier 25 was billed to indicate significant, separately identifiable E/M services." *See* Ex. 20 at 2.

196.  This algorithm analyzed claims paid by the MCE Defendants using Medicaid funds with dates of service between January 1, 2017, and January 31, 2020.

197.  Within this universe, IBM Watson first flagged the chiropractic office visit claims, which were billed using CPT codes 99201-205 or 99211-215, that had the same dates of service as chiropractic services. IBM then focused on the subset of claims that did not have modifier 25.

198. Based on this analysis, IBM Watson found that all of the MCE Defendants had misused Medicaid funds to pay for improper chiropractic office visit claims.

199. More specifically, IBM's analysis showed that Defendant Anthem had misused $1,711,510.85 of Medicaid funds to pay 26,988 improper chiropractic office visit claims; Defendant MDwise misused $797,592.57 of Medicaid funds to pay 12,610 improper chiropractic office visit claims; Defendant Coordinated Care (operating as MHS) misused $424,209.75 of Medicaid funds to pay 12,610 improper chiropractic office visit claims; and Defendant CareSource misused $160,828.59 of Medicaid funds to pay 2,351 improper chiropractic office visit claims. *See* Ex. 18 (a summary of IBM's findings as to the MCE Defendants).

200. The MCE Defendants not only were aware of its obligation to detect and prevent payment of these improper chiropractic office visit claims, but each also had assured Relator McCullough in late 2016 and early 2017 that they were fulfilling this obligation. However, as the IBM analysis makes clear, the MCE Defendants did not fulfill that promise or their legal obligation.

201. Each of the MCE Defendants, therefore, knowingly misused Medicaid funds to pay improper chiropractic office visit claims and, thereby, violated Medicaid billing requirements.

4) Each MCE Defendant Routinely and Knowingly Misused Medicaid Funds to Pay Standalone Dental Claims in Violation of Billing Requirements

202. In September 2020, IBM Watson conducted an algorithmic audit to identify improper payments by the MCE Defendants to "providers who were paid for unbundled dental services" with the same dates of service as bundled payments for other dental procedures that encompassed those services. *See* Ex. 21 at 2.

203. This algorithm analyzed claims paid by the MCE Defendants using Medicaid funds with dates of service between February 1, 2017, and January 31, 2020. Within this universe, IBM

Watson focused on three specific types of improper dental claims that should have been bundled.

204. <u>First</u>, IBM found suture claims paid by the MCE Defendants (with CPT codes D7910, D7911, and D7912) that had the same dates of service and same tooth number as paid tooth extraction claims (with CPT codes D7111, D7140, D7210, D7220, D7230, D7240, D7241, D7250, and D7251), which were paid a bundled amount that included sutures.

205. <u>Second</u>, IBM found prophylaxis claims paid by the MCE Defendants (with CPT codes D1110 and D1120) that had the same dates of service as paid full-mouth debridement claims (with CPT code D4355) or periodontal scaling/root planning claims (with CPT codes D4341 and D4342), which both were paid a bundled amount that included prophylaxis.

206. <u>Third</u>, IBM found bitewing radiographs claims paid by the MCE Defendants (with CPT codes D0270, D0272, D0273, D0274, and D0277) that had the same dates of service as paid full-mouth radiograph series claims (with CPT code D0210), which were paid a bundled amount that included bitewing radiographs.

207. Based on this analysis, IBM Watson found that all of the MCE Defendants had misused Medicaid funds to pay for improperly unbundled dental claims.

208. More specifically, IBM's analysis showed that Defendant Anthem had misused $5,265,268.40 of Medicaid funds to pay improperly unbundled dental claims; Defendant MDwise misused $4,765,635.25 of Medicaid funds to pay improperly unbundled dental claims; Defendant Coordinated Care (operating as MHS) misused $325,604.01 of Medicaid funds to pay improperly unbundled dental claims; and Defendant CareSource misused $21,785.18 of Medicaid funds to pay improperly unbundled dental claims. *See* Ex. 18 (a summary of IBM's findings as to the MCE Defendants).

209. The MCE Defendants not only were aware of their obligation to detect and prevent payment of these improperly unbundled dental claims, but they also had each assured Relator

McCullough in late 2016 and early 2017 that they were fulfilling this obligation. However, as the IBM analysis makes clear, the MCE Defendants did not fulfill that promise or their legal obligation.

210.  Each of the MCE Defendants, therefore, knowingly misused Medicaid funds to pay improperly unbundled dental claims and, thereby, violated Medicaid billing requirements.

5)  <u>Each MCE Defendant Routinely and Knowingly Misused Medicaid Funds to Pay Standalone Addiction Treatment Claims in Violation of Billing Requirements</u>

211.  In June 2020, IBM Watson conducted an algorithmic audit to identify improper payments by the MCE Defendants to "providers who were paid for [addiction treatment] services that are included in the Opioid Treatment Program daily bundled rate." *See* Ex. 22 at 2.

212.  This algorithm analyzed claims paid by the MCE Defendants using Medicaid funds with dates of service between June 1, 2017, and November 30, 2019.

213.  Within this universe, IBM Watson focused on the types of services included in the bundled rate for opioid treatment—such as daily methadone treatment and daily pharmacologic management—that were paid by the MCE Defendants while they were also paying the bundled daily rate for opioid treatment for a Medicaid beneficiary.

214.  Based on this analysis, IBM Watson found that all the MCE Defendants had misused Medicaid funds to pay for improperly unbundled addiction treatment claims.

215.  More specifically, IBM's analysis showed that Defendant Anthem had misused $1,161,988.37 of Medicaid funds to pay 11,490 improperly unbundled addiction treatment claims; Defendant Coordinated Care (operating as MHS) misused $792,964.96 of Medicaid funds to pay 8,551 improperly unbundled addiction treatment claims; Defendant MDwise misused $395,500.41 of Medicaid funds to pay 3849 improperly unbundled addiction treatment claims; and Defendant

CareSource misused $329,334.19 of Medicaid funds to pay 2,648 improperly unbundled addiction treatment claims. *See* Ex. 18 (a summary of IBM's findings as to the MCE Defendants).

