**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF INDIANA, *ex rel.* JOHN D. MCCULLOUGH and JAMES R. HOLDEN,<br><br>       Plaintiff-Relators,<br><br>vs.<br><br>ANTHEM INSURANCE COMPANIES, INC., MIDWISE, INC., *et al.*,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No: 1:21-CV-00325-TWP-TAB |

**PLAINTIFFS-RELATORS' CONSOLIDATED MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ..................................................................................... 1

SUMMARY OF THE KEY ALLEGATIONS ............................................................... 4

    A.    IBM Used Well-Established Data Analysis Algorithms to Accurately Identify False Claims That Clearly Did Not Comply with Medicaid Billing Requirements ................................................................. 5

    B.    Improper Political Pressure—Instead of a Change in Law or Policy or a Concern about Accuracy —Impeded Indiana Medicaid's Recovery Efforts .......... 7

    C.    IBM's Reports Identified the False Medicaid Claims at Issue with Specificity ..... 8

    D.    IBM Watson's Reports Were Provided Directly to the Program Integrity Team at Indiana Medicaid and Were Not Publicly Available or Given to Federal Officials ................................................................................... 9

STANDARD OF REVIEW ......................................................................................... 10

ARGUMENT ............................................................................................................. 10

I.    THE SAC PLEADS DEFENDANTS' FALSE MEDICAID CLAIMS WITH SUFFICIENT PARTICULARITY .......................................................................... 10

    A.    In FCA Cases, Rule 9(b) Requires Details on the "Who, What, When, Where, and How" of the Fraud Akin to "the First Paragraph of [a] Newspaper Story" ... 10

    B.    For Each Defendant, the SAC Provides Ample Details on the Nature, Scope, and Timing of Each Type of Medicaid Billing Violations by That Defendant ......11

    C.    Relators Also Plead Falsity—the "What" Element of Fraud—with Particularity 12

    D.    Defendants' 9(b) Arguments Misstate the Legal Standard .................................. 14

    E.    Defendants' 9(b) and Falsity Arguments Raise Factual Disputes That Cannot Be Resolved at the Pleading Stage ........................................................................ 16

II.    RELATORS HAVE SUFFICIENTLY ALLEGED MATERIALITY ............................. 20

    A.    Under *Escobar*, Materiality Is Assessed "Holistically" ........................................ 20

    B.    The SAC Sufficiently Pleads Materiality under *Escobar* by Detailing the Direct Connection to Payment of the Medicaid Billing Requirements at Issue, Consistent Government Enforcement, and Defendants' Knowledge.................... 21

    C.    Defendants' Exclusive Focus on Government Inaction Raises a Factual Dispute

That Cannot be Resolved at the Pleading Stage .................................................. 23

III.    THE SAC'S DETAILED *SCIENTER* ALLEGATIONS READILY SATISFY RULE 9(B)'S STANDARD THAT STATES OF MIND SUCH AS RECKLESS DISREGARD "MAY BE ALLEGED GENERALLY" .................................................................... 26

    A.    The FCA's *Scienter* Element Is Satisfied When the Factual Allegations Show That Defendants Ignored "a Substantial and Unjustifiable Risk" of False Claims ....... 26

    B.    The SAC Details Each Defendant's Awareness of Their Obligation to Comply with the Medicaid Requirements at Stake ........................................................... 27

    C.    Defendants' Reckless Disregard Can Be Readily Inferred from Their Routine Non-Compliance with Medicaid Billing Requirements Uncovered by IBM ....... 28

    D.    Defendants' *Scienter* Arguments Mischaracterize the SAC's Detailed Allegations, Raise Factual Disputes, and Misconstrue Caselaw .............................................. 30

IV.    THE HOSPITAL DEFENDANTS' PROXIMATE CAUSATION ARGUMENT LACKS MERIT BECAUSE THE SAC ALLEGES HOW THEIR FALSE CLAIMS FORESEEABLY LED TO LOSS BY MEDICAID .......................................................... 31

V.    THE PUBLIC DISCLOSURE BAR IS INAPPLICABLE ................................................ 32

    A.    There Was No Public Disclosure .......................................................................... 33

        1.    Defendants Do Not Identify a Qualifying Public Disclosure .................. 33

        2.    The IBM Watson Reports Did Not Fully Disclose Defendants' *Scienter* . 37

    B.    Relators Plausibly Allege Their Original Source Status ....................................... 39

VI.    DEFENDANTS' PERFUNCTORY CONSTITUTIONAL CHALLENGES FAIL ......... 41

VII.    ANY DISMISSAL SHOULD ALLOW RELATORS TO REPLEAD ............................ 42

CONCLUSION.................................................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abner v. Jewish Hosp. Health Care Svcs. Inc.*,
  2008 WL 3853361 (S.D. Ind. Aug. 13, 2008) ......................................................1, 10, 16, 27

*Adams v. City of Indianapolis*,
  742 F.3d 720 (7th Cir. 2014) .............................................................................................10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................................10

*Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*,
  377 F.3d 682 (7th Cir. 2004) .............................................................................................43

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................................10

*Bellevue v. Universal Health Servs. of Hartgrove, Inc.*,
  867 F.3d 712 (7th Cir. 2017) .........................................................................................38, 41

*Berg v. Honeywell Int'l, Inc.*,
  502 F. App'x 674 (9th Cir. 2012) .......................................................................................35

*Cause of Action v. Chicago Transit Auth.*,
  815 F.3d 267 (7th Cir. 2016) .........................................................................................36, 38

*In re Eli Lilly & Co., Prozac Prods. Liab. Litig.*,
  789 F. Supp. 1448 (S.D. Ind. 1992) ..................................................................................16

*Grant on behalf of United States v. Zorn*,
  2021 WL 4145724 (S.D. Iowa Mar. 8, 2021) ...................................................................39

*People ex rel. Lindblom v. Best Buy Stores, L.P.*,
  2024 WL 5205729 (Ill. App. 2d, Dec. 24, 2024)...........................................................36, 37

*Pisciotta v. Old Nat. Bancorp*,
  499 F.3d 629 (7th Cir. 2007) .............................................................................................37

*In re Plavix Mktg., Sales Pracs. & Prods. Liab. Litig.*,
  123 F. Supp. 3d 584 (D.N.J. 2015) ....................................................................................41

*Pullins v. Thomson Reuters Inc.*,
  2021 WL 5637959 (S.D. Ind. Nov. 30, 2021) ...................................................................43

*Riley v. St. Luke's Episcopal Hosp.*,
  252 F.3d 749 (5th Cir. 2001) (*en banc*) ............................................................................42

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
  563 U.S. 401 (2011)............................................................................................................33

*Thompson v. Trustees of Indiana Univ.*,
  2024 WL 4289642 (S.D. Ind. Sept. 24, 2024) ...............................................43

*U.S. ex rel. Bantsolas v. Superior Air & Ground Ambulance Trans., Inc.*,
  2004 WL 609793 (N.D. Ill. Mar. 22, 2004)...................................................42

*U.S. ex rel. Bashir v. Boeing Co.*,
  2025 WL 405478 (W.D. Wash. Feb. 5, 2025)..................................................25

*U.S. ex rel. Campie v. Gilead Scis. Inc.*,
  862 F.3d 890 (9th Cir. 2017) .........................................................................25

*U.S. ex rel. Cooley v. ERMI, LLC*,
  2023 WL 3587543 (N.D. Ga. May 22, 2023)..................................................39

*U.S. ex rel. Depa v. Midland Orthopedic Assocs.*,
  2024 WL 3797387 (N.D. Ill. Jan. 8, 2024) ..............................................12, 15

*U.S. ex rel. Dieter v. City of Milwaukee*,
  2023 WL 2869851 (E.D. Wis. Apr. 10, 2023)................................................40

*U.S. ex rel. Escobar v. Universal Health Servcs.*,
  842 F.3d 103 (1st Cir. 2016) ..........................................................................21

*U.S. ex rel. Fadlalla v. DynCorp Int'l LLC*,
  402 F. Supp. 3d 162 (D. Md. 2019).................................................................41

*U.S. ex rel. Fischer v. Cmty. Health Network, Inc.*,
  2021 WL 12222172 (S.D. Ind. Oct. 20, 2021) ......................................3, 20, 22, 23

*U.S. ex rel. Foreman v. AECOM, Inc.*,
  19 F.4th 85 (2d Cir. 2021) ........................................................................25, 26

*U.S. ex rel. Fowler v. Caremark Rx, LLC*,
  496 F.3d 730 (7th Cir. 2007) .....................................................................15, 16

*U.S. ex rel. Fryberger v. Kiewit Pac. Co.*,
  41 F. Supp. 3d 796 (N.D. Cal. 2014) ..............................................................41

*U.S. ex rel. Gill v. CVS Health Corp.*,
  2024 WL 3950211 (N.D. Ill. Aug. 26, 2024) .................................................20

*U.S. ex rel. Graziosi v. Accretive Health, Inc.*,
  2018 WL 4503366 (N.D. Ill. Sept. 20, 2018) ............................................12, 38

*U.S. ex rel. Graziosi v. R1 RCM, Inc.*,
  2019 WL 861368 (N.D. Ill. Feb. 22, 2019) ...............................................38, 39

*U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*,
  772 F.3d 1102 (7th Cir. 2014) ........................................................................31

*U.S. ex rel. Grubbs v. Ravikumar Kanneganti*,
  565 F.3d 180 (5th Cir. 2009) ..........................................................................20

*U.S. ex rel. Hanna v. City of Chicago,*
2014 WL 12933553 (N.D. Ill. Sept. 25, 2014) ...................................................35

*U.S. ex rel. Harman v. Trinity Indus. Inc.,*
872 F.3d 645 (5th Cir. 2017) ...........................................................................21

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.,*
352 F.3d 908 (4th Cir. 2003) ...........................................................................25

*U.S. ex rel. Heath v. Wis. Bell, Inc.,* 92 F.4th 654
(7th Cir. 2024), *aff'd* 604 U.S. ----, 2024 WL 567337 (Feb. 21, 2025).......................... *passim*

*U.S. ex rel. Heath v. Wisconsin Bell, Inc.,*
760 F.3d 688 (7th Cir. 2014) ...........................................................................33

*U.S. ex rel. Kelly v. Boeing Co.,*
9 F.3d 743 (9th Cir. 1993) ...............................................................................42

*U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.,*
985 F.2d 1148 (2d Cir. 1993)............................................................................42

*U.S. ex rel Lemon v. Nurses To Go, Inc.,*
924 F.3d 155 (5th Cir. 2019) .......................................................................21, 24

*U.S. ex rel. Ling v. City of L.A.,*
389 F. Supp. 3d 744 (C.D. Cal. 2019) *(same)* ...............................................24, 26

*U.S. ex rel. Lusby v. Rolls-Royce Corp.,*
570 F.3d 849 (7th Cir. 2009) ...................................................................2, 11, 20

*U.S. ex rel. Marsteller v. Tilton,*
2019 WL 4749986 (N.D. Ala. Sept. 30, 2019) ....................................................24

*U.S. ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.,*
540 F.3d 1180 (10th Cir. 2008) ........................................................................37

*U.S. ex rel. May v. Purdue Pharma L.P.,*
737 F.3d 908 (4th Cir. 2013) ...........................................................................34

*U.S. ex rel. Montenegro v. Roseland Cmty. Hosp. Assoc.,*
2023 WL 8190136 (N.D. Ill. Nov. 27, 2023) .................................................13, 15

*U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC,*
812 F.3d 294 (3d Cir. 2016)........................................................................40, 41

*U.S. ex rel. Oliver v. Philip Morris USA Inc.,*
763 F.3d 36 (D.C. Cir. 2014)......................................................................36, 37

*U.S. ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.,*
892 F.3d 822 (6th Cir. 2018) .......................................................................21, 24

*U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC,*
836 F.3d 770 (7th Cir. 2016) ...................................................................2, 11, 17

*U.S. ex rel. Prose v. Molina Healthcare of Ill.*,
  17 F.4th 733 (7th Cir. 2021) ....................................................................... *passim*

*U.S. ex rel. Raffington v. Bon Secours Health Sys., Inc.*,
  405 F. Supp. 3d 549 (S.D.N.Y. 2019)............................................................22

*U.S. ex rel. Reed v. KeyPoint Gov't Sols.*,
  923 F.3d 729 (10th Cir. 2019) .......................................................................41

*U.S. ex rel. Roberts v. Lutheran Hosp.*,
  1998 WL 1753335 (N.D. Ind. Apr. 17, 1998) ...............................................17

*U.S. ex rel. Rockey v. Ear Inst. of Chicago*,
  92 F. Supp. 3d 804 (N.D. Ill. 2015) ..............................................................20