216.  The MCE Defendants not only were aware of their obligation to detect and prevent payment of these improperly unbundled addiction treatment claims, but each also had assured Relator McCullough in late 2016 and early 2017 that it was fulfilling this obligation. However, as the IBM analysis makes clear, the MCE Defendants did not fulfill that promise or their legal obligation.

217.  Each of the MCE Defendants, therefore, knowingly misused Medicaid funds to pay improperly unbundled addiction treatment claims and, thereby, violated Medicaid billing requirements.

## VII.  THE HOSPITAL DEFENDANTS IMPROPERLY OBTAINED MEDICAID FUNDS BY KNOWINGLY AND ROUTINELY SUBMITTING CLAIMS IN VIOLATION OF CLEAR MEDICAID BILLING REQUIREMENTS

218.  As detailed below, the Hospital Defendants each has knowingly and improperly obtained millions of dollars in Medicaid funds by submitting claims that A) violated basic hospital billing rules such as those disallowing two separate in-patient claims when the patient is readmitted right away for the same condition, *see infra* ¶¶ 219–258; B) were clearly not payable because they were for services after patients' death or were duplicative of already-paid claims, *see infra* ¶¶ 259–288; and C) contravened Medicaid billing requirements for injection claims, *see infra* ¶¶ 289–306.

### A.  The Hospital Defendants Routinely and Knowingly Submitted Claims to Medicaid That Violated Medicaid Hospital Billing Rules

#### 1)  The Hospital Defendants Knew the Importance of Complying with Medicaid Hospital Billing Rules for Readmissions, Transfers, and 24-Hour Stays

219.  As detailed above, Medicaid billing rules prohibit separate in-patient hospital claims in cases of immediate readmissions for the same medical condition, require the use of the hospital transfer status code, and disallow full in-patient hospital claims without 24-hour hospital stay.

HHS-OIG and Indiana Medicaid, moreover, have enforced those billing rules through civil penalties and audits. *See supra* ¶¶ 85–96.

220.  The provider agreement that each Hospital Defendant executed in order to receive Medicaid payments, as well as federal and state Medicaid regulations, imposed an obligation on the Hospital Defendants to familiarize themselves with Medicaid billing rules, including those requiring the use of the hospital transfer status code, disallowing full in-patient hospital claims without a 24-hour hospital stay, and prohibiting separate in-patient hospital claims in cases of immediate readmissions for the same medical condition. *See* Ex. 28 at 2 (provider agreement provision mandating agreement to "abide by the state's Medical Policy Manual and IHCP Provider Reference Modules as amended from time to time, as well as all provider bulletins, banner pages, and notices"); 405 Ind. Admin Co. § 1-1.4-3.

221.  To ensure that Medicaid providers in Indiana like the Hospital Defendants understood these rules, Indiana Medicaid also repeatedly gave them notice about these improper claim types.

222.  In June 2015, for example, Relator McCullough gave a presentation on the 2015 audit strategy for the Program Integrity team at Indiana Medicaid to representatives of all health industry participants, including the Hospital Defendants. During that presentation, Relator McCullough highlighted that Indiana Medicaid routinely audited claims for, among other issues, "Hospital Transfers," "Outpatient During Inpatient," and "Hospital Readmissions." *See* Ex. 5 at 4.

223.  Other members of Indiana Medicaid's Program Integrity team and Provider Relations team offered similar alerts and warnings about these types of improper claims to the Hospital Defendants during other regularly scheduled meetings and trainings.

    2)  <u>Each Hospital Defendant Routinely and Knowingly Submitted Separate In-Patient Claims to Medicaid Despite Immediate Readmissions</u>

224.  In 2019, IBM Watson conducted an algorithmic audit to identify claims for

beneficiaries who were discharged and then subsequently readmitted within 72 hours at the same facility for the same condition, but for which two separate claims were created. *See* Ex. 10 at 1.

225.   Specifically, IBM Watson analyzed fee-for-service and managed care claims for the period of July 2015 through December 2018 that involved a beneficiary's readmission to the same facility with the same condition within 72 hours of the discharge date on an earlier claim. *Id.*

226.   IBM determined that the each of the Hospital Defendants had routinely and improperly submitted separate in-patient claims that involved a beneficiary's readmission to the same facility with the same condition within 72 hours of the discharge date on an earlier claim.

227.   In Defendant IU Health's case, IBM Watson found that multiple hospitals within IU Health's network—including the main hospital and the Riley Hospital for Children in Indianapolis, IU Health Arnett Hospital, IU Health Bloomington Hospitals, and IU Health Ball Memorial Hospital—improperly submitted hundreds of separate in-patient claims that involved a beneficiary's readmission to the same facility with the same condition within 72 hours of the discharge date on an earlier claim. *See* Ex. 10; Ex. 23 at 1. For example, IU Health's Riley Hospital for Children submitted 89 such claims to MCEs and improperly obtained more than $946,000 in Medicaid payments. Ex. 10 at 1. IU Health's main campus also submitted 66 such claims to MCEs and improperly obtained more than $854,000 in Medicaid payments. *Id*. In addition, IU Health Bloomington Hospitals submitted 37 such claims to MCEs and improperly obtained more than $412,000 in Medicaid payments. *Id*.

228.   For Defendant Ascension, IBM Watson similarly found that multiple hospitals within Ascension's network submitted scores of separate in-patient claims that involved a beneficiary's readmission to the same facility with the same condition within 72 hours of the discharge date on an earlier claim. *See* Ex. 10 at 1-2. For example, Ascension's St. Vincent Hospital West 86th Street in Indianapolis submitted 28 such claims to MCEs and improperly obtained more than $292,000

in Medicaid payments. *Id*. at 1. Similarly, Ascension's St. Vincent Hospital campus in Evansville submitted 26 such claims to MCEs and improperly obtained more than $156,000 in Medicaid payments. *Id*.