*U.S. ex rel. Rose v. Stephens Inst.*,
  909 F.3d 1012 (9th Cir. 2018) .......................................................................21

*U.S. ex rel. Rowe v. Si-Bone, Inc.*,
  2016 WL 9344090 (D. Vt. Dec. 2, 2016) ......................................................20

*U.S. ex rel. Schramm v. Fox Valley Physician Svcs.*,
  2016 WL 537951 (N.D. Ill. Feb. 11, 2016) ...................................................16

*U.S. ex rel. Schutte v. SuperValu, Inc.*,
  598 U.S. 739 (2023).......................................................................................27

*U.S. ex rel. Stone v. Rockwell Int'l Corp.*,
  282 F.3d 787 (10th Cir. 2002) .......................................................................42

*U.S. ex rel. Suarez v. AbbVie, Inc.*,
  503 F. Supp. 3d 711 (N.D. Ill. 2020) .......................................................33, 38

*U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*,
  41 F.3d 1032 (6th Cir. 1994) .........................................................................42

*U.S. ex rel. USN4U v. Wolf Creek Fed. Svcs.*,
  34 F.4th 507 (6th Cir. 2022) ..........................................................................25

*U.S. ex rel. Watkins v. KBR, Inc.*,
  106 F. Supp. 3d 946 (C.D. Ill. 2015) .......................................................15, 16

*U.S. ex rel. Williams v. NEC Corp.*,
  931 F.2d 1493 (11th Cir. 1991) .....................................................................33

*U.S. ex rel. Wilson v. Graham Cnty. Soil & Water Conservation Dist.*,
  777 F.3d 691 (4th Cir. 2015) .........................................................................37

*U.S. ex rel. Yarberry v. Sears Holdings Corp.*,
  2013 WL 12111729 (S.D. Ill. Nov. 20, 2013) ..........................................29, 30

*U.S. v. Bank of Farmington*,
  166 F.3d 853 (7th Cir. 1999) ...............................................................35, 36, 37

*U.S. v. Chattanooga-Hamilton Cnty. Hosp. Auth.*,
782 F.3d 260 (6th Cir. 2015) .................................................................................36

*U.S. v. Mortg. Invs. Corp.*,
987 F.3d 1340 (11th Cir. 2021) .............................................................................21

*U.S. v. Raymond & Whitcomb Co.*,
53 F. Supp. 2d 436 (S.D.N.Y. 1999) ...............................................................29, 30

*U.S. v. Reditus Labs., LLC*,
2024 WL 4351862 (C.D. Ill. Sept. 30, 2024) ....................................................34, 36

*U.S. v. Sanford-Brown, Ltd.*,
840 F.3d 445 (7th Cir. 2016) .................................................................................26

*U.S. v. UCB, Inc.*,
970 F.3d 835 (7th Cir. 2020) .................................................................................42

*United States v. King-Vassel*,
728 F.3d 707 (7th Cir. 2013) .................................................................................27

*United States v. Krizek*,
111 F.3d 934 (D.C. Cir. 1997) ....................................................................27, 29, 30

*United States v. Luce*,
873 F.3d 999 (7th Cir. 2015) .................................................................................32

*United States v. Rogan*,
517 F.3d 449 (7th Cir. 2008) .................................................................................26

*United States v. Strock*,
982 F.3d 51 (2d Cir. 2020) .....................................................................................21

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
579 U.S. 176 (2016) ..................................................................................... *passim*

## STATUTES

31 U.S.C. § 3729 ...................................................................................1, 3, 27, 31

31 U.S.C § 3730 ..............................................................................33, 34, 35, 39

42 U.S.C. § 1320c-5(a) ...........................................................................................13

## OTHER AUTHORITIES

Fed. R. Civ. P. 9(b) ....................................................................................... *passim*

Fed. R. Civ. P. 15 ...................................................................................................43

Rule 12(b)(6) ....................................................................................................10, 43

Pursuant to the Court's Orders dated January 11, 2025, and February 7, 2025(ECF No. Nos. 179, 184) Plaintiffs-Relators John McCullough and James Holden (together, "Relators") respectfully submit this consolidated memorandum of law in opposition to Defendants' motions to dismiss the False Claims Act ("FCA") claims in the Second Amended Complaint ("SAC") (ECF No. 67). For the reasons set forth below, Defendants' motions should be denied in their entirety.

PRELIMINARY STATEMENT

Relying on their own firsthand experiences and detailed findings by IBM Watson, Relators set forth in the SAC how each Defendant routinely violated Medicaid billing requirements and why those violations were material and reckless. Instead of confronting these allegations in their motions, Defendants effectively ask this Court to require Relators to *prove* their claims before any discovery and to adjudicate the merits of Relators' claims based on a set of facts hypothesized by Defendants. The only basis Defendants proffer for running roughshod over the applicable legal standards at the pleadings stage is that Rule 9(b) supposedly requires as much.

This is improper. As the Seventh Circuit and courts in this District have emphasized, while "Rule 9(b) requires specificity . . . it does not insist that a plaintiff literally prove his case in the complaint." *U.S. ex rel. Prose v. Molina Healthcare of Ill.*, 17 F.4th 733, 741 (7th Cir. 2021); *accord Abner v. Jewish Hosp. Health Care Svcs. Inc.*, 2008 WL 3853361, at *5 (S.D. Ind. Aug. 13, 2008) (*Hamilton, C.J.*) ("Neither section 3729 nor Rule 9(b) requires proof of the falseness of the claim at the complaint stage"). Reviewed under the correct standards, the SAC provides the specificity required by Rule 9(b), satisfies the materiality and *scienter* elements of the FCA, and comports with the FCA's "public disclosure" provisions.

*First*, the SAC lays out how IBM reliably found false claims. IBM was able to identify *falsity* because its computer algorithms looked for Medicaid claims with data-points that clearly show a violation of Medicaid billing requirements. For example, to find false "hospital transfer"

claims, IBM's algorithm identified paired claims where the same patient was discharged from one hospital and admitted at another hospital on the same day without a "transfer" code—which was a clear violation of Indiana Medicaid's hospital billing policy. *See* ECF No. 67 ¶¶ 111−112. The same goes for the other types of false claims at issue. *See infra* at 12−14.

The SAC and attached exhibits also specify the "who, what, when, where, and why" of these false claims. IBM's "Hospital Transfer" report, for instance, details which hospitals and MCE plans were responsible for false claims lacking a "transfer" code and precisely when those false claims were made. *See* ECF No. 67-6 at 5-11. Relators, in short, have complied with Rule 9(b) by spelling out the particulars of the fraud akin to "the first paragraph of any newspaper story." *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009). *See infra* at 11−12.

Unable to address Relators' detailed facts, Defendants disingenuously suggest that IBM's *falsity* findings are unreliable because of boilerplate caveats in the reports. This argument fails for two reasons. To start, it is belied by specific factual allegations on the reliability of IBM's findings. For example, Exhibit 1 to the SAC explains that when specifically challenged and tested for accuracy, IBM's Medicaid overpayment findings were sustained *more than 99% of the time*. ECF No. 67-1 at 15. Further, Rule 9(b) only requires "some measures" of "precision" and "substantiation" from an FCA complaint. *U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016). The SAC, therefore, does not need to "exclude all possibility of honesty in order to give the particulars of fraud." *Lusby*, 570 F.3d at 854-55. IBM's fraud detection algorithms' proven record of 99% accuracy amply meets this standard of falsity. *See infra* at 14−20.

*Second*, the SAC similarly illustrates the *material* nature of Defendants' non-compliance. Relators detail—from their firsthand experience—the training conducted by Indiana Medicaid officials on the billing requirements at issue, and they provide additional specifics about past reviews and recoveries relating to claims that did not comply with those requirements. Courts have

2

found such allegations sufficient to "plausibly alleged materiality under the Supreme Court's holistic approach to determining materiality." *U.S. ex rel. Fischer v. Cmty. Health Network, Inc.*, 2021 WL 12222172, at * 7 (S.D. Ind. Oct. 20, 2021); *accord Molina*, 17 F.4th at 744.

Evading the holistic approach delineated by the Supreme Court, Defendants ask this Court to ignore factual disputes relevant to materiality. Rather than letting the facts reveal if Defendants are correct that IBM's findings were ignored due to a flawed methodology or if Relators are right in attributing inaction to Defendants' "improper political pressure," Defendants ask the Court to just accept their version of the events. *See infra* at 21−26. This does not square with the admonition from the Seventh Circuit's recent *Molina* decision—factual disputes over materiality are "better saved for a later stage, once both sides have conducted discovery." 17 F.4th at 744.

*Third*, Relators also have set forth why Defendants made false claims with *scienter*—which the FCA defines to encompass "actual knowledge," "deliberate ignorance," and "reckless disregard." 31 U.S.C. § 3729(b)(1)(A). As alleged, Defendants received frequent training on the Medicaid billing requirements at issue here. *See* ECF No. 67-5. In late 2016 and early 2017, moreover, each MCE Defendant expressly acknowledged their obligation to comply with those requirements. Given these facts, and as precedents show, Defendants' clear and repeated non-compliance with plainly expressed billing requirements was at least reckless. *See U.S. ex rel. Heath v. Wis. Bell, Inc.*, 92 F.4th 654, 662-63 (7th Cir. 2024), *aff'd* 604 U.S. ----, 2024 WL 567337 (Feb. 21, 2025). *See infra* at 26–31.[1]

*Fourth*, the Court should reject Defendants' erroneous entreaty to dismiss this case on "public disclosure" grounds. As the SAC makes clear, the IBM reports that found the false claims at issue were provided privately to a *state* agency, not to the *federal* government. Thus, the federal

---

[1]    The Hospital Defendants also half-heartedly assert a causation argument. *See* ECF No. 176 at 20-21. But, as explained below, proximate causation is amply alleged because Defendants' false claims directly affected whether and how much Medicaid would pay. *See infra* at 31–32.

FCA's public disclosure bar is plainly inapplicable.[2] As for the Indiana FCA, the IBM reports were never made "public." Instead, they were transmitted privately to the state Medicaid agency as required by contract, and those transmissions do not implicate the public disclosure provisions of the Indiana FCA. *See infra* at 32–41.

*Finally*, defendants' last-gasp effort to inject a constitutional issue into this litigation wholly lacks merit. The FCA's *qui tam* provisions are deeply rooted in history—they are part of a long tradition of similar federal statutes stretching back to the First Congress. Unsurprisingly, therefore, *every* Circuit that has considered the constitutionality of the FCA's *qui tam* provisions has concluded that they accord with the separation of powers principles. *See infra* at 41–42.

### SUMMARY OF THE KEY ALLEGATIONS

Instead of squarely addressing the SAC's detailed allegations, Defendants repeatedly distort the SAC and ask the Court to draw inferences in *their* favor in contravention of Rule 12. For example, the IBM reports attached to the SAC make clear that IBM found false Medicaid claims using well-established and accurate fraud detection algorithms. Defendants, however, mischaracterize IBM's methods as newfangled and unreliable "AI screening tools" and its reports as theoretical "whitepapers." ECF 176 at 1–2, 11–13. Similarly, while the SAC specifies that political pressure—not a concern about accuracy or a change in law or policy—prevented recoveries for the false claims at issue, *see* ECF 67 ¶¶ 36–40, Defendants improperly ask the Court to accept their speculation that Indiana Medicaid stopped utilizing IBM's findings out of accuracy concerns. *See* ECF 176 at 3. Likewise, the SAC states that Relators received the IBM reports "well after the end of their respective tenures as [state] employees." ECF 67 ¶ 19. Yet, Defendants falsely assert that Relators "came into possession" of these reports during their state employment. ECF

---

[2]    Insofar as Defendants speculate that the IBM reports were provided to federal agencies, such rank speculation is wholly improper for at the pleadings stage. *See infra* at 33–35.

173 at 4. Below, Relators briefly recap their core fraud allegations to correct these distortions.

### A.    IBM Used Well-Established Data Analysis Algorithms to Accurately Identify False Claims That Clearly Did Not Comply with Medicaid Billing Requirements

Defendants dispute that IBM Watson "found" false Medicaid claims with its fraud detection algorithms. *See* ECF No. 173 at 5. But the reports attached to the SAC are replete with summaries of IBM's "Findings." *See*, *e.g.*, ECF No. 67-6 at 8, 10; ECF No. 67-11 at 11. The SAC, moreover, explains how and why the data analysis algorithms utilized by IBM both were a widely accepted means of identifying false claims and had a proven track record of accuracy.

As detailed in the SAC, IBM identified the false Medicaid claims at issue here in its role as the fraud and abuse detection system contractor for Indiana Medicaid. Specifically, IBM's main role was to develop, refine, and implement sophisticated computer algorithms to apply plainly expressed Medicaid billing requirements to claims data to find improper Medicaid billing. *See* ECF No. 67 ¶¶ 30−32.