229.  In Defendant Community's case, IBM Watson found that Community's campus in Anderson submitted multiple separate in-patient claims that involved a beneficiary's readmission to the same facility with the same condition within 72 hours of the discharge date on an earlier claim. These include such a fee-for-service claim that allowed Community Hospital of Anderson to improperly obtain more than $33,000 in Medicaid payments. *See* Ex. 23. These also include 4 claims submitted to MCEs by Community Hospital of Anderson that enabled it to improperly obtain more than $153,000 in Medicaid payments. *See* Ex. 10 at 2.

230.  For Defendant Eskenazi, IBM Watson found 37 instances where Eskenazi submitted separate fee-for-service in-patient claims that involved a beneficiary's readmission to the same facility with the same condition within 72 hours of the discharge date on an earlier claim. *See* Ex. 23. Those false claims enabled Eskenazi to improperly obtain more than $1.4 million in Medicaid payments. *Id*. Eskenazi also improperly submitted 24 such claims to MCEs and improperly obtained more than $272,000 in Medicaid payments based on those claims. *See* Ex. 10 at 1.

231.  In Defendant Lutheran's case, IBM Watson found that Lutheran submitted 34 in-patient claims that involved a beneficiary's readmission to the same facility with the same condition within 72 hours of the discharge date on an earlier claim and improperly obtained more than $259,000 in Medicaid payments. *See* Ex. 10. at 1-2.

232.  Finally, for Defendant Parkview, IBM Watson found that at least two Parkview hospitals submitted managed care in-patient claims that involved a beneficiary's readmission to the same facility with the same condition within 72 hours of the discharge date on an earlier claim. Parkview Regional Medical Center (*i.e.*, Parkview North), for example, submitted 80 such claims

to MCEs and improperly obtained more than $563,000 in Medicaid payments. *See id.* at 1. Parkview North also submitted 6 such fee-for-service claims and improperly obtained more than $150,000 in Medicaid payments. *See* Ex. 23.

233.   Each of these Hospital Defendants not only was aware of Medicaid's prohibition against submitting separate in-patient claims when the same beneficiary was readmitted within 72 hours for the same condition, but each also had expressly agreed in its provider agreement to "abide" by those requirements. Further, those defendants had notice of the need to monitor and prevent such claims during trainings offered by Indiana Medicaid, including the June 2015 training given by Relator McCullough. However, as the IBM analysis makes clear, these Hospital Defendants knowingly disregarded their express undertaking and their legal obligation to comply with Medicaid billing requirements for claims involving hospital readmissions.

234.   Each Hospital Defendant, therefore, routinely and knowingly submitted false claims when they made separate claims for Medicaid payments when the same beneficiary was readmitted within 72 hours for the same condition.

3)   Each Hospital Defendant Routinely and Knowingly Submitted Claims in Contravention of Medicaid Billing Rules on Hospital Transfers

235.   In 2018, IBM Watson conducted an algorithmic audit "to identify fee-for-service (FFS) and managed care (MC) inpatient claims with patient status discharge code other than 'transfer,'" but otherwise met "criteria that indicated a same-day transfer may have occurred, resulting in a full DRG payment [to the transferring hospital], rather than the DRG-prorated daily rate." Ex. 6 at 4.

236.   Specifically, IBM Watson focused on claims from the period of September 2011 to February 2017 and "identified inpatient claim pairs for the **same** recipient, **same** discharge date (for claim 1) and admission date (for claim 2)," with "**different**" billing providers, and "**without**

a 'transfer' patient status discharge code []for claim 1[.]" *Id*. (emphasis added). Further, to target claims with DRG-based payments, IBM focused on "claim pairs where the first claim was reimbursed according to []DRG[] methodology[.]" *Id*.

237.  Based on this analysis, IBM Watson found that each Hospital Defendant improperly submitted claims, and received Medicaid payments under the DRG system, without using the "transfer" patient status discharge code.

238.  In Defendant IU Health's case, IBM Watson determined that multiple hospitals within IU Health's network—including the main hospital and the Riley Hospital for Children in Indianapolis as well as the IU Health Ball Memorial Hospital in Muncie—improperly submitted dozens of claims for full DRG payment without using the transfer code. *See id.* at 8, 11. For example, IU Health's main campus in Indianapolis submitted 17 such fee-for-service claims and improperly obtained more than $184,000 in Medicaid payments as well as 8 such claims to MCEs and improperly obtained more than $65,000 in Medicaid payments. *Id.*

239.  For Defendant Ascension, IBM Watson found that Ascension's St. Vincent Hospital West 86th Street in Indianapolis submitted 13 fee-for-service claims for full DRG payments without using the transfer code and improperly obtained more than $94,000 in Medicaid payments. *Id*. at 8. IBM also found that the same hospital submitted 2 such claims to MCEs and improperly obtained more than $26,000 in Medicaid DRG payments. *See* Ex. 19 at 1.

240.  In Defendant Community's case, IBM Watson found that multiple hospitals in Community's system improperly submitted claims for full DRG payments without using the transfer code. *Id*. at 1-2. For example, Community Hospital North and Community Hospital South in Indianapolis each submitted 2 such claims and, together, improperly obtained more than $15,000 in Medicaid payments. *Id.*

241. For Defendant Eskenazi, IBM Watson found that Eskenazi submitted 9 fee-for-service claims for full DRG payments without using the transfer code and improperly obtained more than $71,000 in Medicaid payments. *See* Ex. 6 at 8. Eskenazi also submitted 4 such managed care claims and improperly obtained more than $14,000 in Medicaid payments. *Id.* at 11.

242. In Defendant Lutheran's case, IBM Watson found that Lutheran's main campus submitted 2 managed care claims for full DRG payments without using the transfer code and improperly obtained more than $1,000 in Medicaid payments. *See id*. at 2.

243. Finally, for Defendant Parkview, IBM Watson found that multiple Parkview hospitals submitted claims for full DRG payments without using the transfer code. Parkview Whitley Hospital, for example, submitted 5 such claims to MCEs and improperly obtained nearly $9,000 in Medicaid payments. Similarly, Parkview Huntington Hospital submitted 5 such claims to MCEs and improperly obtained more than $6,000 in Medicaid payments.