IBM started the process by analyzing the applicable Medicaid billing requirement to determine whether it could be applied algorithmically. Take the "hospital transfer" claims, for example. IBM began with the text of the billing requirement—namely, the "[s]pecial payment policies [that] apply to transfer cases" that directed "**providers to indicate the appropriate patient status discharge code to identify the transferring hospital**." *See* ECF No. 67-6 at 5 (emphasis in original). Under this policy, the transferring hospital are paid "**a DRG-prorated daily rate for each day**," rather than the normal DRG rate. *Id*. (emphasis in original).

To apply this requirement, IBM developed an algorithm to analyze Medicaid claims data looking for "inpatient claim pairs for the **same** recipient, **same** discharge date (for claim 1) and admission date (for claim 2)," with "**different**" billing providers, and "**without** a 'transfer' patient status discharge code[] for claim 1[]." ECF No. 67 ¶ 112 (quoting ECF No. 67-6 at 4). Further, to

ensure that its algorithm analyzed claims data that contained sufficient information, IBM excluded claims that lacked a data field regarding "the severity of illness." *See* ECF No. 67-6 at 7.

The process that IBM followed in 2018 to find improper hospital transfer claims without the required transfer code was not new—IBM had successfully followed the same process in 2012 and 2014 to generate more than $2 million in recoveries for Indiana Medicaid. *See* ECF No. 67 ¶¶ 91−92. Indeed, nearly all of the algorithms that IBM used to identify the false claims at issue here had been implemented previously to recoup improper overpayments for Indiana Medicaid. *Id.* ¶ 88 (prior IBM identification of improper hospital readmission claims), ¶ 96 (prior IBM analysis of out-patient claims improperly billed as in-patient claims), ¶ 132 (prior IBM identification of claims paid after patients' deaths), ¶ 138 (prior IBM identification of duplicate in-patient claims), ¶ 185 (prior IBM identification of improperly unbundled dental claims).

As the SAC also makes clear, the findings of IBM's algorithmic analysis were both accurate and reliable. Between 2011 and 2020, for example, Medicaid overpayments identified by IBM's algorithms were sustained more than 99% of the time when they were challenged. *See id.* ¶ 34 (less than 1% of Indiana Medicaid's recoupment demands based on IBM's analysis were overturned on appeal); *see also* ECF No. 67-1 at 4. Further, IBM's analysis also led to recovery of tens of millions of dollars by Indiana Medicaid. *See* ECF No. 67 ¶ 33 (in 2016, Indiana Medicaid obtained nearly $9 million in recoveries based on IBM's analysis); *see also* ECF No. 67-1 at 15 (as of May 2020, IBM's analytics had enabled Indiana Medicaid to "recover[] over $64M in overpaid claims").

Further, IBM Watson's use of computer algorithms to find false claims that violate billing requirement also is consistent with the process that federal and state Medicaid authorities have regularly used to detect fraud. Specifically, both the Centers for Medicare and Medicaid Services ("CMS"), the federal agency primarily responsible for the Medicaid and Medicare programs, and

the Office of Inspector General for the Department of Health and Human Services ("HHS-OIG"), which is responsible for Medicaid and Medicare oversight, have regularly utilized similar processes to detect and recoup improper overpayments.

For example, to implement the basic principle that Medicare and Medicaid do not pay duplicate claims for the same treatment, CMS has directed recovery auditors to execute "automated post-payment review algorithms to detect and recoup [hospital and physician] duplicate claims." ECF No. 67 ¶ 137. Likewise, HHS-OIG has undertaken audits and data analysis to identify improper payments made after patients' death and to pursue enforcement action relating to claims improperly submitted "for unbundled dental procedures." *See id.* ¶¶ 134−36, 186.

## B.    Improper Political Pressure—Instead of a Change in Law or Policy or a Concern about Accuracy —Impeded Indiana Medicaid's Recovery Efforts

The cessation of Indiana Medicaid's recovery efforts based on the false claims identified by IBM was not based on any change in law or policy; nor was it due to any concern about the accuracy or reliability of IBM's methodology. Specifically, as the SAC explains, Indiana Medicaid has never repudiated, or cast doubt on, the importance of the billing requirements at issue—such as Medicaid not paying duplicate claims or paying claims for services that were supposedly given after patients' deaths. Also, the Hospital Defendants and the MCE Defendants had the same compliance obligations to Medicaid. *See* ECF No. 67 ¶¶ 39−40. Further, Indiana Medicaid never criticized or questioned either the reliability of IBM's analysis or the accuracy of IBM's findings. *See id.* ¶ 38.[3]

Defendants ask the Court to rely on their improper speculation that Indiana Medicaid had

---

[3]    Indeed, the current Indiana state government has plans to use "third-party technology platform services to conduct an independent audit of Medicaid and SEHP claims encounter data from the last three biennia to determine whether unwarranted or inappropriate amounts were paid," including by utilizing "state-of-the-art data analytics solutions[.]" *See* Governor-Elect Mike Braun 2025 Policy Agenda at 27-28 (available at: https://www.brauntransition.com/wp-content/uploads/2024/12/Braun-Policy-Agenda12324.pdf).

concerns about IBM's methodology. *See* ECF No. 176 at 3. In fact, as explained in the SAC, Indiana Medicaid decided to curtail its efforts to recoup improper Medicaid overpayments identified by IBM's analysis due to "political pressure exerted by the health insurers' and the hospitals' lobby." ECF No. 67 ¶ 36. Specifically, a Program Integrity Director with Indiana Medicaid repeatedly refused to allow IBM to "recover identified MCE overpayments" as "result of improper political pressure from the MCE Defendants and the Hospital Defendants." *Id*. ¶ 37. As the SAC alleges, the improper political pressure had a seismic impact on Indiana Medicaid's fraud detection efforts—by 2019, fraud recoveries had fallen by more than 40% from 2016 (from $12.84 million to $7.24 million) even as the volume of claims increased. *Id*. ¶ 40. Relators are entitled to this inference as a matter of law under Rule 12 at this stage of litigation.

## C.    IBM's Reports Identified the False Medicaid Claims at Issue with Specificity

As described in the SAC (and as the exhibits attached to the SAC illustrate), the IBM Watson reports at issue specify the "who, what, when, where, and why" of the false Medicaid claims made by Defendants. The "hospital transfer" report, for example, details by provider IDs and plan IDs, which hospitals and MCE plans were responsible for claims involving hospital transfers that lack the proper "transfer" code, how many such claims each hospital and MCE was involved with, and the date range for those improper claims. *See* ECF No. 67 ¶¶ 111-118; ECF No. 67-6 at 5-12 (an excerpt from page 8 of this IBM report is reproduced below).



**Findings**

**FFS Summary**

For dates of service on or after 9/1/2011 and paid dates on or before 2/28/2017, the IHCP paid a total of a little over $2.5M for 172 claims that possibly ended in a transfer but were not billed with a "transfer" patient status code. These claim lines were billed by 65 unique billing provider IDs, and billing provider totals ranged from about $1,100 to $500,000. The estimated potentially recoverable amount for these claims is around $1.2M.

## Billing Providers

The billing providers above the $30,000 threshold are listed below.

**Figure 1: FFS Billing Providers – by Estimated Recovery Amount**

| Billing Provider ID | Name | Claims | Payment | Est. Recovery |
|---|---|---|---|---|
| 200119790A | INDIANA UNIVERSITY HEALTH | 17 | $506,964.78 | $184,659.85 |
| 200119770A | RILEY HOSPITAL FOR CHILDREN AT IU HLTH | 8 | $235,713.35 | $143,858.81 |

IBM's reports also set forth why those claims did not comply with Indiana Medicaid's billing policy. For example, in its report detailing its findings on the duplicate in-patient hospital claims that the MCE Defendants improperly paid using Medicaid funds, IBM illustrates the basis for its conclusion that claims were duplicative. *See* ECF No. 67-15 at 16 (excerpted below).

| EXAMPLE 8: <u>DIFFERENT</u> BILLING PROVIDER, SAME DATES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Recipient | Billing Provider | MCE | Claim Number | Admit Date | Discharge Date | Primary Diagnosis | Amount Paid | Date Billed |
| OP | INDIANA UNIVERSITY HEALTH INC *100380380A* | MHS-HIP | 67676 | 7/13/2017 | 7/17/2017 | OTHER PULMONARY EMBOLISM | $9,500 | 8/5/2017 |
| OP | INDIANA UNIVERSITY HEALTH *200119790A* | MHS-HIP | 78787 | 7/13/2017 | 7/17/2017 | OTHER PULMONARY EMBOLISM | $9,500 | 1/13/2018 |

In Example 8, we are concerned that the same provider (based on the provider name) submitted what appears to be the exact same encounter using two different billing provider IDs. Additionally, provider ID 100380380A is enrolled as a transportation provider (provider type 26), which does not make sense for an inpatient claim.

### D. IBM Watson's Reports Were Provided Directly to Indiana Medicaid and Were Not Given to Federal Officials or Publicly Available

The SAC alleges that IBM Watson generated the reports identifying the false claims at issue in its role as the fraud and abuse detection contractor for Indiana Medicaid. The SAC further specifies that those reports were provided privately to the Program Integrity team at Indiana Medicaid and were not publicly available. *See* ECF No. 67 ¶¶ 30–35.

Contrary to Defendants' mischaracterizations, *cf.* ECF No. 173 at 15, the SAC does *not* allege that IBM participated in *federal* audit of Indiana Medicaid. Indeed, in Relators' experience, CMS's audits of Indiana's Medicaid program have always focused on whether the state agency has

9

implemented appropriate *policies and procedures*, not any of the specific *findings or reports* generated pursuant to those policies and procedures.

## STANDARD OF REVIEW

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require detailed factual allegations. *See Twombly*, 550 U.S. at 555. Instead, a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (*quoting Iqbal*, 556 U.S. at 678). For the FCA claims here, Rule 9(b) requires particularity as to "the circumstances constituting fraud." *See Molina*, 17 F.4th at 739. By contrast, that "knowledge[] and other conditions of a person's mind" "may be alleged generally" under Rule 9(b). *Id*. In other words, "the rule allows a party to plead [*scienter*] generally" in FCA cases. *Abner*, 2008 WL 3853361, at *5.

## ARGUMENT

## I.   The SAC Pleads Defendants' False Medicaid Claims with Sufficient Particularity

### A.   In FCA Cases, Rule 9(b) Requires Details on the "Who, What, When, Where, and How" of the Fraud Akin to "the First Paragraph of [a] Newspaper Story"

Rule 9(b) requires FCA plaintiffs to plead "with particularity the circumstances constituting fraud[.]" *Presser*, 836 F.3d 770. Practically, this means spelling out "the who, what, when, where, and how" of the fraud akin to "the first paragraph of any newspaper story." *Lusby*, 570 F.3d at 853 (quotations omitted). While Rule 9(b) requires "some means of injecting precision and some measure of substantiation," the "precise details that must be included in a complaint may vary on the facts of a given case," *Presser*, 836 F.3d at 776 (cleaned up). Put simply, "Rule 9(b) … does not insist that a plaintiff literally prove his case in the complaint." *Molina*, 17 F.4th at 741.

**B.    For Each Defendant, the SAC Provides Ample Details on the Nature, Scope, and Timing of Each Type of Medicaid Billing Violations by That Defendant**

Across 284 paragraphs in the SAC, Relators assert detailed factual allegations against each Defendant concerning its violations of material Medicaid billing requirements by billing Medicaid after patients' deaths, billing for Medicaid out-patient services at the in-patient rate, not using the transfer modifier in a claim when the patient were transferred to another hospital, and billing separately for dental procedures when they were part of another procedure like extraction. *See* ECF No. 67 ¶¶ 83−306.

For each Defendant, the SAC also specifies the scope of each type of billing violations that specific Defendant committed in a given period of time. For example, IBM's findings show that MCE Defendant Anthem Insurance misused Medicaid funds to pay 1,004 hospital claims that should have been denied as readmissions between July 2015 and December 2018, *see* ECF No. 67 ¶¶ 102-105; that Anthem improperly paid more than 400 claims between March 2017 and February 2020 for services that purported were given to patients after their deaths, *see id.* ¶¶ 145-147; and that Anthem misused $5,265,268.40 of Medicaid funds to pay claims for dental procedures that were already being covered as part of other procedures, *see id.* ¶¶ 202-208.

Similarly, for Hospital Defendant IU Health, the SAC describes how IBM found that multiple hospitals within IU Health's network improperly submitted separate in-patient claims despite immediate readmissions between July 2015 and December 2018, including 89 such claims at Riley Hospital for Children, 66 claims at IU Health's main campuses, and 37 claims at IU Health's Bloomington campus, *see id.* ¶¶ 224-227; as well as how different hospitals in IU Health's network submitted dozens of claims for treatment allegedly rendered months after patients' death such as two claims for care that supposedly occurred 139 days after a patient's death at Riley Hospital, *see id.* ¶¶ 264-266.