244.  Each of these Hospital Defendants not only was aware of its obligation to use the transfer code when submitting claims for full DRG payments involving hospital transfers, but each also had expressly agreed in its provider agreement to "abide" by those requirements. Further, those defendants had notice of the need to monitor and prevent such claims during trainings offered by Indiana Medicaid, including the June 2015 training given by Relator McCullough. However, as the IBM analysis makes clear, these Hospital Defendants knowingly disregarded their express undertaking and their legal obligation to comply with Medicaid billing requirements for claims involving hospital transfers.

245. Each Hospital Defendant, therefore, routinely and knowingly submitted false claims for full DRG payments to Medicaid without using the transfer code.

4) <u>Each Hospital Defendant Routinely and Knowingly Submitted In-Patient Claims to Medicaid Without 24-Hour Hospital Stays</u>

246.  In 2020, IBM Watson conducted an algorithmic audit "to identify inpatient claims and encounters where the patient may have been admitted for less than 24 hours." Ex. 12 at 4.

247.  Specifically, IBM Watson analyzed paid fee-for-service and managed care facility in-patient claims for the period of May 2017 through April 2020 "where the inpatient length of stay was one or two days." *Id.* IBM limited its analysis to specific patient status codes and claims reimbursed using DRG methodology and excluded claims that did not fit those criteria as well as claims that had already been subjected to prior audits. *Id.* at 10.

248.  Based on this analysis, IBM Watson determined that all the Hospital Defendants regularly submitted in-patient claims that either had the same admission and discharge date where the length of stay was clearly under 24 hours or had admission and discharge dates one day apart where the length of stay was likely under 24 hours. *Id.* at 11, 14.

249.  Specifically, IBM Watson found that IU Health's Riley Hospital for Children received more than $28,000 in payment for a fee-for-service claim with the same date of admission and discharge. *See id.* at 11. IBM also found 499 paid managed care in-patient claims with the *same* admission and discharge date. *Id.* The full payments on these claims totaled more than $5.9 million. *See id.* at 14.

250.  In addition, IBM determined that a large volume of two-day fee-for-service and managed care in-patient claims—totaling more than 27,000 between and involving approximately $280 million in Medicaid payments—likely involved a length of stay under 24 hours, depending on the time of day the patient was admitted and discharged. *Id.*

251.  In Defendant IU Health's case, IBM Watson determined that multiple hospitals within IU Health's network—including the main hospital and the Riley Hospital for Children in

Indianapolis, IU Health hospital in Bloomington, and the IU Health Ball Memorial Hospital in Muncie—all submitted hundreds of in-patient claims who likely had a length of stay under 24 hours. *See id.* at 11, 14. For example, Riley Hospital for Children submitted 176 such likely false fee-for-service claims and obtained more than $2.6 million in Medicaid payments as well as 899 such claims to MCEs and obtained nearly $12.3 million in Medicaid payments. *Id.*

252.  For Defendant Ascension, IBM Watson found that Ascension's St. Vincent Hospital West 86th Street in Indianapolis submitted 718 such likely false managed care claims and obtained more than $7.6 million in Medicaid payments. *Id*. at 14.

253.  In Defendant Community's case, IBM Watson found that Community's hospital in Munster submitted 60 such likely false fee-for-service claims and obtained more than $730,000 in Medicaid payments. *Id*. at 9. Further, Community's campus in Indianapolis submitted 497 such likely false managed care claims and obtained more than $6.2 million in Medicaid payments. *Id.*

254.  For Defendant Eskenazi, IBM Watson found that Eskenazi submitted 676 such likely false fee-for-service claims and obtained more than $6.9 million in Medicaid payments and also submitted 891 such likely false managed care claims and obtained more than $10.1 million in Medicaid payments. *Id.* at 9, 14.

255.  In Defendant Lutheran's case, IBM Watson found that Lutheran's campus in Fort Wayne submitted 145 such likely false fee-for-service claims and obtained more than $1.2 million in Medicaid payments and also submitted 617 such likely false managed care claims and obtained more than $6.2 million in Medicaid payments. *Id.* at 9, 14.

256.  Finally, for Defendant Parkview, IBM Watson found that Parkview's main campus in Fort Wayne submitted 212 such likely false fee-for-service claims and obtained more than $1.8 million in Medicaid payments and also submitted 1560 such likely false managed care claims and obtained more than $12.7 million in Medicaid payments. *Id.* at 9, 14.

257.  Each of these Hospital Defendants not only was aware of its obligation to avoid submitting in-patient claims in cases involving less than 24 hours of stay, but each also had expressly agreed in its provider agreement to "abide" by those requirements. Further, those defendants had notice of the need to monitor and prevent such claims during trainings offered by Indiana Medicaid, including the June 2015 training given by Relator McCullough. However, as the IBM analysis makes clear, these Hospital Defendants knowingly disregarded their express undertaking and their legal obligation to comply with Medicaid billing requirements and avoid submitting in-patient claims without 24-hour hospital stays.

258.  Each Hospital Defendant, therefore, routinely and knowingly submitted false in-patient claims to Medicaid when patients did not stay for at least 24 hours.

### B.  The Hospital Defendants Routinely and Knowingly Submitted Medicaid Claims That Were Clearly Unallowable

> 1)  The Hospital Defendants Knew the Importance of Complying with the Medicaid Billing Rules Against Claims for Services After Deaths and Duplicate Claims

259.  As detailed above, federal and state Medicaid regulations prohibited the submission of claims for treatment supposedly rendered after beneficiaries' deaths and submitting duplicate claims for the same treatment. Indiana Medicaid, moreover, has repeatedly enforced those billing rules through audits. *See supra* ¶¶ 130–39.

260.  The provider agreement that each Hospital Defendant executed in order to receive Medicaid payments, as well as federal and state Medicaid regulations, imposed an obligation on the Hospital Defendants to familiarize themselves with Medicaid regulations and billing rules and requirements, including the rules against submitting claims for treatment supposedly rendered after beneficiaries' deaths and submitting duplicate claims for the same treatment. *See* Ex. 28 at 2 (provider agreement provision mandating agreement to "abide by the state's Medical Policy Manual and IHCP Provider Reference Modules as amended from time to time, as well as all

provider bulletins, banner pages, and notices"); 405 Ind. Admin Co. § 1-1.4-3.