11

This level of detail as to Defendants' false claims, as courts in this Circuit have repeatedly found, satisfies Rule 9(b) because it "provide[s] sufficiently particularized information to enable defendants to defend this case." *U.S. ex rel. Depa v. Midland Orthopedic Assocs.*, 2024 WL 3797387, at *4, (N.D. Ill. Jan. 8, 2024); *accord U.S. ex rel. Graziosi v. Accretive Health, Inc.*, 2018 WL 4503366, at *7 (N.D. Ill. Sept. 20, 2018) (allowing claims to proceed where the allegations "allow the parties to identify (albeit with some further work) that subset of each hospital client's bills to Medicare or Medicaid that allegedly are fraudulent").[4]

### C.    Relators Also Plead Falsity—the "What" Element of Fraud—with Particularity

When it comes to pleading falsity—*i.e.*, the "what" aspect of 9(b)—courts have long recognized that the FCA "is not limited to claims that are facially false." *Molina*, 17 F.4th at 740. Claims can be false based on "false certification [of compliance] with a statute, regulation, or condition of payment," "promissory fraud[] or fraud in the inducement," and "implied false certification." *Id*.

Specifically, falsity can be established under the FCA if a defendant violates applicable rules or regulations while it "certifies—either expressly or by omission—that the claim submitted complies with [rules or] regulations." *U.S. ex rel. Montenegro v. Roseland Cmty. Hosp. Assoc.*, 2023 WL 8190136, at *6 (N.D. Ill. Nov. 27, 2023). Here, the SAC sets forth why each type of claim at issue is "false" under the FCA by (1) spelling out the applicable Medicaid billing requirements, (2) describing the algorithms used by IBM to find violations of those requirements, and (3) tying those violations back to each Defendant's undertaking to comply with those

---

[4]    While the IBM Watson reports detailing the findings of IBM's fraud detection algorithms do not identify the false claims IBM identified by specific Medicaid beneficiaries, that detailed, claim-level data was generated by IBM as part of its fraud detection analysis. Perhaps more importantly, Relators understand that IBM has retained the detailed, claim-level data relevant to this case. That data, therefore, is readily available through discovery.

requirements in its agreement with Medicaid.

*First*, the SAC identifies the source of each requirement in federal or state Medicaid statutes and rules. For example, with respect to Medicaid's billing requirements for cases involving immediate hospital readmissions, services supposedly rendered after patients' deaths, and overlapping dental procedures, the SAC cites to the Indiana Medicaid's "Inpatient Hospital Services Module" on hospital readmissions, the medical necessity requirement codified at 42 U.S.C. § 1320c-5(a) on claims after deaths and duplicate claims, and Indiana Medicaid's "Dental Services Provider Reference Module" on overlapping dental procedures. *See* ECF No. 67 ¶¶ 86, 130, 180. The same goes for all the other types of false claims alleged by Relators. *Id.* ¶ 93 (requiring at least 24 hours hospital stay for in-patient claims), ¶¶ 175−176 (requiring a modifier in chiropractic evaluation claims separate from manipulative treatment claims on the same day), ¶¶ 187−189 (prohibiting separate opioid treatment claims included in a daily bundled rate).

*Second*, the SAC describes how IBM designed algorithms to find violations of those requirements. For cases involving immediate hospital readmissions, for example, IBM looked for data showing that a Medicaid beneficiary was "discharged and subsequently readmitted to the same facility for the same or related condition within 3 days of the initial [] discharge date." *See* ECF No. 67-9 at 2 ("Project Description" field in the row for "Hospital Readmissions"). For cases involving services after deaths, IBM focused on "recipients with death dates in the [Indiana Medicaid] recipient database and flagged all services that occurred at least on day after the recipient's death date." ECF No. 67 ¶ 145. And, for cases involving improperly-billed dental procedures, IBM's algorithm looked for claims with overlapping dental procedures for the same patients on the same dates of service—such as having both a suture and an extraction on the same tooth according to the tooth number. *See id.* ¶¶ 204−207. Further, Relators offer a similarly detailed explanation of each algorithm IBM used to find the false claims at issue. *Id.* ¶¶ 111−112 (improper

hospital transfer claims), ¶¶ 119−120 (improper in-patient claims without 24-hour hospital stays), ¶¶ 161−162 (duplicate in-patient claims), ¶¶ 168−169 (hard duplicate claims), ¶¶ 195−197 (improper chiropractic evaluation claims), ¶¶ 211−213 (improper opioid treatment claims).

*Third*, the SAC explains how each Defendant's non-compliance with Medicaid billing requirements contravened its agreements with the Medicaid program. MCE Defendants like Anthem, for example, signed contracts with Indiana Medicaid in which they "expressly agreed to 'comply with all federal and state requirements regarding fraud and abuse'" and to establish "procedures designed to prevent and detect fraud and abuse." ECF No. 67 ¶ 74. Hospital Defendants like IU Health all executed "the Indiana Medicaid provider agreement," which required each hospital to attest to understanding its obligation to "comply with all federal and state laws and regulations as well as Indiana Medicaid policies." *Id*. ¶¶ 79-80. In addition, when Indiana Medicaid submitted its quarterly expenditure reports to the federal government, it likewise certified that it was reporting "only [] expenditures … that are allowable in accordance with applicable implementing federal, state, and local statutes, regulations, [and] policies." *Id*. ¶ 59 (discussing certification in the CMS-64 form).

Together, these detailed factual allegations sufficiently establish both the falsity element of Relators' FCA claims and the "what" aspect of Rule 9(b)'s particularity requirements. *See Roseland*, 2023 WL 8190136, at *6-7 (denying motion to dismiss *qui tam* claim); *Midland Orthopedic Assocs*., 2024 WL 3797387, at *4-5 (*qui tam* relator satisfied Rule 9(b) by describing a universe of claims for a particular X-ray imaging service that were billed by the FCA defendant in violation of federal and state requirements).

### D.    Defendants' 9(b) Arguments Misstate the Legal Standard

Rather than directly addressing Relators' detailed allegations, Defendants ask this Court to apply incorrect legal standards. Specifically, ignoring Seventh Circuit's mandate to avoid "an

overly rigid view" on how to apply Rule 9(b) to FCA cases, *Molina*, 17 F.4th at 739, Defendants ask this Court to impose a requirement that facts must be alleged at "an *individualized transaction level*.'" *See* ECF No. 173 at 21-23 (emphasis in original). Defendants derive this supposed requirement by cherry-picking language from two cases—*U.S. ex rel. Watkins v. KBR, Inc*. and *U.S. ex rel. Fowler v. Caremark Rx, LLC*—involving wholly different types of fraud.

In *Watkins*, the district court invoked "individual transactions" in relation to allegations that the FCA defendants inflated certain invoices submitted to the Army by miscounting specific costs, rather than, as here, by making or paying claims that violated specific billing requirements. *See* 106 F. Supp.3d 946, 967-68 (C.D. Ill. 2015). In that context, the court found it necessary to assess factual allegations at an "individual transaction" level where the relator did not "provide[] information that can be used to discern how much, if any, of any individual invoice or voucher submitted to the Government under [an Army contract] was artificially inflated." *Id*. at 968. By contrast, this case is about Defendants' non-compliance with basic billing requirements like not seeking two payments for the same service and billing for patients after their deaths and where the amounts "any invoice or voucher submitted to the Government" are detailed *to the penny*. *Watkins*, thus, is inapposite.

Even more telling is Defendants' misplaced reliance on *Fowler*. There, the *qui tam* relators "worked at two of Caremark's distribution facilities" and alleged that Caremark was improperly billing the Government for prescription medications that patients returned. 496 F.3d 730, 741 (7th Cir. 2007). But they "lack[ed] knowledge of Caremark's financial activities" relating to returned medications and did not know "whether Caremark replaced the returned prescription with another prescription without charge." *Id*. at 742.

The opposite is true here. As the SAC makes clear, IBM had access to, and based its findings on, the totality of Indiana Medicaid's payment data. To identify hospital claims without

the required transfer modifier, for example, IBM compared claims submitted by the transferring hospital against those from the receiving hospitals. *See* ECF No. 67 ¶¶ 111-113. Similarly, to identify unallowable dental suture claims that should have been "bundled" with tooth extractions, IBM examined claims with the "same dates of service and same tooth numbers." *Id*. ¶¶ 202-205. Here, therefore, there is no "lack of knowledge" about financial aspects of the fraud alleged.

To the extent *Watkins* and *Fowler* could be understood as rigidly requiring transaction-level details outside of their specific factual contexts, "any such requirement would be inconsistent with modern civil practice." *Abner*, 2008 WL 3853361, at *5 n. 2 (*Hamilton, C.J.*); *see also U.S. ex rel. Schramm v. Fox Valley Physician Svcs*., 2016 WL 537951, at *7 (N.D. Ill. Feb. 11, 2016) (declining to apply *Fowler's* "individualized transaction level" language when the fraud alleged "does not depend on the accounting mechanics of any particular Medicare claim"). In short, the Court should reject Defendants' invitation to utilize cherry-picked language from two inapposite cases as a basis to adopt a dogmatic standard in contravention of the Seventh Circuit's long-standing, flexible approach to Rule 9(b) in FCA cases. *See Molina*, 17 F.4th at 739; *Presser*, 836 F.3d at 775; *see also re Eli Lilly & Co., Prozac Prods. Liab. Litig*., 789 F. Supp. 1448, 1456 (S.D. Ind. 1992) (in applying Rule 9(b), courts are more "lenient in sustaining pleadings where the transactions involved are complex or cover a long period of time, and in cases where the fraud was perpetrated on a party other than the plaintiff") (quotations omitted); *accord U.S. ex rel. Roberts v. Lutheran Hosp*., 1998 WL 1753335, at *6 (N.D. Ind. Apr. 17, 1998) (Rule 9(b) does not require relators to give defendants "a pretrial memorandum containing all of the evidentiary support").

### E.    Defendants' 9(b) and Falsity Arguments Raise Factual Disputes That Cannot Be Resolved at the Pleading Stage

Defendants also improperly seize on boilerplate caveats in IBM's reports to posit that IBM's proven methodologies and detailed findings somehow fail to show falsity or provide

sufficient particularity. To arrive at this erroneous conclusion, Defendants ask the Court to accept their version of disputed facts and ignore Relators' allegations about the trustworthy approach taken by IBM to find overpayments, *see*, *e.g.*, ECF No. 67 ¶¶ 102, 112, the significant recoveries that IBM generated for Indiana Medicaid, *id.* ¶ 33 (in 2016, IBM's algorithms "led to more than $8.9 million in such recoveries"), and the demonstrated accuracy of IBM's algorithms, *id.* ¶ 34 ("less than 1% of Indiana Medicaid's recoupment demands based on IBM['s] analysis were overturned on appeal").[5] Drawing inferences in Defendants' favor at this stage is plain error. *See Travel All Over the World v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1430 (7th Cir. 1996).

Further, contrary to Defendants' suggestions, the fact that IBM discussed standard "limitations" to its fraud detection algorithms is not a "gotcha" moment, and it does not require this Court to overlook the factual underpinnings of IBM's findings. The improperly-coded hospital transfer claims found by IBM's algorithm provide a good illustration. Specifically, IBM compared specific data fields to find claims where the same patient was discharged from one hospital on the same day as she was admitted at a different hospital without a "transfer" modifier. *See* ECF No. 67-6 at 7. These data points directly establish the violation of the relevant Medicaid billing rules. This is further illustrated by the fact that Indiana Medicaid had successfully obtained millions of dollars in recoveries in 2012 and 2014 based on this algorithm. *Id.* at 6. The "limitations" noted in IBM's report, moreover, do not bear on whether Medicaid hospital billing rules were violated; instead, they relate to a different set of issues—"whether services were actually performed or were medically necessary"—that would provide separate bases for disallowing the claims. *Id.* at 7.

The basic logic of IBM's algorithms compels the same conclusion with respect to the other

---

[5]    As noted above, Defendants also implausibly quibble with whether IBM "found" any overpayment in the detailed "findings" sections of its reports, *see* ECF No. 173 at 5, and mischaracterize those reports as mere "whitepaper[s]," *see*, *e.g.*, ECF No. 176 at 12, 13, 25.

types of false claims found by IBM's algorithms such as submitting two separate in-patient claims when the same patient was readmitted within 72 hours at the same hospital, *see* ECF No. 67 ¶¶ 102-103; billing for dental sutures separately from tooth extractions for the same patient on the same day on the same tooth number, *id*. ¶¶ 203-204; and billing for medical care that were supposedly provided to patients after their deaths, *id*. ¶ 264. *See also id.* ¶¶ 119−120 (improper in-patient claims without 24-hour hospital stays), ¶¶ 161−162 (duplicate in-patient claims), ¶¶ 168−169 (hard duplicate claims), ¶¶ 195−197 (improper chiropractic evaluation claims), ¶¶ 211−213 (improper opioid treatment claims).