261.  To ensure that Medicaid providers in Indiana like the Hospital Defendants understood these rules, Indiana Medicaid also repeatedly gave them notice about these improper claim types.

262.  In June 2015, for example, Relator McCullough gave a presentation on the 2015 audit strategy for the Program Integrity team at Indiana Medicaid to representatives of all health industry participants, including the Hospital Defendants. During that presentation, Relator McCullough highlighted that Indiana Medicaid routinely audited claims for, among other issues, "Services After Date of Death." *See* Ex. 5 at 4.

263.  Other members of Indiana Medicaid's Program Integrity team and Provider Relations team offered similar alerts and warnings about claims for services after date of death and duplicate claims to the Hospital Defendants during other regularly scheduled meetings and trainings.

 2)  Defendants IU Health, Ascension, Community, and Parkview Knowingly Submitted Medicaid Claims for Services Supposedly Given After Patients' Deaths

264.  In late 2020, IBM Watson conducted an algorithmic audit "to identify payments for services that occurred at least one day after a recipient['s] death[.]" Specifically, IBM Watson began with "recipients with death dates in the [Indiana Medicaid] recipient database and flagged all services that occurred at least one day after the recipient's death date." Ex. 13 at 4.

265.  Based on this analysis, IBM Watson found that Hospital Defendants IU Health, Ascension, Community, Eskenazi, and Parkview all submitted numerous claims to Medicaid and obtained payments for medical services that supposedly were rendered after beneficiaries' deaths.

266.  In Defendant IU Health's case, IBM Watson found that several different hospitals within IU Health's network submitted dozens of different claims for treatments that supposedly occurred months, sometimes years, after patients had died. IU Health's Riley Hospital for children, for example, submitted two claims for services allegedly rendered 139 days after a patient's death

and received more than $7,000 in Medicaid payments. *See* Ex. 13 at 16. IU Health's Riley Hospital, moreover, submitted 37 separate claims for services allegedly rendered years after two patients' death and received more than $800 in Medicaid payments. *See id*.

267.  In Defendant Ascension's case, IBM Watson found that the hospice unit at its St. Vincent Hospital submitted 22 separate claims for services allegedly rendered 12 days after a patient's death and received more than $3,300 in Medicaid payments. *See id*. at 13.

268.  For Defendant Community, IBM Watson found that Community's hospital in Noble County obtained more than $1,400 in Medicaid payments after submitting 8 claims for two different patients for services allegedly rendered months after their deaths. *See id*. at 16.

269.  For Defendant Parkview, IBM Watson found that the Parkview Regional Medical Center (*i.e.*, Parkview North) obtained more than $900 in Medicaid payments after submitting 14 claims for a patient for services allegedly rendered more than half a year after death. *See id*. at 16.

270.  Defendants IU Health, Ascension, Community, and Parkview not only were aware of their obligation to avoid submitting claims for services that supposedly were rendered after beneficiaries' deaths, but they also had expressly agreed in their provider agreements to "abide" by those requirements. Further, those defendants had notice of the need to monitor and prevent such claims during trainings offered by Indiana Medicaid, including the June 2015 training given by Relator McCullough. However, as the IBM analysis makes clear, these Hospital Defendants knowingly disregarded their express undertaking and their legal obligation to comply with Medicaid billing requirements and to avoid submit claims after patients' death.

271.  Defendants IU Health, Ascension, Community, and Parkview, therefore, knowingly submitted false claims to Medicaid for services supposedly rendered after beneficiaries' deaths.

3) <u>Each Hospital Defendant Routinely and Knowingly Submitted Duplicate Claims to Medicaid</u>

272.  In early 2019, IBM Watson conducted an algorithmic audit to identify duplicate in-patient claims submitted by hospitals either directly to Indiana Medicaid or to the MCE Defendants.

273.  Specifically, IBM designed its algorithm "to identify inpatient claims … with the same first date of service and/or same last date of service as another inpatient claim for the same recipient." Ex. 15 at 4. For purposes of this 2019 analysis, IBM focused on encounter data for in-patient claims "with service dates on/after 8/1/2012 and paid dates on/before 1/31/2018" and excluded "previously-audited" claims. *Id.*

274.  IBM's analysis shows that each of the Hospital Defendants routinely misused Medicaid funds to pay duplicate claims for the same in-patient hospital treatment.

275.  In IU Health's case, IBM found that multiple hospitals within IU Health's network each received payments for hundreds of duplicate in-patient claims. Specifically, IU Health's main campus in Indianapolis received more than $25 million in Medicaid payments for over 2,300 potentially duplicate in-patient claims. Further, IU Health's Ball Memorial Hospital and Bloomington Hospital each received more than $5 million in Medicaid payments for, respectively, 1,143 and 927 duplicate in-patient claims. *See* Ex. 13 at 11, 14, 17.

276.  For example, IU Health's Riley Hospital for Children submitted duplicate claims for treating the same patient starting on August 5, 2016—one to Indiana Medicaid directly and one to an MCE. As a result, IU Health received two payments for the same treatment—$25,000 directly from Indiana Medicaid and $270,000 from the MCE. *See id.* at 13.

277.  For Defendant Community, IBM Watson also found that multiple hospitals within Community's network routinely received Medicaid payments for duplicate in-patient claims.

Specifically, Community's main campus received more than $5 million in Medicaid payments for over 1,200 potentially duplicate in-patient claims. *See id*. at 17. Community Hospital North also received more than $4 million in Medicaid payments for over 500 duplicate in-patient claims. *See* Ex. 17 at 1.

278.  For example, on February 1, 2016, Community submitted two separate claims for treating the same patient for the same condition (post operative infection) between August 20 and August 28, 2015. As a result, Community received two payments from Medicaid. Ex. 15 at 10.

279.  For Defendant Eskenazi, IBM Watson found that it received more than $29 million in Medicaid payments for over 2,500 potentially duplicate in-patient claims. *See id*. at 14, 17.