Tellingly, the Hospital Defendants' attack on IBM's "service after death" report shows why the "limitations" noted by IBM do not excuse Defendants' violations of Medicaid billing rules. According to Defendants, an "egregious example of IBM Watson's unreliability" is its reliance on the accuracy of the dates of death in the Social Security Administration's Death Master File in this report. *See* ECF No. 176 at 21 (discussing the limitation noted at ECF No. 67-13 at 11).

Put simply, Defendants posit that even when data shows that a hospital repeatedly billed Medicaid for medical care it supposedly gave to patients after those patients—according to Social Security's database—had died, is not *plausible* to infer that Medicaid's billing rules were violated. This turns the federal pleading standard on its head. Defendants are not entitled to have the Court *assume* that Social Security must have been wrong in each of these cases. Instead, if Defendants believe there is evidence that Social Security's Death Master File was wrong in each of these cases, they can try to make that showing through discovery.

Defendants' other attack on the "service after death" report is equally revealing. IBM noted that its data did "not include the date that a death date was entered into [Indiana Medicaid's] recipient database." *See* ECF No. 67-13 at 11. Seizing on this, hospital Defendants implausibly claim that if a "recipient's death date was entered [into a database] after a service was rendered,"

18

it means that "the service was in fact rendered before death." ECF No. 176 at 21.

This is nonsensical. The date on which a patient's date of death is put into a database has nothing to do with when that patient died. And delayed data entry cannot entitle a hospital to falsely bill Medicaid for medical care that was supposedly rendered months, or even years, after a patient's death. *See*, *e.g.*, ECF No. 67 ¶ 266 (discussing payments obtained by IU Health's Riley hospital for care supposedly given to years after two patients' deaths).

Finally, the MCE Defendants raise another set of factual disputes as to the reliability of IBM's findings. They mischaracterize as "speculative" Relators' allegations about their widespread misuse of Medicaid funds to pay duplicate claims. According to the MCE Defendants, it was somehow inappropriate for IBM to rely on the accuracy of the data that *they* "submitted to Indiana Medicaid." *See* ECF No. 173 at 27 (discussing ECF No. 67 ¶ 173 n. 23). The MCE Defendants, however, leave out the second half of the footnote in the SAC. It goes on to explain that it was reasonable for IBM to rely on the data submitted by the MCE Defendants because they had "expressly agreed to submit accurate encounter data to Indiana Medicaid." ECF No. 67 ¶ 173 n. 23; *see also id*. ¶ 70 (detailing the MCE Defendants' obligation to submit accurate data).

Ultimately, whether some of the duplicate claims identified by IBM's analysis were "false positives" due to inaccurate data submission by the MCE Defendants is a fact that Defendants are free to try and prove in discovery. At the motion to dismiss stage, however, courts have routinely applied "a relaxed pleading standard" where, as here, "the pertinent facts" concerning potential errors in the MCE Defendants' data "are solely in defendants' possession." *U.S. ex rel. Rowe v. Si-Bone, Inc.*, 2016 WL 9344090, at *7 (D. Vt. Dec. 2, 2016); *accord U.S. ex rel. Rockey v. Ear Inst. of Chicago*, 92 F. Supp. 3d 804, 823 (N.D. Ill. 2015) (recognizing that under the Seventh Circuit's "permissive" approach to Rule 9(b) in FCA cases, a qui tam relator is not required to plead details "that are in Defendants' sole possession"); *U.S. ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d

19

180, 191-92 (5th Cir. 2009) (recognizing that Rule 9(b) does not require *qui tam* relators to provide details from records that "defendants will be in possession of").[6]

## II.    Relators Have Sufficiently Alleged Materiality

### A.    Under *Escobar*, Materiality Is Assessed "Holistically"

The Supreme Court delineated the contours of the FCA's materiality element in *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176 (2016). As a framework for "evaluating materiality" under the FCA, *Escobar* held materiality is determined by "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id*. at 193. Since *Escobar*, courts have followed a "holistic approach to determining materiality." *Fischer*, 2021 WL 12222172, at *5.[7] This, as the Seventh Circuit noted, entails a fact-intensive inquiry. The materiality, *vel non*, of a requirement turns on whether "facts [] indicate that the government actually attaches weight to that requirement and relies on compliance with it." *Molina*, 17 F.4th at 740.

As part of the holistic inquiry, courts have highlighted several relevant considerations. First, courts examine whether a regulatory or contractual requirement directly affects the amount that government pays for a given type of claim, *i.e.*, it went to the "essence of the bargain." *See Escobar*, 579 U.S. at 194; *accord Molina*, 17 F.4th at 744 (recognizing that the fact a contract

---

[6]    Defendants also incorrectly press their "false positives" attack on the potentially improper in-patient claims without 24-hour hospital stays because IBM's algorithm looked for in-patient claims where patients were admitted and discharged on the same day or two consecutive days.

    As IBM acknowledged, some of the claims its algorithm found may not have been improperly billed. But Relators are not required to "exclude all possibility of honesty in order to give the particulars of fraud." *Lusby*, 570 F.3d at 854. As another court in this Circuit has noted, even if a universe of claims consist "primarily" of claims outside of the FCA's reach, a qui tam relator nonetheless "is entitled to the plausible inference that some" are false claims. *See U.S. ex rel. Gill v. CVS Health Corp.*, 2024 WL 3950211, at *11 (N.D. Ill. Aug. 26, 2024).

[7]    *Accord U.S. ex rel. Escobar v. Universal Health Servcs.*, 842 F.3d 103, 109 (1st Cir. 2016), *United States v. Strock*, 982 F.3d 51 (2d Cir. 2020); *U.S. ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 661 (5th Cir. 2017); *U.S. ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 831 (6th Cir. 2018); *U.S. v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1347 (11th Cir. 2021).

"fixes the cost of the NF category [of service] well above the other tiers [of service] is powerful evidence" of materiality); *Heath*, 92 F. 4th at 665 ("*Escobar* does not suggest that violating such a relevant requirement of a government subsidy program should be found immaterial under the False Claims Act.").

Second, courts look to whether the Government took action when it learned of noncompliance with a given requirement. *Escobar*, 579 U.S. at 194-195. But courts consider the import of government knowledge cautiously, recognizing that government enforcement of a given requirement is not confined to a binary choice of payment versus refusal to pay. *See Molina*, 17 F.4th at 744. Instead, enforcement efforts can take the forms of criminal and civil actions, *see U.S. ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 164 (5th Cir. 2019) ("criminal and civil enforcement actions" for similar noncompliance "raised a reasonable inference that the Government would deny payment if it knew about Defendants' alleged violations"); or audits and administrative recoupment, *see U.S. ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1021-22 (9th Cir. 2018) (noting administrative settlements yielding "more than $59 million in [recoupments]"); *U.S. ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 405 F. Supp. 3d 549, 569 (S.D.N.Y. 2019).

Finally, under *Escobar*, the designation of a particular requirement by the government, while "not automatically dispositive," is still relevant to materiality. 579 U.S. at 194; *see also Fischer*, 2021 WL 12222172, at *5.

### B. The SAC Sufficiently Pleads Materiality under *Escobar* by Detailing the Direct Connection Between the Fraud and Medicaid Payment, Consistent Government Enforcement, and Defendants' Knowledge

Consistent with this holistic materiality framework, Relators set forth facts in the SAC showing that the billing requirements at issue go to the "essence of the bargain" between Medicaid and MCEs and hospitals, that prior government audits and reviews mean that "the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with [these]

requirement[s]," and that the government has defined compliance with those requirements as conditions of payment. *See Escobar*, 579 U.S. at 194-95.

*First*, the SAC explains how Medicaid's hospital billing rules like prohibiting separate claims for immediately readmitted patients and requiring a transfer code when a patient is transferred to another hospital directly affect payment under the "diagnosis-related group ("DRG") payment system. Specifically, because the DRG system pays hospitals based on a patient's medical condition, violations of these rules lead to double payments for treating the same condition. *See* ECF No. 67 ¶¶ 85−87, 89-90. Similarly, Relators have set forth how the other billing requirements at issue—such as requiring chiropractic, dental, and opioid addiction treatment claims to be "bundled"—prevents Medicaid from having to pay twice for the same service. *Id*. ¶¶ 175, 180−182, 187−189. In addition, the SAC alleges that Indiana Medicaid requires hospitals to certify their understanding of the obligation to comply with these requirements before they can start billing Medicaid. *Id*. ¶¶ 80−81. In short, compliance with these requirements goes to the very "essence of the bargain" between the hospital and MCE Defendants and Medicaid.

*Second*, for each of the billing rules at issue, Relators also explain how Medicaid has consistently taken steps to enforce the requirement through audits and similar procedures. As discussed above, Indiana Medicaid recouped over two million dollars in 2012 and 2014 for violations of the hospital transfer code requirement. *See* ECF No. 67 ¶¶ 91−92. The SAC abounds with other factual allegations on Medicaid's enforcement of billing requirements like 24-hour minimum stay for in-patient claims, *id*. ¶ 96, payments for medical care supposedly given after patients' deaths, *id*. ¶¶ 132−136, duplicate payments for the same service, *id*. ¶¶ 138−139, and improperly unbundled claims for chiropractic and dental services, *id*. ¶¶ 178, 185−186.

Further, the SAC describes monthly meetings that Relator McCullough held between fall 2016 and February 2017 in which the MCE Defendants said they were already implementing

procedures to disallow claims that do not comply with the billing requirements at issue. *See* ECF No. 67 ¶¶ 100−101, 143−144, 193−194. In short, those Defendants admitted their knowledge of the materiality of these requirements. The SAC also describes regularly scheduled compliance trainings that made the hospital Defendants aware that Medicaid "routinely audited claims" for violations of these billing requirements and plainly highlighting their materiality to payment. *Id.* ¶¶ 221−223, 261−263. In short, Relators have alleged Defendant's knowledge that Medicaid "consistently refuses to pay claims in the mine run of cases" that do not comply with the billing requirements at issue. *Escobar*, 579 U.S. at 195.

*Third*, the fact that Indiana Medicaid expressly conditioned payment on compliance with the relevant billing requirements also illustrates their materiality. *See id.* at 194; *accord Fischer*, 2021 WL 12222172, at *5. Here, as the SAC and the attached exhibits show, Indiana Medicaid made it a condition of payment for providers to attest to their understanding their obligation to comply with Indiana Medicaid policies as well as applicable federal and state laws and regulations, including the billing requirements at issue. *See* ECF No. 67 ¶ 80; ECF No. 67-28 at 6.

## C. Defendants' Exclusive Focus on Government Inaction Raises a Factual Dispute That Cannot be Resolved at the Pleading Stage

Ignoring *Escobar*'s admonition that materiality "cannot rest on a single fact or occurrence as always determinative," 579 U.S. at 195 (quotations omitted), *accord Lemon*, 924 F.3d at 162 (recognizing that "no one factor is dispositive"); *Prather*, 892 F.3d at 834; Defendants ask this Court to disregard the detailed materiality allegations in the SAC and, instead, focus solely on past government inaction on the IBM reports. *See*, *e.g.*, ECF No. 173 at 10 (MCE Defendants mischaracterizing Relators' detailed materiality allegations as "boilerplate" without actually addressing the facts alleged).

Defendants' gambit to reduce the holistic materiality inquiry to a single consideration fails

for three reasons. First, Defendants improperly conflate the materiality of the relevant Medicaid requirements with the reliability of IBM's findings. Second, Defendants' exclusive focus on government inaction—which, as alleged, was due to improper political pressure, not apathy—does not square with either *Escobar*'s holistic approach to materiality or the reasoning of the cases that Defendants rely on. *See*, *e.g.*, *U.S. ex rel. Marsteller v. Tilton*, 2019 WL 4749986, at * 7 (N.D. Ala. Sept. 30, 2019) ("proof of actual knowledge [by an agency] is not dispositive" of materiality); *U.S. ex rel. Ling v. City of L.A.*, 389 F. Supp. 3d 744, 757 (C.D. Cal. 2019) (*same*). Third, and most crucially at this juncture in litigation, Defendants ignore core factual disputes concerning the government's supposed inaction, which precludes their motion to dismiss.

To start, Defendants' materiality argument should be rejected because it improperly conflates two different things—whether the government attaches weight to the Medicaid requirements at stake versus whether IBM's specific findings were reliable. Under *Escobar*, what matters for materiality purposes is the connection between "particular statutory, regulatory, or contractual requirement" that payment by the government. *See* 579 U.S. at 194.