280.  For example, Eskenazi submitted two separate claims in August 2015 for treating the same patient for the same condition (disturbance of skin sensation) on the same dates. Eskenazi received two separate $1,250 payments from Medicaid from those claims. *See id*. at 10.

281.  For Defendant Ascension, IBM Watson found that multiple hospitals within Ascension's network routinely received Medicaid payments for duplicate in-patient claims. Specifically, St. Vincent Hospital West 86th Street in Indianapolis received more than $10 million in Medicaid payments for over 1,300 potentially duplicate in-patient claims. Further, St. Vincent Regional Hospital in Anderson received more than $2.5 million in Medicaid payments for 742 duplicate in-patient claims. *See* Ex. 17 at 1.

282.  For Defendant Parkview, IBM Watson found that Parkview Regional Medical Center (*i.e.*, Parkview North) received more than $10 million in Medicaid payments for over 2,100 potentially duplicate in-patient claims. *See* Ex. 15 at 14, 17. IBM also found that Parkview's Whitley campus received more than $262,000 in Medicaid payments for 51 potentially duplicate in-patient claims. *See* Ex. 23 at 5.

283.  For Defendant Lutheran, IBM Watson found that Lutheran received nearly $5 million in Medicaid payments for over 600 potentially duplicate in-patient claims. *See* Ex. 17 at 1.

284.  The findings of the 2019 IBM duplicate in-patient claims analysis, moreover, were corroborated by IBM's 2020 analysis of duplicate claims.

285.  Specifically, by examining fee-for-service claims data and MCE encounter data for "hard duplicates," *i.e.*, two or more claims with **matching** data in nine separate fields—i) recipient ID, ii) billing provider ID, iii) servicing provider ID, iv) date of service, v) procedure code, vi) modifiers, vii) revenue code, viii) amount paid, and ix) quantity allowed, for the period of August 1, 2016, to June 30, 2019, IBM Watson's analysis showed that each of the Hospital Defendants continued to submit, and receive Medicaid payments for, duplicate claims on a routine basis. *See* Ex. 18, Ex. 19.

286.  The Hospital Defendants not only were aware of their obligation to avoid submitting duplicate claims, but they also had expressly agreed in their provider agreements to "abide" by those requirements. Further, those defendants had notice of the need to monitor and prevent such claims during trainings offered by Indiana Medicaid. However, as the IBM analysis makes clear, these Hospital Defendants knowingly disregarded their express undertaking and their legal obligation to comply with Medicaid billing requirements and to avoid duplicate claims.

287.  The Hospital Defendants, therefore, knowingly submitted false duplicate claims and improperly obtained millions of dollars in Medicaid payments.[26]

---

[26]   As IBM acknowledged in its 2019 report, the full extent of its 2019 duplicate hospital in-patient claims findings may be overstated due to "duplicate inpatient encounters" in the data that the MCE Defendants submitted to Indiana Medicaid. Specifically, if "the MCEs did not submit the void records" to clarify that "previous iterations of [an] encounter were actually voided," it would create false positives. Ex. 30 at 9. However, given the fact that IBM found that the Hospital Defendants submitted duplicate claims both directly to Indiana Medicaid and to the MCEs, and given the consistent findings between the 2019 and 2020 IBM analysis, the evidence shows that the Hospital Defendants each had a practice of routinely submitting duplicate claims.

C. **Hospital Defendants Eskenazi, Parkview, IU Health, Community, and Lutheran Routinely, Knowingly, and Improperly Billed Medicaid for Injection Services That Were Duplicative of Their Treatment Room Visit Claims**

1) Hospital Defendants Eskenazi, Parkview, IU Health, Community, and Lutheran Knew the Importance of Not Submitting Injection Claims to Medicaid That Were Duplicative of Treatment Room Visit Claims

288. It is a long-standing Medicaid policy to reimburse out-patient treatment room services fee-for-service claims at a flat rate that includes most drugs, injections, infusions, and supplies. In other words, the cost of the administration of injections is taken into account when Medicaid sets the out-patient treatment room reimbursement rate. *See* IHCP Provider Module, Outpatient Facility Services at 5 (Rev. Jan. 1, 2024).[27]

289. "Therefore, when providing other services in the treatment room setting, administration of the injection is not[a] separately reimbursable [claim]" for Medicaid billing purposes. IHCP Provider Module, Outpatient Hospital and Ambulatory Surgical Center Services (Rev. Apr. 1, 2016).

290. The provider agreement that each Hospital Defendant executed in order to receive Medicaid payments, as well as federal and state Medicaid regulations, imposed an obligation on the Hospital Defendants to familiarize themselves with Medicaid regulations and billing rules and requirements, including the rules against submitting injection claims separate from treatment room services. See Ex. 28 at 2 (provider agreement provision mandating agreement to "abide by the state's Medical Policy Manual and IHCP Provider Reference Modules as amended from time to time, as well as all provider bulletins, banner pages, and notices"); 405 Ind. Admin Co. § 1-1.4-3.

291. To ensure that Medicaid providers in Indiana like the Hospital Defendants understood these rules, Indiana Medicaid also repeatedly gave them notice about these improper claim types.

---

[27]   Available at: https://www.in.gov/medicaid/providers/files/modules/outpatient-facility-services.pdf (last visited August 7, 2024).

292.  In June 2015, for example, Relator McCullough gave a presentation on the 2015 audit strategy for Indiana Medicaid's Program Integrity team to representatives of all the health industry participants, including the Hospitals. During that presentation, Relator McCullough highlighted that Indiana Medicaid routinely audited claims for, among other issues, "Standalone services." *See* Ex. 5 at 4.

293.  Other members of Indiana Medicaid's Program Integrity and Provider Relations team offered similar alerts and warnings to the Hospital Defendants in other regularly scheduled meetings and trainings about submitting injection claims separate from treatment room services.

2)  <u>Defendants Eskenazi, Parkview, IU Health, Community, and Lutheran Routinely, Knowingly, and Improperly Submitted Injection Claims to Medicaid Separate from Treatment Room Services Claims</u>

294.  In early 2017, IBM Watson conducted an algorithmic audit "to identify providers that billed for injection services in addition to treatment room services (for the same recipient on the same date of service)" in violation of Medicaid billing rules. Ex. 26 at 1.