Here, the IBM reports appended to the SAC detail Indiana Medicaid's repeated and successful recoupment efforts based on the billing requirement at issue, which illustrate the materiality of the underlying requirements. Insofar as Defendants target the reliability of the specific IBM reports at issue, that is merely a reprise of their Rule 9(b) challenge to the particularity of Relators' fraud allegations and should be rejected as such.

Second, although *Escobar* gives weight to the Government's treatment of known instances of noncompliance, that consideration does not occur in a vacuum. Rather, as the Seventh Circuit explains, "[m]any things could explain the government's continued [payment]" despite knowledge of noncompliance. 17 F.4th at 744; *see also U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 917 (4th Cir. 2003). Indeed, as a court recently noted, appellate "courts have

recognized that [an] agency may decide not to suspend payment to a potentially liable FCA defendant for reasons unrelated to the materiality of the defendant's false claims." *U.S. ex rel. Bashir v. Boeing Co.*, 2025 WL 405478, at *15 (W.D. Wash. Feb. 5, 2025) (citing *U.S. ex rel. USN4U v. Wolf Creek Fed. Svcs.*, 34 F.4th 507, 517 (6th Cir. 2022).

Here, Defendants' request for this Court to base its materiality determination solely on Indiana Medicaid's past inaction on the IBM reports is particularly inappropriate because Relators "plausibly plead facts to support [a] possible alternative explanation" for that inaction. *U.S. ex rel. Foreman v. AECOM, Inc*., 19 F.4th 85, 115 (2d Cir. 2021); *accord U.S. ex rel. Campie v. Gilead Scis. Inc*., 862 F.3d 890, 906 (9th Cir. 2017) (explaining that the significance of an agency's decision to continue paying claims can be diminished by the existence of alternative explanations for the decision). Specifically, the SAC plausibly alleges—supported by contemporaneous IBM records like Exhibits 1 and 2, *see* ECF No. 67-1, 67-2—that Indiana Medicaid's inaction was not due to either a concern with the accuracy or reliability of IBM's findings or a change in the law. *See* ECF No. 67 ¶¶ 38−39. Instead, improper political pressure from Defendants caused the "Program Integrity Director who was appointed to replace Relator McCullough" to prevent IBM from helping Indiana Medicaid recoup overpayments based on IBM's analysis as it had done repeatedly and successfully for years. *Id*. ¶ 37.

Tellingly, in nearly ten pages of briefing on materiality, *see* ECF No. 173 at 6-10, ECF No. 176 at 17-20, Defendants wholly fail to address, let alone engage with this, the plausible and specific "alternative explanation" that Relators have offered for Indiana Medicaid's inaction. Defendants may vigorously pursue discovery to refute Relators' explanation, and Relators recognize that they "must support these allegations with evidence" in "a later stage of litigation." *Foreman*, 19 F.4th at 115. But this is clearly a factual dispute that cannot be decided on a motion to dismiss. *Cf. U.S. v. Sanford-Brown, Ltd*., 840 F.3d 445, 447 (7th Cir. 2016) (affirming summary

judgment where relator "*offered no evidence* that the government's decision to pay SBC would likely or actually have been different had it known of SBC's alleged noncompliance with Title IV regulations") (emphasis added).

Instead, the question of what truly led Indiana Medicaid to change its fraud detection approach in 2018 "is better saved for a later stage, once both sides have conducted discovery." *Molina*, 17 F.4th at 744. For pleading purposes, the SAC's materiality allegations, including past overpayment recoveries for violations of the same Medicaid requirements, are sufficient. *See*, *e.g.*, *Ling*, 389 F. Supp. 3d at 759-61.[8]

## III.    The SAC's Detailed *Scienter* Allegations Readily Satisfy Rule 9(b)'s Standard That States of Mind Such As Reckless Disregard "May Be Alleged Generally"

### A.    The FCA's *Scienter* Element Is Satisfied When Factual Allegations Show That Defendants Ignored "a Substantial and Unjustifiable Risk" of False Claims

When it amended the FCA in 1986, Congress authorized an FCA plaintiffs to satisfy the *scienter* element in one of three ways—to show defendant's (1) "actual knowledge" of a claim's falsity, (2) "deliberate ignorance" of its truth or falsity, or (3) "reckless disregard" of truth or falsity. *See* 31 U.S.C. § 3729(b)(1). Congress also specified that "no specific proof of intent to defraud" is required. *Id.*

In *United States v. King-Vassel*, 728 F.3d 707 (7th Cir. 2013), the Seventh Circuit addressed meaning of "reckless disregard." Following the D.C. Circuit's decision in *United States v. Krizek*, 111 F.3d 934 (D.C. Cir. 1997), the Seventh Circuit recognized that "reckless disregard in the FCA context" can be "an extension of gross negligence or an extreme version of ordinary negligence."

---

[8]    As the Seventh Circuit has noted, the materiality requirements must be applied with the recognition that the FCA helps "to guard the public fisc against schemes designed to take advantage of overworked, harried, or inattentive disbursing officers," and it "does this by insisting that persons who send bills [] tell the truth." *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008). And the FCA can "not serve this function if proof of materiality depended on establishing that the recipient of the statement would have protected his own interests." *Id.*

728 F.3d at 713 (quotations omitted). Thus, a defendant can be said to act in reckless disregard if she "had reason to know of facts that would lead a reasonable person to realize that she was causing the submission of a false claim" or if she "failed to make a reasonable and prudent inquiry into that possibility." *Id.* at 713. The Supreme Court recently adopted this standard—holding that reckless disregard applies to "defendants [who are] conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *U.S. ex rel. Schutte v. SuperValu, Inc.*, 598 U.S. 739, 751 (2023).

Further, as the Seventh Circuit has emphasized, a *qui tam* "relator may of course rely on circumstantial evidence to prove scienter under the [FCA]." *Heath*, 92 F.4th at 663. Finally, the text of Rule 9(b) makes clear there is no heightened pleading requirements for mental states like reckless disregard. Instead, such "conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *accord Abner*, 2008 WL 3853361, at *5.

## B.     The SAC Details Each Defendant's Awareness of Their Obligation to Comply with the Medicaid Requirements at Stake

Drawing on their firsthand interactions with Defendants, Relators offer detailed allegations about both the MCE and the Hospital Defendants' awareness of their compliance obligations at issue. For the MCE Defendants, Relator McCullough held a series of meetings with each of the MCEs between fall 2016 and February 2017. *See*, *e.g.*, ECF No. 67 ¶ 100; ECF No. 67-8 (agenda for February 2017 meeting with CareSource). In those meetings, Relator McCullough repeatedly emphasized to the MCE Defendants their obligation to implement procedures to detect and prevent the payment of claims that violate Medicaid requirements like the rules on billing for hospital readmissions, hospital transfers, minimum 24-hour stay for in-patient claims, and duplicate payments. *See* ECF No. 67 ¶¶ 101, 144, 194. The admonitions to the MCE Defendants in those in-person meetings, moreover, reiterated compliance training that Relator McCullough and others

from Indiana Medicaid's Program Integrity team had repeatedly given to MCEs years earlier, including at a training session for all Medicaid participants in June 2015. *See*, *e.g.*, ECF No. 67-5 (Relator McCullough's June 2015 fraud detection and prevention presentation that highlighted nearly all of the specific Medicaid requirements at stake here).

The SAC is similarly detailed on the Hospital Defendants' awareness of their obligation. To receive payment as a Medicaid provider, each Hospital Defendant attested to understanding that it must comply with Indiana Medicaid policies and all applicable laws and regulations. *See* ECF No. 67 ¶ 80. Hospital Defendants also expressly "agreed to familiarize themselves with Indiana Medicaid billing policies" and to "abide by the state's Medicaid Policy Manual and [] Modules … as well as provider bulletins, banner pages, and notices." *Id*. ¶ 81. To drive home the importance for understanding and complying with the Medicaid requirements at stake here, Relator McCullough and his colleagues at Indiana Medicaid's Program Integrity team regularly gave training to the Hospital Defendants on those requirements. *Id*. ¶ 221−223, 261−263.

### C. Defendants' Reckless Disregard Can Be Readily Inferred from Their Routine Non-Compliance with Medicaid Billing Requirements Uncovered by IBM

Where, as here, an FCA defendant had ample notice of its obligation to comply with a requirement but nonetheless committed widespread violations of that requirement, courts have readily inferred reckless disregard. In *Heath*, for example, the Seventh Circuit found that the relator met his burden to show reckless disregard *at summary judgment* based on the evidence of a persistently high level of "estimated overcharges." 92 F.4th at 664. In *Krizek*, the D.C. Circuit found the obvious and repeated nature of defendants' improper Medicare claims was particularly "telling[]" and "amply support the District Court's determination that the Krizeks acted with reckless disregard." 111 F.3d at 942. Similarly, in *U.S. ex rel. Yarberry v. Sears Holdings Corp*., the court rejected defendant Kmart's *scienter* argument because it "may be sufficiently reckless"

to violate the FCA if Kmart "did have all the information it needed" to comply with a billing requirement "but failed to have an adequate system in place" to do so. 2013 WL 12111729, at *10-11 (S.D. Ill. Nov. 20, 2013); *see also U.S. v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 447 (S.D.N.Y. 1999) ("a failure to conduct a proper investigation before making a false statement may be sufficiently reckless to yield [FCA] liability").

Here, the allegations in the SAC illustrate the same type of obvious and widespread violations of Medicaid requirements by Defendants. For example, even though Anthem was well aware of its obligation as a Medicaid MCE to detect and prevent double payments for patients who were immediately readmitted to hospitals, IBM found that Anthem improperly paid more than 1,000 such claims in a three-year period. *See* ECF No. 67 ¶ 105. As IBM's findings further show, Anthem misused more than $5 million in Medicaid funds to pay thousands of dental claims that were subsumed within other procedures that were already paid. *See id*. ¶¶ 203−208. In addition, despite being aware of their obligation not to pay duplicate claims, Anthem, Coordinated Care, and MDWise each paid tens of thousands of duplicate in-hospital claims. *See id*. ¶¶ 162−166.

The same is true for the allegations against the Hospital Defendants. For example, IBM found dozens of cases at three different facilities within IU Health where the same hospital billed Medicaid twice for a patient who was immediately readmitted. *See id*. ¶ 227. Further, according to IBM's findings, IU Health's Riley hospital submitted 37 separate claims to Medicaid for medical services that it allegedly to two patients *years* after their death. *See id*. ¶ 266.

In short, the SAC richly alleges that each Defendant "did have all the information it needed" to comply with the Medicaid requirements at stake—for example, Anthem had data showing that it was paying the same hospital twice for the same patient who was immediately readmitted, and IU Health knew it was seeking two separate payments for the same immediately readmitted patient. *See Yarberry*, 2013 WL 12111729, at *11; *accord Raymond & Whitcomb*, 53

F. Supp. 2d at 447 ("clarity of the falsity supports the [conclusion] that a failure to know of the falsity was at least reckless"). Yet, Defendants "failed to have an adequate system in place" to prevent those improper claims, which resulted in each violating Medicaid requirements hundreds, often thousands, of times. *Yarberry*, 2013 WL 12111729, at *11

As *Heath*, *Krizek*, and *Yarberry* show, the clear nature and wide scale of Defendants' noncompliance strongly support an inference of reckless disregard. *See Heath*, 92 F.4th at 664; *Krizek*, 111 F.3d at 942; *Yarberry*, 2013 WL 12111729, at *11. Indeed, the allegations here go beyond those in *Heath*, *Krizek*, and *Yarberry* in one key respect. Rather than violating just one specific Medicare or Medicaid requirement, each of the Defendants in this case—as IBM's reports show—repeatedly violated multiple material Medicaid billing requirements. This further supports an inference of reckless disregard.

### D. Defendants' *Scienter* Arguments Mischaracterize the SAC's Detailed Allegations, Raise Factual Disputes, and Misconstrue Caselaw

Rather than addressing Relators' extensive *scienter* allegations, Defendants resort to mischaracterizing and ignoring the record. For example, while the SAC clearly states that Indiana Medicaid "*repeatedly trained* the MCE Defendants on the importance of complying with" the billing requirements at issue and "*repeatedly warned* them" about paying medically unnecessary claims, *see* ECF No. 67 ¶¶ 98, 141, the MCE Defendants disingenuously assert that "Relators plead that Medicaid conducted a single training in 2016 that warned against some of the violations alleged[.]" ECF No. 173 at 21.

In the same vein, Relators specifically allege that MCE Defendants was incentivized to under-invest in fraud detection procedures due to the structure of Indiana Medicaid's capitated payment system. *See* ECF No. 67 ¶ 69. In response, the MCE Defendants disputes this fact, which simply highlights a factual dispute, as opposed to supporting dismissal. *See* ECF No. 173 at 20.