295.  Specifically, IBM Watson's analysis examined "paid fee-for-service (FFS) facility outpatient (UB-04) claims with service dates on/after 6/1/2010 and paid dates on/before 11/30/2015." *Id*.

296.  To identify the injection claims, IBM Watson utilized a combination of a revenue code (260) and specific procedure codes (such as 96372 and 90460). To identify the treatment room claims, IBM utilized revenue codes 45X, 51X, 52X, 70X, 72X, and 76X. *See id*. at 1-2.

297. To identify the instances of improper duplicate billing, IBM Watson "limited the revenue code 260 injection services [claims] to those with the same date of service, billing provider, billing provider service location, and recipient ID as the treatment room revenue code [claims]." *Id*. at 2.

298. IBM Watson's analysis shows that Hospital Defendants IU Health, Community, Eskenazi, and Parkview all improperly submitted hundreds of injection claims to Medicaid separate from the treatment room service claims for the same patients and on the same dates. *See id.* at 10.

299. IBM also found that 99.9% of those injection claims were for the same medical conditions—as evidenced by the fact that the injection claim was "billed with the exact same diagnosis code" as the treatment room service claim. *Id*. at 1.

300. In Defendant Parkview's case, IBM Watson found that multiple hospitals within Parkview's system submitted hundreds, sometimes thousands, such claims and obtained nearly $700,000 in total Medicaid payments. Specifically, Parkview Regional Medical Center in Fort Wayne (*i.e.*, Parkview North) submitted 8,910 such claims and received more than $481,000 in Medicaid payments. Further, Parkview's Noble Hospital in Kendallville and Huntington Hospital in Huntington each submitted more than 1,500 such claims and obtained more than $85,000 in Medicaid payments. In addition, Parkview's Whitley Hospital in Columbia City submitted more than 1,100 such claims and obtained more than $60,000 in Medicaid payments. *See id.* at 10.

301. For Defendant Eskenazi, IBM Watson found that Eskenazi submitted more than 10,000 injection claims separate from treatment room service claims for the same patients on the same dates and received more than $517,000 in Medicaid payments. *See id.*

302. For Defendant IU Health, IBM Watson found that two different hospitals within IU Health's network each submitted of hundreds of injection claims separate from treatment room service claims. Specifically, IU Health's LaPorte Hospital in La Porte and Starke Hospital in Knox each submitted 621 and 578 such claims, respectively; and each obtained more than $30,000 in Medicaid payments. *See id.*

303. For Defendant Community, IBM Watson found that Community's hospital in

Munster County submitted 469 such claims and received more than $24,000 in Medicaid payments. *See id.*

304.  For Defendant Lutheran, IBM Watson found that Lutheran submitted more than 400 such claims and received more than $20,000 in Medicaid payments. *See id.*

305.  Defendants Parkview, Eskenazi, IU Health, Community, and Lutheran not only were aware of their obligation to avoid submitting claims for injection services separate from treatment room service claims for the same patients on the same dates, but they also had expressly agreed in their provider agreements to "abide" by those requirements. Further, those defendants had notice of the need to monitor and prevent such claims in trainings offered by Indiana Medicaid, including the June 2015 training given by Relator McCullough. However, as the IBM analysis makes clear, these Hospital Defendants knowingly disregarded their express undertaking and their legal obligation to comply with Medicaid billing requirements for injection services.

306.  Defendants Parkview, Eskenazi, IU Health, Community, and Lutheran therefore, knowingly submitted false claims to Medicaid on account of their improperly billing for injection services separately from treatment room services for the same patients on the same dates.

## COUNT I

### PRESENTATION OF FALSE OR FRAUDULENT CLAIMS
### 31 U.S.C. § 3729(A)(1)(A)

307.  The allegations contained in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

308.  Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to Indiana Medicaid within the meaning of 31 U.S.C. § 3729(a)(1)(A).

309.  Specifically, on account of their knowing and improper acceptance of false Medicaid claims for payment in violation of federal Medicaid regulations, Indiana Medicaid regulations and

rules, and the terms of their contracts with Indiana Medicaid, the MCE Defendants knowingly submitted, or caused to be submitted, false claims to Indiana Medicaid in connection with seeking capitated payments.

310.  Similarly, on account of their knowing and improper submission of false Medicaid claims for payment in violation of federal Medicaid regulations, Indiana Medicaid regulations and rules, and the terms of their contracts with Indiana Medicaid, the Hospital Defendants knowingly submitted, or caused to be submitted, false claims to Indiana Medicaid in connection with seeking payments.

311.  Further, on account of their knowing misconduct, the MCE Defendants and the Hospital Defendants caused false claims to CMS for federal Medicaid funds, including the submission of CMS-64 forms that inaccurately certified that all reported "expenditures … are allowable in accordance with applicable implementing federal [and] state statutes, regulations, [and] policies." *See* Ex. 29.

312.  By reason of the false attestations, claims, and data that Defendants knowingly presented, or caused to be presented, for payment or approval, the Medicaid program has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT II

### MAKING AND USING FALSE STATEMENTS IN VIOLATION OF THE FCA
### 31 U.S.C. § 3729(A)(1)(B)

313.  The allegations contained in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

314.  Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

315.  Specifically, on account of their knowing and improper acceptance of false Medicaid claims for payment in violation of federal Medicaid regulations, Indiana Medicaid regulations and rules, and the terms of their contracts with Indiana Medicaid, the MCE Defendants knowingly made or used, or caused to be made or used, false records or statements to Indiana Medicaid in connection with seeking capitated payments.

316.  Similarly, on account of their knowing and improper submission of false Medicaid claims for payment in violation of federal Medicaid regulations, Indiana Medicaid regulations and rules, and the terms of their contracts with Indiana Medicaid, the Hospital Defendants knowingly made or used, or caused to be made or used, false records or statements to Indiana Medicaid in connection with seeking payments.