The Hospital Defendants' *scienter* arguments turn on similar sleights of hand. They assert, for example, Relators do not adequately allege why they "were aware of the entire universe of general billing requirements they alleged violated." ECF No. 176 at 16. Not so. The SAC details how ***each Hospital Defendant attested in writing*** to understanding their obligation to comply with these requirements (not to mention regularly-conducted trainings that they receive from Indiana Medicaid on those requirements). *See* ECF No. 67 ¶¶ 80, 221−223, 261−263. And, as discussed above, the IBM reports show that the Hospital Defendants had knowledge of all the facts they needed to comply with the Medicaid requirements at issue.

Even weaker is the legal aspect of the Hospital Defendants' *scienter* argument. For example, they suggest that this Court should dismiss Relators' FCA claims for not pleading that they "acted with the intention of defrauding the government." ECF No. 176 at 17 (discussing *U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102 (7th Cir. 2014)). This directly contradicts the text of the FCA, which requires no specific intent to defraud. *See* 31 U.S.C. § 3729(b)(1)(B); I.C. § 5-11-5.7-1(b)(4). Defendants' other case citations are similarly inapposite.

In short, under Rule 9(b)'s general pleading standard for states of mind, the SAC sufficiently pleads that both the MCE Defendants and the hospital Defendants acted with reckless disregard. Nothing in Defendants' *scienter* arguments alters that conclusion.

**IV.    The Hospital Defendants' Proximate Causation Argument Lacks Merit Because the SAC Alleges How Their False Claims Foreseeably Led to Loss by Medicaid**

In *United States v. Luce*, the Seventh Circuit held that proximate causation is required for FCA liability. 873 F.3d 999, 1011-1013 (7th Cir. 2015). As *Luce* noted, this element further the FCA's statutory purpose by "winnowing out" those cases "with only attenuated links between the defendant's specific actions and the presentation of false claims." *Id.* at 1012-13 (quotations omitted). To satisfy this element, the loss to the government needs to be "within the foreseeable

risk of harm" created by an FCA defendant's noncompliance. *Id*. at 1011-12.

Here, the SAC clearly alleges the foreseeable—and, in fact, direct—link between the Hospital Defendants' reckless disregard of Medicaid billing requirements and loss to the Medicaid program. For example, by submitting two separate claims to Medicaid for patients who were immediately readmitted 89 times, *see* ECF No. 67 ¶ 227, Defendant IU Health's Riley Hospital improperly obtained nearly $1 million from Medicaid. Similarly, Defendant Ascension's St. Vincent Hospital improperly obtained nearly $300,000 from Medicaid by submitting 28 such claims in violation of Medicaid requirements. *See id*. ¶ 228.

At bottom, this is not a case where the Hospital Defendants did not interact directly with the Medicaid program or a case premised on violation of a general "verification [] required for continued program participation." *See Luce*, 873 F.3d at 1001. Instead, the Medicaid billing requirements that the Hospital Defendants repeatedly violated directly caused false claims to be paid. Accordingly, proximate causation has been adequately pled.

## V.    The Public Disclosure Bar is Inapplicable

Defendants erroneously contend that Relators' claims are foreclosed by the "public disclosure bar" of the federal FCA and Indiana FCA. Both statutes limit a relator's ability to bring *qui tam* claims when the critical elements of those claims were already publicly disclosed through an enumerated source. *See* 31 U.S.C § 3730(e)(4); I.C. § 5-11-5.7-7(f)(2).  As the Seventh Circuit has explained, the "public disclosure" analysis involves "a three-step inquiry":

> First, it examines whether the relator's allegations have been "publicly disclosed." If so, it next asks whether the lawsuit is "based upon" those publicly disclosed allegations. If it is, the court determines whether the relator is an "original source'" of the information upon which his lawsuit is based.

*U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 690 (7th Cir. 2014) (quotations omitted).

Defendants' public disclosure challenge fails at both the first and third steps; for both reasons,

therefore, the public disclosure bar does not apply to this case.

### A.    There Was No Public Disclosure

The first step of the public disclosure inquiry "presents two distinct issues: whether the relevant information was placed in the public domain, and, if so, whether it contained the critical elements exposing the transaction as fraudulent." *U.S. ex rel. Suarez v. AbbVie, Inc.*, 503 F. Supp. 3d 711, 737 (N.D.Ill. 2020). Defendants fail on both scores, and each failure is independently fatal.

### 1.    Defendants Do Not Identify a Qualifying Public Disclosure

The federal and Indiana FCAs both enumerate the specific types of channels that can trigger the public disclosure bar. *See* 31 U.S.C. § 3730(e)(4)(B); I.C. § 5-11-5.7-7(e). Critically, "the methods of public disclosure" identified in the statutes "are exclusive." *U.S. ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1499 (11th Cir. 1991). Thus, "the public disclosure bar applies to some methods of public disclosure and not to others." *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 414 (2011). In other words, even if Defendants point to a relevant disclosure, this bar does not apply unless the disclosure was through a specific channel enumerated in the statute. *Id.*

Defendants predicate their argument on transmission of the IBM reports to *state* Medicaid officials in Indiana. *See* ECF No. 173 at 12; ECF No. 176 at 7−8. This does not fall within one of the enumerated channels of public disclosures under either the federal FCA or the Indiana FCA.

***Federal FCA.*** In 2010, Congress amended the federal FCA, in part, to provide clarity on the public disclosure provisions. *See U.S. ex rel. May v. Purdue Pharma L.P.,* 737 F.3d 908, 917 (4th Cir. 2013). Where, as here, there was no prior public disclosure "from the news media," the 2010 FCA amendments made clear that only *federal* channels—namely, "a **Federal** criminal, civil, or administrative hearing in which the Government or its agent is a party" or "a congressional, Government Accountability Office, or other **Federal** report, hearing, audit, or investigation" — can trigger the public disclosure bar. 31 U.S.C. 3730(g)(4) (emphasis added); *see generally May,*

737 F.3d at 917.

Here, Defendants improperly seek to invoke the *federal* FCA's public disclosure provisions to the IBM reports. But those reports are state reports, not federal reports. And they were generated and transmitted to state officials pursuant to a state contract. As courts in this Circuit have recognized, purported disclosures to state officials do not qualify as public disclosures under the federal FCA. *See U.S. v. Reditus Labs., LLC*, 2024 WL 4351862, at *8 (C.D. Ill. Sept. 30, 2024) ("Because Aaron relies on disclosures made in a state court suit, those disclosures do not trigger the public disclosure bar."). Here, the SAC is crystal clear about the fact that IBM worked for the state under a "contract with Indiana Medicaid." ECF No. 67 ¶ 31.

The Hospital Defendants do not address this fatal shortcoming at all. For their part, the MCE Defendants vainly attempt to close the gap with two inapt arguments. *First*, they improperly ask this Court to disregard the plain text of the 2010 FCA amendment and, instead, mis-interpret the federal statute based on how Defendants believe the Indiana FCA should be read. *See* ECF No. 173 at 14-15 (asserting that Relators' federal claims "still would be barred under the precise language of the IFPA's public disclosure bar, which is triggered by *state* reports and audits"). This turns black-letter principles of statutory interpretation on their heads. This Court should construe the federal FCA based on its text to give effect to the purpose of the 2010 FCA amendment, not to subordinate federal law to state law. In any event, as discussed below, the IBM Watson reports also did not fit within the enumerated channels of public disclosures under the Indiana FCA.

*Second*, the MCE Defendants disingenuously assert that "per Relators' own pleadings, IBM Watson participated in federal audits of Indiana Medicaid, a joint Federal-state program." ECF No. 173 at 15. This is false. The fact that the federal government *could* audit Indiana Medicaid does not mean that the IBM reports *were* federal reports provided to federal agencies. As the Seventh Circuit observed, the mere *possibility* of federal audits do not suffice for the public disclosure bar

to apply. *See Farmington*, 166 F.3d at 860 (recognizing that materials "theoretically available upon … request" are "not 'publicly disclosed' within the meaning of § 3730(e)(4)(A)"); *accord Berg v. Honeywell Int'l, Inc.*, 502 F. App'x 674, 676 (9th Cir. 2012). Courts in this Circuit have rejected similar speculative public disclosure arguments without evidentiary foundation. *See U.S. ex rel. Hanna v. City of Chicago*, 2014 WL 12933553, at *2 (N.D. Ill. Sept. 25, 2014) ("the City has not offered evidence that the fraud alleged by Hanna has been publicly disclosed."). Consequently, Defendants' speculation that the federal government *could* have obtained the relevant information through audits is insufficient.

Finally, Defendants' briefs make much ado of the Seventh Circuit's *U.S. v. Bank of Farmington*, decision and its progeny, which found that government "possession" of materials disclosing fraud can count as a public disclosure without the materials ever becoming public in the ordinary sense of the word, 166 F.3d 853, 861 (7th Cir. 1999). *See* ECF No. 173 at 12; ECF 176 at 7−8. This is a red herring. Even under the *Farmington* line of cases, only disclosures through an enumerated channel qualify as public disclosure. *See Reditus Labs*, 2024 WL 4351862, at *8.

Further, even the Seventh Circuit has recognized that the *Farmington* line of cases is an outlier. *See Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 277 (7th Cir. 2016) (noting that the *Farmington* line of decisions is at odds with decisions from "other circuits" and that "[t]here is significant force in the position of the other circuits" that may "warrant in-depth reconsideration of our precedent"). Specifically, every other Circuit that has considered this issue has given effect to the FCA's specific use of the word "***public***" by "requir[ing] some affirmative act of disclosure ***to the public outside the government***." *U.S. v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 782 F.3d 260, 268 (6th Cir. 2015) (emphasis added).[9] Under the majority view,

---

[9]    *Accord U.S. ex rel. Oliver v. Philip Morris USA Inc.*, 763 F.3d 36, 42 (D.C. Cir. 2014) ("The government's own, internal awareness of the information is not one such channel.")

Defendants' public disclosure argument would be a non-starter because the IBM reports were not disclosed publicly in the congressionally-defined sense prior to the filing of this *qui tam* action.

**Indiana FCA.** Defendants' briefs do not meaningfully distinguish between the public disclosure bars of the federal and Indiana statutes. For both statutes, Defendants predicate their argument on the private transmission of the IBM reports to Indiana state Medicaid officials, which plainly did not involve any public dissemination. Thus, Defendants posit that—for purposes of the Indiana FCA—internal government knowledge suffices to trigger the public disclosure bar. But they offer no basis to show that Indiana courts would follow *Farmington*'s outlier interpretation of the federal FCA's public disclosure provisions rather than following the majority view (as even the Seventh Circuit has acknowledged) and as an Illinois state appellate court recently did. *See People ex rel. Lindblom v. Best Buy Stores, L.P.*, 2024 WL 5205729 (Ill. App. 2d, Dec. 24, 2024).

As noted above, the Seventh Circuit's approach to public disclosure in the *Farmington* line of cases has been widely rejected by other courts interpreting the federal FCA. *See Chattanooga-Hamilton Cnty.*, 782 F.3d at 268 (collecting cases); *Oliver,* 763 F.3d at 42 (same). State courts, including other states within the Seventh Circuit, have followed the majority view in interpreting their state FCAs. For example, just last year, the Illinois Appellate Court rejected *Farmington* when interpreting the public disclosure bar of the Illinois FCA. *See Lindblom*, 2024 WL 5205729. The court explained that "[t]he overwhelming majority of courts have taken the position that confidential disclosures to the government are not public disclosures for purposes of false claims cases;" and it chose "to follow that well-reasoned and well-developed body of law." *Id*. at *8.

Further, the plain language of the Indiana FCA specifies that a disqualifying disclosure can occur through "a legislative, an administrative, or another **public** report, hearing, audit, or investigation." I.C. § 5-11-5.7-7(e)(2) (emphasis added). Use of the word "public" clearly signifies that—consistent with the prevailing view of federal courts—a state agency's internal receipt of a

report is not a "public disclosure." *See U.S. ex rel. Wilson v. Graham Cnty. Soil & Water Conservation Dist.*, 777 F.3d 691, 696 (4th Cir. 2015) ("By specifying that a 'disclosure' must be 'public,' Congress indicated that only disclosures made to the public at large or to the public domain" can trigger the public disclosure bar.); *U.S. ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, 540 F.3d 1180, 1185 (10th Cir. 2008) ("The primary definition of the term 'public,' as used in this context, is 'open to general observation, sight, or cognizance; existing, done, or made in public; manifest; not concealed.'). *Id.*

When deciding unresolved questions of Indiana state law, federal courts "are charged with predicting … how … the Supreme Court of Indiana would decide th[e] issue." *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007). For the reasons described above, every indication is that the Indiana Supreme Court would follow the overwhelming majority view of other federal and state courts, and not an outlier decision that the Seventh Circuit itself has recognized likely requires "in-depth reconsideration." *Cause of Action*, 815 F.3d at 277. Accordingly, Defendants have failed to identify any disqualifying public disclosure under the Indiana FCA.