317.  Further, on account of their knowing misconduct, the MCE Defendants and the Hospital Defendants caused false statements to be made to CMS material to payment of federal Medicaid funds, including the submission of CMS-64 forms that inaccurately certified that all reported "expenditures … are allowable in accordance with applicable implementing federal [and] state statutes, regulations, [and] policies." *See* Ex. 29.

318.  By reason of these false records or statements, the Medicaid program has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT III

### REVERSE FALSE CLAIMS — KNOWINGLY AND IMPROPERLY AVOIDING AN OBLIGATION TO REPAY THE GOVERNMENT BY THE FCA DEFENDANTS

### 31 U.S.C. § 3729(A)(1)(G)

319.  The allegations contained in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

320.  Through the acts and omissions described above, and within the meaning of 31

U.S.C. § 3729(a)(1)(G), the Defendants knowingly made or used a false record or statement material to an obligation to repay the Government in violation of their clear obligation to do so under federal laws, Medicaid regulations, and their agreements with Indiana Medicaid. Defendants also knowingly and improperly concealed, avoided, or decreased their obligation to repay the Government.

321. By reason of these false records or statements, the Government has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

**COUNT IV**

**PRESENTING FALSE OR FRAUDULENT CLAIMS IN VIOLATION OF INDIANA MEDICAID FCA IND. CODE § 5-11-5.7-2(b)(1)**

322. The allegations contained in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

323. Through the acts and omissions described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to Indiana Medicaid within the meaning of the Indiana Medicaid FCA, Ind. Code § 5-11-5.5-2(b)(1).

324. Specifically, on account of their knowing and improper acceptance of false Medicaid claims for payment in violation of federal Medicaid regulations, Indiana Medicaid regulations and rules, and the terms of their contracts with Indiana Medicaid, the MCE Defendants knowingly submitted, or caused to be submitted, false claims to Indiana Medicaid in connection with seeking capitated payments in violation of Ind. Code § 5-11-5.7-2(b)(1).

325. Similarly, on account of their knowing and improper submission of false Medicaid claims for payment in violation of federal Medicaid regulations and Indiana Medicaid regulations and rules, the Hospital Defendants knowingly submitted, or caused to be submitted, false claims

to Indiana Medicaid in connection with seeking payments in violation of Ind. Code § 5-11-5.7-2(b)(1).

326.  By reason of the false attestations, claims, and data that Defendants knowingly presented, or caused to be presented, for payment or approval, the State has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### COUNT V

### MAKING AND USING FALSE STATEMENTS IN VIOLATION OF INDIANA MEDICAID FCA
### IND. CODE § 5-11-5.7-2(b)(2)

327.  The allegations contained in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

328.  Through the acts and omissions described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, within the meaning of the Indiana Medicaid FCA, Ind. Code § 5-11-5.7-2(b)(2).

329.  Specifically, on account of their knowing and improper acceptance of false Medicaid claims for payment federal Medicaid regulations, Indiana Medicaid regulations and rules, and the terms of their contracts with Indiana Medicaid, the MCE Defendants knowingly made or used, or caused to be made or used, false records or statements to Indiana Medicaid in connection with seeking capitated payments.

330.  Similarly, on account of their knowing and improper submission of false Medicaid claims for payment federal Medicaid regulations and Indiana Medicaid regulations and rules, the Hospital Defendants knowingly made or used, or caused to be made or used, false records or statements to Indiana Medicaid in connection with seeking payments.

331.  By reason of these false records or statements, the State has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil

monetary penalty for each false claim.

## COUNT VI

### REVERSE FALSE CLAIMS — MAKING AND USING FALSE RECORDS AND STATEMENTS TO AVOID AN OBLIGATION TO REPAY THE STATE BY THE MCE DEFENDANTS

### IND. CODE § 5-11-5.7-2(b)(6).

332.  The allegations contained in the foregoing paragraphs are alleged as though fully set forth in this paragraph.

333.  Through the acts and omissions described above, and within the meaning of Ind. Code § 5-11-5.7-2(b)(6), the Defendants knowingly made or used a false record or statement material to an obligation to repay the Government in violation of their clear obligation to do so under federal laws, Medicaid regulations, and their agreements with Indiana Medicaid. Defendants also knowingly and improperly concealed, avoided, or decreased their obligation to repay the Government.

334. By reason of these false records or statements, the State has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

## DEMAND FOR RELIEF

WHEREFORE, Relators seek entry of judgment against Defendants, jointly and severally, as follows:

a.      ordering Defendants to cease and desist from violating the FCA, 31 U.S.C. § 3729 *et seq*., and the Indiana Medicaid FCA, Ind. Code. § 5-11-5.7-1 *et seq*.;

b.      entering judgment against Defendants in an amount equal to three times the amount of damages that the Government and the state have sustained because of Defendants' actions, plus the maximum civil penalties provided for each violation of the FCA and the Indiana Medicaid FCA;

c.      awarding Relators a full share of the proceeds of this action or settlement in accordance with 31 U.S.C. § 3730(d) and Ind. Code. § 5-11-5.7-6;

d.      awarding Relators all costs of this action, including their attorneys' fees and expenses, pursuant to 31 U.S.C. §3730(d) and Ind. Code. § 5-11-5.7-6;

e.      awarding the Government and the State their respective costs and all other relief authorized by law; and

f.      ordering such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a jury trial.

Dated: <u>August 19, 2024</u>

| **DICELLO LEVITT LLP** | **THE WOLCOTT LAW FIRM LLC** |
|---|---|
| By: <u>*/s/ Li Yu*   </u><br>Li Yu*<br>Stacey MacKinnon**<br>485 Lexington Avenue, Suite 1001<br>New York, NY 10017<br>(646) 933-1000<br>lyu@DicelloLevitt.com<br><br>Molly Knobler<br>801 17th St NW, Suite 430<br>Washington, DC 20006<br>(202) 975-2288<br>mknobler@DicelloLevitt.com | By: <u>    */s/*             </u><br>Christopher S. Wolcott (#23259-32)<br>450 East 96th Street, Suite 500<br>Indianapolis, IN 46240<br>(317) 500-0700<br>Indy2buck@hotmail.com |

* Admitted *pro hac vice*

** *Pro hac vice* application forthcoming