2.    <u>The IBM Watson Reports Did Not Fully Disclose Defendants' <i>Scienter</i></u>

Even if the provision of the IBM reports to Indiana state officials could qualify as a public disclosure under the federal or Indiana FCA, Defendants also have failed to demonstrate that the reports "contained the critical elements exposing the transaction as fraudulent." *Suarez.*, 503 F. Supp. 3d at 737. Under the FCA, one "critical element of fraud" is "a *knowing* misrepresentation of facts," *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 718 (7th Cir. 2017) (emphasis added). Accordingly, "[i]n keeping with the FCA's *scienter* requirement, the public disclosure bar applies only in instances where one can infer, as a direct and logical consequence of the disclosed information, that the defendant knowingly—as opposed to negligently—submitted a false set of facts to the Government." *U.S. ex rel. Graziosi v. R1 RCM, Inc.*, 2019 WL 861368, at

37

*7 (N.D. Ill. Feb. 22, 2019) (quotations omitted).

Here, although the IBM Reports revealed the falsity of Defendants' Medicaid claims, the reports are not enough to show that Defendants acted with *scienter*. As a starting point, by challenging the sufficiency of Relators' *scienter* allegations, Defendants effectively concede that the IBM reports did not disclose that they acted knowingly. For example, the Hospital Defendants assert that Relators "try to leverage the IBM Watson reports to turn the FCA into a strict liability statute by inferring knowledge from an AI screening tool's analyses." ECF No. 176 at 16. This is effectively an admission by Defendants that the IBM reports do not suffice to show *scienter*.

Independent of this argument, the IBM reports cannot establish *scienter* by themselves because those reports do not show Defendants' awareness of the billing requirements at issue—as courts have routinely held in analogous circumstances. For example, in *Graziosi*, the government conducted "a set of audits" that examined whether a hospital had improperly billed for medically unnecessary inpatient admissions. 2019 WL 861368, at *6-7. That allegation then served as the foundation for a *qui tam* case against the hospital and related entities, and the defendants moved to dismiss on public disclosure grounds by pointing to the audits. *Id*. The court concluded that "evidence that [the hospital] made even a large number of incorrect assessments of the 'medical necessity' for particular inpatient admissions is [not] enough to support an inference that the …Defendants knowingly submitted false facts." *Id*. at 7.

The same is true here. The IBM reports found false claims, but the reports do not in themselves show *scienter* because they do not speak to Defendants' awareness of their compliance obligations. Accordingly, as *scienter* is an indispensable element of FCA liability, the reports do not disclose all critical elements of Defendants' fraud and do not trigger the public disclosure bar. *See Grant on behalf of United States v. Zorn*, 2021 WL 4145724, at *5 (S.D. Iowa Mar. 8, 2021) ("Although the Letters certainly reveal what AdvanceMed had determined to be a suspicious

38

pattern in [the defendant's] coding practices…, the Letters did not reveal . . . fraudulent misrepresentations sufficient to disclose his *scienter*."); *U.S. ex rel. Cooley v. ERMI, LLC*, 2023 WL 3587543, at *5 (N.D. Ga. May 22, 2023) (similar).

Further, the same goes for the element of materiality. The IBM reports do not by themselves come close to establishing the materiality of Defendants' non-compliance without the detailed materiality allegations set forth by Relators. *See*, *e.g.*, ECF No. 67 ¶¶ 91−92, 96, 100−101, 132−136, 138−139, 143−144, 178, 185−186, 193−194.

## B.    Relators Plausibly Allege Their Original Source Status

Even when the public disclosure bar otherwise applies, individuals who have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" are allowed proceed as "original sources." 31 U.S.C. § 3730(e)(4)(B); I.C. § 5-11-5.7-7(e).[10] As explained below, Relators contribute detailed, non-public information that is both "independent of" and "materially adds to" the purported public disclosures.

Significantly, Relator McCullough worked in high-level positions with Indiana Medicaid, including serving as Director of Program Integrity for Indiana Medicaid for several years. *Id*. ¶ 17. From that unique vantage point, Relator provides powerful evidence of Defendants' *scienter*. For instance, he personally attended monthly meetings with each the MCE Defendants at which he emphasized their fraud and abuse detection and prevention responsibilities, including to explain the MCE Defendants' obligation "to identify, prevent, and recoup improper payments relating to claims that fail to comply with Medicaid hospital billing rules" with respect to the specific requirements at stake here. *See* ECF No. 67 ¶¶ 100-101. In response, "each MCE Defendant assured Relator McCullough that they were implementing those procedures," which, as the SAC

---

[10]    Original sources must also voluntarily provide the information to the government before filing a *qui tam* action. Relators did so. *See* ECF No. 67 ¶ 15.

details, was not true. *Id.* ¶¶ 101, 117, 128, 144, 194. Should this case go to trial, Relator's testimony about these meetings will be highly probative evidence not contained in the IBM reports.

In addition, Relator McCullough gave a presentation to the Hospital Defendants and the MCE Defendants that covered the same Medicaid requirements underlying the claims here. *Id.* ¶¶ 99, 142, 192, 222, 262, 292; *see* ECF No. 67-5. Specifically, that presentation "highlighted that Indiana Medicaid routinely audited claims for, among other issues, 'Hospital Transfers,' 'Outpatient During Inpatient,' and "Hospital Readmissions.'" *Id.* ¶ 222; ECF No. 67-6 at 4.

Relators' above-described knowledge is "independent of" and "materially adds to" the purported public disclosures (the IBM reports). First, this information is independent of the "information that was disclosed through the public disclosure sources." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC,* 812 F.3d 294, 305-307 (3d Cir. 2016). In other words, Relators obtained this information through sources—including Relator's McCullough's firsthand observations—separate from the IBM reports. *See U.S. ex rel. Dieter v. City of Milwaukee*, 2023 WL 2869851, at *6 (E.D. Wis. Apr. 10, 2023) (describing "Relators' direct and independent personal observations of Defendants' alleged violations").

Second, Relators satisfy the "materially adds" requirements by "contribut[ing] information—distinct from what was publicly disclosed—that adds in a significant way to the essential factual background." *Moore*, 812 F.3d at 307. As discussed above, *see supra* at 27−28, Relators' non-public information provides powerful evidence that Defendants acted with the requisite *scienter* to support FCA liability.

Indeed, *scienter*-based contributions are particularly significant because, as described above, scienter is one of the "critical element[s] of fraud." *Bellevue*, 867 F.3d at 718. To be clear, a relator does not need to contribute an essential element of the fraud to qualify as an original source. Indeed, such a standard "would read out of the statute the original source exception" and

render it meaningless since the public disclosure bar only applies if all essential elements of a fraud were disclosed in the first place. *Moore*, 812 F.3d at 307. But the fact that Relators contribute powerful evidence toward a critical element of Defendants' liability underscores their material contributions. Moreover, FCA "cases often turn on the issue of *scienter*" and "the government is never in a good position to have direct evidence of guilty knowledge." *U.S. ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 760 (10th Cir. 2019) (quotations omitted). The difficulty in uncovering evidence of *scienter* further underscores the materiality of Relators' contributions. *See In re Plavix Mktg., Sales Pracs. & Prods. Liab. Litig.*, 123 F. Supp. 3d 584, 599 (D.N.J. 2015) ("allegations [that] tend to show that Defendants had knowledge that their claims were false and were intended to have physicians make false claims to the government involving Plavix prescriptions, provide 'essential elements of the fraudulent scheme' which were missing from the prior disclosures.").[11]

In sum, Relators' information "breathe[s] important life into proving the scheme." *U.S. ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 185 (D. Md. 2019). At the very least, drawing all inferences in Relators' favor, they have plausibly alleged contributions that are independent of and materially add to the IBM reports, which qualify them for original source status at the pleading stage. *See U.S. ex rel. Fryberger v. Kiewit Pac. Co.*, 41 F. Supp. 3d 796, 810 (N.D. Cal. 2014) (inquiry at motion to dismiss stage is limited to whether "Relators have adequately alleged, for pleading purposes, that they are 'original sources' of information").

**VI.      Defendants' Perfunctory Constitutional Challenges Fail**

In two bare paragraphs, the MCE Defendants allege that the FCA's *qui tam* provisions violate three separate provisions of the Constitution. *See* ECF No. 173 at 28-29. The Hospital

---

[11]    Again, this argument also applies to the element of materiality. Relators' information concerning Defendants' knowledge regarding materiality of their non-compliance is independent from and materially adds to the information in the IBM reports.

Defendants' constitutional challenge is even more half-hearted: they devote a few sentences to contending that the constitutionality of *qui tam* lawsuits "remains in question" and "reserv[ing] the right to challenge Relators' standing" based on future developments. ECF No. 176 at 29. Relators largely defer to the Government's detailed explanation as to why Dfendants' perfunctory challenges to the constitutionality of a 160-year old statute well-rooted in history and common law are meritless. *See* ECF No. 181.

Relators only add three simple points. *First*, *every* Circuit that has examined this issue has upheld the constitutionality of the FCA. *See U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148 (2d Cir. 1993); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (*en banc*); *U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032 (6th Cir. 1994); *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993); *U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002). *Second*, while the Seventh Circuit has not squarely addressed this issue, it has clearly signaled its skepticism towards arguments that *qui tam* claims are unconstitutional. *See U.S. v. UCB, Inc.*, 970 F.3d 835, 847 (7th Cir. 2020) ("Their ancient pedigree, however, together with their widespread use at the time of the Founding, suggests that the [FCA] as a whole is not in imminent danger of unconstitutionally usurping the executive power."). *Third*, district courts in this Circuit that have considered such constitutional challenges "have already squarely rejected [these] precise arguments[.]" *U.S. ex rel. Bantsolas v. Superior Air & Ground Ambulance Trans., Inc.*, 2004 WL 609793, at *5 (N.D. Ill. Mar. 22, 2004).[12]

## VII.    Any Dismissal Should Allow Relators to Replead

Federal Rule of Civil Procedure 15 "directs that courts should 'freely' grant leave to amend a pleading 'when justice so requires.'" *Pullins v. Thomson Reuters Inc.*, 2021 WL 5637959, at *2

---

[12]    Defendants do not appear to challenge the constitutionality of the Indiana FCA's *qui tam* provision.

(S.D. Ind. Nov. 30, 2021) (*Pratt, J.*). Under this liberal standard, "[a] plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *Id*. at *2.  Indeed, "[u]nless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004).

Defendants erroneously contend that any amendment would be futile. *See* ECF No. 173 at 29-30; ECF No. 176 at 29-30. But they give no principled explanation other than to summarily claim that the supposed deficiencies with Relators' allegations cannot possibly be remedied. That bald assertion does not make sense. For example, in the event that the Court were to find any Rule 9(b) deficiency, Relators can remedy by providing additional details.

Defendants also suggest that leave to amend should be denied because Relators previously amended their complaint twice. *See* ECF No. 173 at 29-30; ECF No. 176 at 29-30. That misses the point of Rule 15, which liberalized the standard for amending to correct pleading deficiencies. This is the first time that Relators' allegations are being tested through Defendants' legal arguments and the first time that Relators would have the benefit of the Court's ruling . *Cf. Thompson v. Trustees of Indiana Univ.*, 2024 WL 4289642, at *9 (S.D. Ind. Sept. 24, 2024) (*Pratt, J*.) (granting leave to amend where "she did not have the opportunity to consider additional arguments that were made in Defendants' present motion to dismiss … nor did she have the opportunity to consider the Court's ruling when amending her original Complaint").

**CONCLUSION**

For the reasons set forth above, Defendants' motions to dismiss should be denied in their entirety.

Dated: February 26, 2025

Respectfully submitted,

*s/          Li Yu*

Li Yu (*pro hac vice*)
BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1926
li.yu@blbglaw.com

Daniel Miller (*pro hac vice*)
Jonathan DeSantis (*pro hac vice*)
WALDEN MACHT HARRAN & WILLIAMS LLP
2000 Market Street, Suite 1430
Philadelphia, PA 19103
(215) 825-5283
dmiller@wmhwlaw.com
jdesantis@wmhwlaw.com

*Attorney for Relators John D. McCullough and James R. Holden*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document was electronically filed on this 26th day of February served on all counsel of record by the Court's electronic filing system.

<u>*s/ Li Yu*</u>
Li Yu

*Attorney for Relators John D. McCullough and James R. Holden*