# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. John D. McCullough and James R. Holden, THE STATE OF INDIANA ex rel. John D. McCullough and James R. Holden, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 1:21-cv-00325-TWP-TAB |
| ANTHEM INSURANCE COMPANIES, INC., MDWISE, INC., CARESOURCE INDIANA, INC., COORDINATED CARE CORPORATION, INDIANA UNIVERSITY HEALTH, INC., HEALTH AND HOSPITAL CORPORTION OF MARION COUNTY, COMMUNITY HEALTH NETWORK, INC., ASCENSION HEALTH, INC., LUTHERAN HEALTH NETWORK, INC., PARKVIEW HEALTH SYSTEM, INC., | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| JOHN D. MCCULLOUGH, JAMES R. HOLDEN, | ) ) ) ) | |
| Relators. | ) ) | |

## <u>ORDER ON DEFENDANTS' MOTIONS TO DISMISS</u>

This matter is before the Court on two Motions to Dismiss the Second Amended Complaint: one filed by Defendants Anthem Insurance Companies, Inc. ("Anthem"), MDwise, Inc. ("MDwise"), Caresource Indiana, Inc. ("Caresource"), and Coordinated Care Corporation ("Coordinated Care") (collectively, the "MCE Defendants") (Filing No. 172); and one filed by Defendants Indiana University Health, Inc. ("IU Health"), Health and Hospital Corporation of Marion County, Community Health Network, Inc. ("Eskenazi"), Ascension Health, Inc.

("Ascension"), Lutheran Health Network, Inc. ("Lutheran"), and Parkview Health System, Inc. ("Parkview") (collectively, the "Hospital Defendants") (Filing No. 175). This *qui tam* action was initiated by Plaintiffs John D. McCullough ("McCullough) and James R. Holden ("Holden") (together, the "Relators") alleging the following violations of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*., and the Indiana False Claims Act ("IFCA"), Ind. Code § 5-11-5.7-1 *et seq*.: Count I: Presentation Of False Or Fraudulent Claims in violation of 31 U.S.C. § 3729(A)(1)(A); Count II: Making And Using False Statements in violation of 31 U.S.C. § 3729(A)(1)(B); Count III: Reverse False Claims – Knowingly And Improperly Avoiding An Obligation To Repay The Government in violation of 31 U.S.C. § 3729(A)(1)(G); Count IV: Presenting False Or Fraudulent Claims in violation of Ind. Code § 5-11-5.7-2(b)(1); Count V: Making And Using False Statement in violation of Ind. Code § 5-11-5.7-2(b)(2); and Count VI: Reverse False Claims – Making And Using False Records And Statements To Avoid An Obligation To Repay The State in violation of Ind. Code § 5-11-5.7(b)(6) (Filing No. 67). For the reasons explained in this Order, both Motions to dismiss are **granted**.

## I.     BACKGROUND

The following facts are not necessarily objectively true, but as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of the Relators as the non-moving party. *See Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

The Relators, McCullough and Holden, are United States citizens who reside in Boone County, Indiana (Filing No. 67 at 12). From 2001 until 2017, McCullough was an employee of the State of Indiana, including serving as the Director of Provider Relations for Indiana Medicaid from 2008 to 2013 and as the Director of Program Integrity for Indiana Medicaid from September 2014

to March 31, 2017. *Id*. From 1999 to 2014, Holden was an employee of the State of Indiana, including serving as the Chief Deputy and General Counsel in the Office of the Indiana State Treasurer from January 2007 to June 2011, and again from November 2012 to November 2014. *Id*.

The MCE Defendants are all managed care entities doing business in Indiana. Defendant Anthem is a publicly traded for-profit Indiana corporation headquartered in Indianapolis, Indiana. *Id*. at 12-13. Defendant MDwise is an Indiana non-profit corporation headquartered in Indianapolis, Indiana. *Id*. at 13. Defendant CareSource is an Indiana non-profit corporation headquartered in Indianapolis, Indiana. *Id*. Defendant Coordinated Care is a for-profit Indiana corporation headquartered in Indianapolis, Indiana. *Id*.

The Hospital Defendants are all hospital networks doing business in Indiana. Defendant IU Health is an Indiana non-profit corporation headquartered in Indianapolis, Indiana. *Id*. IU Health operates facilities throughout Indiana. *Id*. Defendant Ascension is a Missouri non-profit corporation headquartered in St. Louis, Missouri and operates multiple facilities through Indiana. *Id*. at 13-14. Defendant Community is an Indiana non-profit corporation headquartered in Indianapolis, Indiana operating acute care and specialty hospitals, immediate care centers, ambulatory care centers, and surgery centers throughout Indiana. *Id*. at 14. Defendant Eskenazi is an Indiana non-profit corporation headquartered in Indianapolis, Indiana and operates the Sidney and Lois Eskenazi Hospital, commonly referred to as Eskenazi Hospital, in Indianapolis. *Id*. Defendant Lutheran is an Indiana for-profit corporation headquartered in Fort Wayne, Indiana and operating multiple hospitals in Fort Wayne. *Id*. Defendant Parkview is an Indiana for-profit corporation headquartered in Fort Wayne, Indiana and operates two hospitals in Fort Wayne. *Id*.

Between 2011 and 2021, IBM Watson and its corporate predecessors ("IBM") served as a fraud and abuse detection system ("FADS") contractor for Indiana Medicaid in accordance with federal Medicaid requirements. *Id*. at 14-15. Pursuant to its FADS contract with Indiana Medicaid, IBM agreed to perform fraud and abuse detection and overpayment recovery services, including fraud and abuse detection, overpayment recovery, pre-payment review, and provider education. *Id*. at 15. To carry out these responsibilities, IBM developed, refined, and implemented a series of sophisticated computer algorithms to detect fraud, abuse, and overpayments. *Id*. Based on its fraud detection algorithms, IBM helped Indiana Medicaid uncover and recoup millions of dollars each year in overpayments relating to fee-for-service Medicaid claims between 2011 and 2016. *Id*.

In a typical case, once IBM's analysis identified overpayments, the Program Integrity staff at Indiana Medicaid would review the findings with IBM, and if the staff agreed, they would issue letters to Medicaid providers to recoup the overpayments. *Id*. In 2016, for example, IBM's algorithms led to more than $8.9 million in such recoveries. *Id*.

IBM's ongoing refinement of its algorithms ensured their accuracy in identifying improper Medicaid payments. *Id*. Between 2011 and 2020, less than one percent of Indiana Medicaid's recoupment demands based on IBM's analysis were overturned on appeal. *Id*. The findings of IBM's algorithmic audits were provided directly to Indiana Medicaid's Program Integrity team and were therefore, not publicly available. *Id*.

Starting in late 2017, and pursuant to political pressure, a senior executive at Indiana Medicaid directed the Program Integrity team to significantly curtail its efforts to utilize IBM's analysis to recoup improper Medicaid overpayments by the MCE Defendants and to the Hospital Defendants. *Id*. at 16. Specifically, as a result of political pressure from the MCE Defendants and Hospital Defendants, the Program Integrity Director, who was appointed to replace McCullough,

repeatedly refused to give IBM permission to proceed with a plan to recover identified overpayments by the MCE Defendants. *Id*.

This decision to no longer allow IBM to proceed with a plan to recover overpayments was not due to concerns about the accuracy or reliability of IBM's analysis and findings. *Id*. The Program Integrity team at Indiana Medicaid never criticized or questioned IBM about the reliability or accuracy of its analysis. *Id*. The change was also not due to a change in the law, the contract between the parties, or a change in formal policy. *Id*.

This decision also led to reduced Medicaid fraud recoupments. For example, in 2019, Medicaid fraud recoveries had fallen from $12.84 million in 2016 to just $7.24 million. The decline reflected that the Program Integrity team at Indiana Medicaid did not pursue recoupment based on a number of valid overpayment findings generated between 2018 and 2021. *Id*. at 17.

The Medicaid program was established in 1965 as a joint federal and state program to provide financial assistance to individuals with low income to enable them to receive medical care. *Id*. at 20. The federal government and state governments (collectively, the "Government") work in conjunction to operate the Medicaid program. Under Medicaid, each state establishes its own eligibility standards, benefit packages, payment rates, and program administration rules in accordance with certain federal statutory and regulatory requirements. *Id*. Under the managed care model, which is the model relevant to this case, the state contracts with private health plans such as the MCE Defendants to administer its Medicaid program. *Id*. The money the state receives for Medicaid is based on the state's per capita income compared to the national average. The federal government then pays to the state the statutorily established share of the total amount expended as medical assistance under the state plan. *Id*.

In Indiana, providers such as the Hospital Defendants submit claims for payment to the MCE Defendants for services provided to Medicaid beneficiaries enrolled in the managed care plan. *Id.* at 24. In their agreements with providers such as the Hospital Defendants, the MCE Defendants require the providers to comply with the rules and regulations of the Medicaid program and with their own plan requirements. *Id.* at 25. Further, in Indiana, Medicaid providers must affirmatively certify, as a condition of payment of the claims submitted for reimbursement from Medicaid, compliance with applicable federal and state laws and regulations as well as Indiana Medicaid policies. *Id.* at 22.

As with all Medicaid providers, the Program Integrity team at Indiana Medicaid would publish bulletins, banner pages, and hold annual meetings to ensure compliance with Medicaid billing requirements. *Id.* at 25. Between fall 2016 and early 2018, the Program Integrity team of Indiana Medicaid held monthly meetings with all the MCE Defendants to discuss common improper billing scenarios and how they could detect, prevent, and recoup improper Medicaid payments resulting from those scenarios. *Id.*

From 2017-2021, IBM conducted analyses identifying various overpayments of claims by the MCE Defendants. The report found that the MCE defendants likely misused between tens and hundreds of millions of dollars of Medicaid funds to pay claims that (1) violated basic hospital billing rules such as those disallowing two separate in-patient claims when the patient is readmitted right away for the same condition, (2) were clearly not payable because they were for services after patients' deaths or were duplicative of already-paid claims, and (3) contravened Medicaid billing requirements for chiropractic, dental, and opioid treatments. *Id.* at 28. The MCE Defendants likely misused Medicaid funds to pay these improper claims, instead of fulfilling their obligation to detect and prevent such improper payments, because they knew reporting higher expenditures

in the encounter data they submitted to Indiana Medicaid would allow them to obtain higher capitated payments in subsequent years. *Id*.

From 2017-2021, IBM conducted analyses identifying various overpayments to the Hospital Defendants. The report found that the Hospital Defendants likely obtained millions of dollars in Medicaid funds by submitting claims that (1) violated basic hospital billing rules such as those disallowing two separate in-patient claims when the patient is readmitted right away for the same condition, (2) were clearly not payable because they were for services after patients' death or were duplicative of already-paid claims, and (3) contravened Medicaid billing requirements for injection claims. *Id*. at 53.

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski*, 550 F.3d at 633. However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("[I]t is not enough to give a threadbare recitation of the elements of a claim without factual

support"). The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

## III.  DISCUSSION

The MCE Defendants and the Hospital Defendants move to dismiss the Second Amended Complaint on similar grounds (Filing No. 173, Filing No. 176). The Court categorizes their arguments as follows: Plaintiffs' Second Amended Complaint should be dismissed with prejudice for four reasons: (1) Relators' claims are barred by the public disclosure doctrine; (2) Relators fail to state a FCA violation requiring dismissal under Federal Rule of Civil Procedure 12(b)(6); (3) Relators fail to plead with particularity under Federal Rule of Civil Procedure 9(b); and (4) *Qui tam* actions are unconstitutional and thus, this action should be dismissed. *Id*.

The Court will address each issue in turn noting any meaningful differences between the arguments progressed by the MCE Defendants and the Hospital Defendants. In addition, the FCA and IFCA are largely the same with only slight differences which the Court will note when relevant. *See Kuhn v. Laporte Cnty. Comprehensive Mental Health Council*, 3:06-cv-317, 2008 U.S. Dist. LEXIS 68737, at *8 (N.D. Ind. Sept. 4, 2008).

## A.  The Public Disclosure Doctrine

The "public disclosure bar" of the FCA states in relevant part that "[t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same

allegations or transactions as alleged in the action or claim were publicly disclosed" through an enumerated source. 31 U.S.C. § 3730(e)(4). For evaluating whether a claim falls under the federal public disclosure bar, the Seventh Circuit has instructed that the "public disclosure" analysis involves "a three-step inquiry":

> First, it examines whether the relator's allegations have been "publicly disclosed." If so, it next asks whether the lawsuit is "based upon" those publicly disclosed allegations. If it is, the court determines whether the relator is an "original source" of the information upon which his lawsuit is based.

*U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 690 (7th Cir. 2014) (quoting *Glaser v. Wound Care Consultants Inc.*, 570 F.3d 907, 913 (7th Cir. 2009)).

First, the 2010 amendments to the FCA significantly changed the scope of the public disclosure bar. "Under the prior version of the statute . . . disclosure in federal and state reports, audits or investigations likewise constitute public disclosures." *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 737 F.3d 908, 917 (4th Cir. 2013) (internal citations omitted) (emphasis in original). "After the amendments, however, only disclosures in *federal* trials and hearings and in *federal* reports and investigations qualify as public disclosures." *Id.* (citing 31 U.S.C. §§ 3730(e)(4)(A)(i) & (ii) (2010)). Thus, the amendments "substantially narrowed the class of disclosures that can trigger the public-disclosure bar. By the same token, the amendments expand the number of private plaintiffs entitled to bring *qui tam* actions by including plaintiffs who learn of the underlying fraud through disclosure in state proceedings or reports." *Id.* This is the case here.

The IBM analyses and reports were generated pursuant to their agreement with Indiana Medicaid and transmitted to state officials. Because such disclosures were made to state officials rather than federal officials, they do not qualify as public disclosures under the FCA. *See United States v. Reditus Labs, LLC*, 1:22-cv-1203, 2024 U.S. Dist. LEXIS 177178, at *24 (C.D. Ill. Sept.

30, 2024) ("Because Aaron relies on disclosures made in a state court suit, those disclosures do not trigger the public disclosure bar.").

Defendants argue that the IBM reports were federal reports because IBM participated in federal audits and "all of Indiana Medicaid's and the MCE Defendant's reporting is governed by and necessarily available to CMS as well." (Filing No. 173 at 16). The Court disagrees. The fact that the Government could audit Indiana Medicaid does not mean that the IBM reports were federal reports. *See United States v. Bank of Farmington*, 166 F.3d 853, 860 (7th Cir. 1999) (recognizing that material theoretically available upon the public's request was not publicly disclosed within the meaning of § 3730(e)(4)(A)), *overruled on other grounds by Glaser v. Wound Care Consultants*, 570 F.3d 907 (7th Cir. 2009). The IBM reports were procured pursuant to a contract with state Medicaid and provided directly to state officials. Accordingly, the reports were not federal reports and the public disclosure bar of the FCA does not apply.

This brings the Court to whether the public disclosure bar of the IFCA, Ind Code § 5-11-5.7-7(e), precludes the Relators' claims. The IFCA bars claims brought under it "if the action or claim is based upon information contained in: . . . a legislative, an administrative, or another public state report, hearing, audit, or investigation." Ind. Code § 5-11-5.7-7(e). The issue here is whether a report provided solely to a state agency constitutes a "public state report" within the meaning of the statute. This issue appears to be an unresolved question of Indiana state law as neither the parties nor the Court located any Indiana cases on point. As such, the Court must predict how the Supreme Court of Indiana would decide the issue. *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007).

Because "[t]he [IFCA] mirrors the Federal FCA in all material respects," *Kuhn*, 2008 U.S. Dist. LEXIS 68737, at *8 n.1, the Court looks to federal law to predict how the Supreme Court of

Indiana would decide the issue. Upon review of the relevant case law, many federal circuits agree that for a disclosure to be "public" under the FCA, it must be disclosed to the public outside of the Government. Indeed, the Seventh Circuit, when determining the same issue, noted that the First Circuit held that "'a "public disclosure" requires that there be some act of disclosure to the public *outside of the government*.'" *Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267, 276 (7th Cir. 2016) (quoting *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 728 (1st Cir. 2007)). In addition, the Fourth Circuit found that "because 'the Government is not the equivalent of the public,' the [public disclosure bar of the FCA] must be read to mean that 'only disclosures made to the public at large or to the public domain ha[ve] jurisdictional significance.'" *Id*. (quoting *United States ex rel. Wilson v. Graham Cnty. Soil & Water Conservation Dist.*, 777 F.3d 691, 696–97 (4th Cir. 2015) (second alteration in original)).

The Seventh Circuit found that other circuits "emphasize the congressional intent behind replacing the broad Government-knowledge bar with the more precise public-disclosure bar." *Id*. at 277. The D.C. Circuit stated "'[a]s a result of that change, the inquiry shifted from whether the relevant information was known to the government to whether that information was publicly disclosed in one of the channels specified by the statute.'" *Id*. (quoting *United States ex rel. Oliver v. Philip Morris USA Inc.*, 763 F.3d 36, 42 (D.C. Cir. 2014)). Moreover, the Tenth Circuit found that "requiring outward disclosure helps to strike the balance sought by Congress between encouraging private citizens with first-hand knowledge to step forward while discouraging opportunistic plaintiffs from capitalizing on public information generated by others." *Id*. (citing *United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, 540 F.3d 1180, 1186 (10th Cir. 2008)).

After this discussion of the rationale of the other circuits, the Seventh Circuit went on to conclude that "[t]here is significant force in the position of the other circuits. If the FTA letter were the only document before us in this case, respect for the position of the other circuits would warrant in-depth reconsideration of our precedent." *Id*. However, the Seventh Circuit did not address the correctness of its prior decision in *United States v. Bank of Farmington*, 166 F.3d 853 (7th Cir. 1999), because the plaintiff in *Cause of Action* conceded that the report was "in the public domain" at the time the complaint was filed. *Id*.

Based on this review by the Seventh Circuit of the relevant case law concerning the meaning of "public" under the FCA, and in conjunction with the Seventh Circuit's own concession that circumstances such as those present in the case before the Court would warrant an "in-depth reconsideration" of its precedent, the Court finds that the Indiana Supreme Court would likely follow the majority view of the federal circuit courts and find that reports provided solely to a state agency do not fall within the meaning of "public" under the Indiana public disclosure doctrine in Ind. Code § 5-11-5.7-7(e).

The MCE Defendants argue the Seventh Circuit precedent indicates that Government possession alone is enough to trigger the public disclosure bar ([Filing No. 173 at 16](#)). While the MCE Defendants are correct that the Seventh Circuit's precedent held that "the Government's possession of the information exposing a fraud is alone sufficient to trigger the public disclosure bar," *Cause of Action*, 815 F.3d at 275, the Seventh Circuit later indicated that it needed to reconsider this precedent for subsequent cases addressing precisely this issue. *Id*. at 277. Accordingly, this Court is persuaded that the Indiana Supreme Court would follow the majority view of the federal circuit courts and thus, the public disclosure bar of the IFCA is inapplicable to the Relator's claims.

12

Because the IBM reports do not qualify as having been "publicly disclosed," the Court need not proceed to the second and third step of the inquiry and the public disclosure bar is inapplicable. *Heath*, 760 F.3d at 690.

**B.    Failure to State a Claim for an FCA Violation**

To adequately allege a violation of the FCA, Relators must plead that: (1) the defendant made a false claim for payment to the Government; (2) the defendant had knowledge of the claim's falsity, also commonly known as "scienter"; (3) the claim was material to the Government's decision to pay the claim; and (4) the claim resulted in payment by the Government. *Id*. at 740 (citing *U.S. ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017)). "Rule 9(b) requires specificity, but it does not insist that a plaintiff literally prove his case in the complaint." *Id*. at 741. "Relators with a legitimate basis for bringing [FCA] cases will not generally have propriety information of the company they are trying to sue, and so courts do not demand voluminous documentation substantiating fraud at the pleading state. All that is necessary are sufficiently detailed allegations." *Id*. at 740–41 (emphases removed).

Both the MCE Defendants and the Hospital Defendants challenge the sufficiency of Relators' Second Amended Complaint arguing that it fails to adequately allege the four elements required for their FCA claims under 31 U.S.C. §§ 3729(a)(1)(A) and (B) to proceed: (1) falsity, (2) knowledge, (3) materiality, and (4) causation (Filing No. 173 at 7–11, 21–22; Filing No. 176 at 18–29). In addition, the Hospital Defendants argue that the Relators fail to adequately allege reverse false claims (Filing No. 176 at 29–31). The Court will first address the arguments concerning the four elements and then turn to the Hospital Defendants' remaining argument.

**1.    Falsity**

To survive a motion to dismiss, Relators must allege facts that "permit the reasonable inference that the defendant[s] presented false claims to the government." *See United States ex rel. Zverev v. USA Vein Clinics of Chicago, LLC*, 244 F. Supp. 3d 757, 745 (N.D. Ill. 2017); *see also United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 870 (7th Cir. 2011) ("A relator need not have seen the claims submitted to the federal government . . . but must know enough to make fraud a likely explanation for any overbilling.").

However, "[t]he [FCA] is not limited to claims that are facially false." *United States v. Molina Healthcare of Ill., Inc.*, 17 F.4th 733, 740 (7th Cir. 2021). "[C]ourts have identified particular theories that support FCA claims, including (1) false certification to the government that the party has complied with a statute, regulation, or condition of payment; (2) promissory fraud, or fraud in the inducement; and (3) implied false certification." *Id*. Liability for claims under the implied false certification theory occurs when a "defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements[;] those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Id*. (quoting *Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016) (alteration in original)).

First, Relators adequately allege factual falsity. Specifically, the Second Amended Complaint alleges that the MCE Defendants improperly paid claims that (A) violated basic hospital billing rules, (B) were clearly not payable, and (C) contravened Medicaid billing requirements (Filing No. 67 at 28). In addition, the Second Amended Complaint alleges that the Hospital Defendants submitted claims that violated basic hospital billing rules, were clearly not payable, and contravened Medicaid billing requirements. *Id*. at 53. The Second Amended Complaint also specifically states the applicable Medicaid billing requirements, *see, e.g., id*. at 28 ¶ 85, 31 ¶ 97,

36 ¶ 130, describes the algorithms used by IBM and what those algorithms were looking for, *see, e.g., id*. at 33 ¶¶ 111, 112, and then tied those violations back to each Defendant. *See, e.g., Id*. at 35–36 ¶¶ 124–127. Such allegations sufficiently allege falsity of the claims under the FCA.

The Hospital Defendants contend that the Relators have failed to allege false claims because the IBM reports which their claims are based on merely identify "potentially" false claims (Filing No. 176 at 19). The Hospital Defendants specifically take issue with the IBM reports' express statements of limitations of the algorithm, and which require additional review by IBM and Indiana Medicaid to identify actual overpayments. The Hospital Defendants point to the following examples arguing that Relators rely on a report from an AI screening tool to pass off potential overpayments as false claims: (1) IBM flags potential overpayments based on the claim status but notes that it is "especially concerned about the latest claim status for each encounter" because it is unsure whether identified claims were paid, voided, or denied; (2) IBM conceded in the improper injections report that it could not verify whether claims for injection services were submitted during separate, same-day visits which would have resulted in valid, payable claims; and (3) IBM admits that "[its] data does not include the date that a death date was entered into the IHCP's recipient database. There is the possibility that the recipient's death date was entered after a service was rendered." *Id*. at 20–21. The Court disagrees.

While the Hospital Defendants are correct that the IBM reports contain express limitations and identify "potential" overpayments, the Relators are not required to conclusively prove that overpayments occurred at this stage of the litigation. That is not the standard. Instead, the Relators must allege facts that "permit the reasonable inference that the defendant[s] presented false claims to the government." *Zverev*, 244 F. Supp. 3d at 745. Here, the Relators specifically explain each billing requirement they allege was violated, explain how IBM compiled a report concerning such

alleged violation, and identify a specific number of claims coinciding with a specific dollar amount that each of the MCE Defendants and Hospital Defendants are alleged to have misused (*See, e.g.,* Filing No. 67 at 55 ¶ 227 ("In Defendant IU Health's case, IBM Watson found that multiple hospitals within IU Health's network—including the main hospital and the Riley Hospital for Children in Indianapolis, IU Health Arnett Hospital, IU Health Bloomington Hospitals, and IU Health Ball Memorial Hospital—improperly submitted hundreds of separate in-patient claims that involved a beneficiary's readmission to the same facility with the same condition within 72 hours of the discharge date on an earlier claim. For example, IU Health's Riley Hospital for Children submitted 89 such claims to MCEs and improperly obtained more than $946,000 in Medicaid payment. IU Health's main campus also submitted 66 such claims to MCEs and improperly obtained more than $854,000 in Medicaid payments. *Id.* In addition, IU Health Bloomington Hospitals submitted 37 such claims to MCEs and improperly obtained more than $412,000 in Medicaid payments.")). Whether Relators can prove the claims were actually false is a matter that can be tested at summary judgment or trial. However, these allegations permit the reasonable inference that each of the Hospital Defendants presented false claims to the Government. As such, Relators have adequately alleged falsity.

### 2. **Scienter**

"The FCA's scienter element refers to respondents' knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023). Further, the FCA defines the term "knowingly" as encompassing three mental states: (1) that the person "has actual knowledge of the information"; (2) that the person "acts in deliberate ignorance of the truth or falsity of the information"; and (3) that the person "acts in reckless disregard of the truth or falsity of the

information." *Id*. (quoting 31 U.S.C. § 3729(b)(1)(A)(i)–(iii)). "In short, either actual knowledge, deliberate indifference, or recklessness will suffice." *Id*.

"First, the term 'actual knowledge' refers to whether a person is 'aware of' information." *Id*. at 751 (citing *Intel Corp. Inv. Policy Comm. v. Sulyma*, 589 U.S. 178, 184 (2020)). "Second, the term 'deliberate indifference' encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity." *Id*. (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)). "And, third, the term 'reckless disregard' similarly captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *Id*.

The MCE Defendants argue that Relators do not allege any facts that, if proven, would demonstrate the MCE Defendants knowingly approved improper invoices, or neglected their contractual obligations to undertake fraud detection practices, in order to cause the Government to increase payments to them (Filing No. 173 at 21). The MCE Defendants also contend that the Relators fail to allege that the MCE Defendants even knew about the IBM reports such that they could have known to review or take other action on any previously submitted claims. *Id*. Likewise, the Hospital Defendants argue that Relators' allegations amount to nothing more than conclusory statements and allegations that the Hospital Defendants were aware of their legal obligations, through general, industry-wide "bulletins" or trainings provided by Relator McCullough in his capacity as director of Indiana Medicaid's Program Integrity unit (Filing No. 176 at 23). In addition, the Hospital Defendants argue that Relators have not described any communications, statements, or even conduct that plausibly suggests any of the Hospital Defendants knew or should have known that their claims were false. *Id*. at 24. The Court disagrees.

The Seventh Circuit, in *United States v. King-Vassel*, recognized that "reckless disregard in the FCA context [can be] 'an extension of gross negligence' or an 'extreme version of ordinary negligence.'" 728 F.3d 707, 713 (7th Cir. 2013) (quoting *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997)). Thus, the Seventh Circuit determined that a defendant may act with reckless disregard if they "had reason to know of facts that would lead a reasonable person to realize that [they were] causing the submission of a false claim" or if they "failed to make a reasonable and prudent inquiry into that possibility." *Id*. Moreover, as previously stated, the Supreme Court held that reckless disregard "similarly captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false but, submit the claims anyway." *Schutte*, 598 U.S. at 751. Finally, the Seventh Circuit has also recognized that "[a] relator may of course rely on circumstantial evidence to prove *scienter* under the [FCA]." *Heath,* 92 F.4th at 663 (citing *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008)).

Here, the Court concludes that Relators have sufficiently pleaded *scienter* by alleging in detail (1) each of the MCE Defendants' and the Hospital Defendants' awareness—and their attestation of such awareness—of their compliance obligations, (2) each type of alleged violation and attributed those violations to each and every one of the MCE Defendants and the Hospital Defendants separately, and  (3) the specific dollar amount coinciding with each violation by each of the defendants. Relators may use this circumstantial evidence at this stage of the litigation to prove *scienter*, *id*., and the Court can reasonably infer knowledge from the alleged facts. Indeed, the Hospital Defendants' contentions that Relators must allege communications, statements, or affirmative conduct are misguided. If that was the standard to properly allege *scienter*, even the most blatant of FCA violations would be stifled at the motion to dismiss stage unless a relator could truthfully allege that a defendant admitted to the FCA violation. But to do so, a relator would

need discovery. All Relators must allege at this stage are facts that can lead to an inference that the MCE Defendants and the Hospital Defendants either "had reason to know of facts that would lead a reasonable person to realize that [they were] causing the submission of a false claim" or that they "failed to make a reasonable and prudent inquiry into that possibility," which they have done. *King-Vassel*, 728 F.3d at 713.

### 3. **Materiality**

"A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 579 U.S. at 181. However, "statutory, regulatory, and contractual requirements are not automatically material, even if they are labeled conditions of payment. *Id*. at 191. "Materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id*. at 193 (internal quotation and citation omitted).

> In sum, when evaluating materiality under the [FCA], the [g]overnment's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the [g]overnment pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.

*Id*. at 194. Accordingly, for Relators' Second Amended Complaint to survive the Motions to Dismiss, it must "include specific allegations that show that the omission in context significantly affected the government's actions." *Molina*, 17 F.4th at 743.

The Second Amended Complaint alleges that starting in 2017, due to political pressure exerted by lobbyists employed by the MCE Defendants and Hospital Defendants, a senior executive directed the Program Integrity team to reduce its efforts to utilize IBM's analysis and

findings to recoup Medicaid overpayments by the MCE Defendants and to the Hospital Defendants (Filing No. 67 at 16). Relators argue the allegations of past overpayment recoveries for violations of the same Medicaid requirements are sufficient to plead materiality.

Both the MCE Defendants and the Hospital Defendants argue that these allegations fail to plead materiality (Filing No. 173 at 8, Filing No. 176 at 27). Specifically, they point out the Relators explanation that in the typical case, the Program Integrity Staff at Indiana Medicaid would pursue recovery of overpayments only when the Program Integrity Staff agreed with IBM's analysis. However, the Program Integrity Staff chose not to pursue the alleged overpayments in this case.

The MCE Defendants and Hospital Defendants further argue that the Relators' allegations show that Indiana Medicaid had knowledge of the claims at issue, reviewed those claims with IBM, and affirmatively decided not to pursue recoupment of the alleged overpayments. They contend that this is a clear indication that Indiana Medicaid did not regard the alleged violations as material. *Id.*

While "materiality cannot rest on a single fact or occurrence as always determinative," *Escobar*, 579 U.S. at 191, Indiana Medicaid's payment of the claims at issue despite its actual knowledge of the alleged violations is "very strong evidence" that the alleged violations were not material. *Id.* at 195. In addition, while there may be alternative reasons that could explain the Indiana Medicaid's continued payment of improper claims despite actual knowledge of the alleged violations, *see Molina*, 17 F.4th at 744 (finding materiality in the face of defendant's barebones assertion that the Government was aware of all material facts concerning the alleged violations), Relators' Second Amended Complaint does not provide an alternative reason that supports materiality. Relators' argument that Indiana Medicaid began curtailing recoupments based on

improper political pressure indicates a conscious choice to no longer emphasize correct payments of claims thus undermining Relators' arguments for materiality. Indeed, Indiana Medicaid's decision to allow the alleged overpayments to go unpursued is further evidence that the Government is not concerned with the alleged violations. Consequently, the alleged violations do not appear material to the Government.

Relators argue that the Second Amended Complaint details previous successful recoupment efforts based on the billing requirements at issue in this case thus illustrating the materiality of the underlying requirements (Filing No. 185 at 32). Relators then argue that improper political pressure rather than apathy is the reason for Indiana Medicaid's continued payment of the claim. Relators contend that the MCE Defendants and Hospital Defendants can pursue discovery to refute this explanation, but it is a factual dispute that cannot be decided on a motion to dismiss. *Id*. at 33.

As with Relators' improper political pressure argument, their argument that Indiana Medicaid was previously successful in recoupment attempts based on the same violations of billing requirements as the alleged violations in this case does not weigh in favor of materiality. Rather, it indicates a conscious decision to reduce compliance efforts and proper payment safeguards by Indiana Medicaid. Relators may even be correct that political pressure caused Indiana Medicaid to allow the MCE Defendants and Hospital Defendants to submit improper claims and retain overpayments pursuant to those claims. However, even if that were the case, it would only further undermine their argument that billing violations are material to Indiana Medicaid. As the Supreme Court stated in *Escobar*, payment of claims by the Government despite actual knowledge of billing violations is very strong evidence that those violations are not material. 579 U.S. at 195.

Whether Indiana Medicaid decided to no longer pursue improper claims or billing violations due to political pressure and whether such political pressure was improper is not an issue before the Court in this case. Rather, the issue is whether the alleged billing violations "significantly affected the government's actions." *Molina*, 17 F.4th at 743. As pled in the Second Amended Complaint, it appears they did not. Accordingly, for the reasons discussed above, the Court finds that Relators' Second Amended Complaint fails to allege materiality under the FCA. The MCE Defendants' and Hospital Defendants' Motions to Dismiss are therefore **granted** as to materiality.

### 4. Causation

In *United States v. Luce*, the Seventh Circuit held that proximate causation is required for FCA liability. 873 F.3d 999, 1011–1013 (7th Cir. 2015). To satisfy this element, Relators must allege that the MCE Defendants' and Hospital Defendants' conduct was "a substantial factor in bringing about the injury," and that "the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Id*. at 1012 (quoting *Blood v. VH-1 Music First*, 668 F.3d 543, 546 (7th Cir. 2012)) (emphasis removed). Here, this element is satisfied.

Relators specifically allege that each of the MCE Defendants and each of the Hospital Defendants violated specific Medicaid billing requirements and directly submitted or paid claims in violation of those requirements. The MCE Defendants appear to agree as they do not challenge this element. However, the Hospital Defendants argue that Relators have only alleged that the violations occurred but have not alleged any facts suggesting *how* the false claims occurred (Filing No. 176 at 28). This is not the standard.

Relators allege that the Hospital Defendants directly submitted for payment improper claims which violated the Medicaid billing requirements (*See, e.g.*, Filing No. 67 at 55 ¶ 227

(alleging that Defendant IU Health submitted two separate claims to Medicaid for patients who were immediately readmitted 89 times improperly obtaining $946,000 in Medicaid payments)). Moreover, submission of improper claims is both the direct cause of the Government's alleged loss as well as a foreseeable outcome. Indeed, the only plausible outcomes of the submission of false claims are that (1) the claims are denied or (2) they are paid, and the Government issues an overpayment. Accordingly, taking the Relators' allegations as true—that the Hospital Defendants submitted improper claims for payment—this element is met.

### 5.  Reverse False Claims

In addition to their arguments that Relators have failed to state a claim for an FCA violation under Sections 3729(a)(1)(A) and (B), the Hospital Defendants argue that Relators have failed to allege a reverse false claim under Section 3729(a)(1)(G) (Filing No. 176 at 29). Relators do not provide an argument in response.

A "reverse false claim under § 3729(a)(1)(G) proscribes 'knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government." *Lanahan v. Cnty. of Cook*, 41 F.4th 854, 864 (7th Cir. 2022) (quoting 31 U.S.C. § 3729(a)(1)(G) (alterations in original)). "Under the [FCA], a 'reverse false claim' is a false statement used not to obtain payments from the Government, but to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government." *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 835 (7th Cir. 2011) (internal quotation and citation omitted).

However, as the Hospital Defendants point out, "when a claim brought pursuant to subsection (G) (like [Relators'] Counts III) is based on the same submissions of false statements

and records underlying claims brought pursuant to subsections (A) and (B) (like [Relators'] Counts I and II), the subsection (G) reverse false claim should be dismissed as redundant of the subsection (A) and (B) claims." *United States ex rel. Myers v. America's Disabled Homebound, Inc.*, 14 C 8525, 2018 U.S. Dist. LEXIS 47087, at *10 (N.D. Ill. March 22, 2018) (citing cases). This is the case here. Relators' allegations concerning Count III are the same facts and transactions underlying their claims for Counts I and II. Indeed, the Second Amended Complaint merely states that "[t]hrough the acts and omissions described above . . . [d]efendants knowingly made or used a false record or statement . . . [and] knowingly and improperly concealed, avoided, or decreased their obligation to repay the Government." (Filing No. 67 at 73–74). These are the exact type of claims the court in *Myers* and the cases it cited dismissed as redundant and inconsistent with the FCA. Accordingly, the Motions to Dismiss are both **granted** as to Count III. In addition, because "[t]he [IFCA] mirrors the Federal FCA in all material respects," *Kuhn*, 2008 U.S. Dist. LEXIS 68737, at *8 n.1, Count VI should be dismissed for the same reasons as Count III.

## C.    <u>Particularity Under Rule 9(b)</u>

"A party bringing a case alleging fraud must satisfy the heightened pleading standards set forth in Rule 9(b), which states that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *Molina*, 17 F.4th at 739 (quoting Fed. R. Civ. P. 9(b)) (alteration in original). "At the same time, Rule 9(b) carves out several matters that may be alleged generally, including '[m]alice, intent, knowledge, and other conditions of a person's mind.'" *Id*. (quoting Fed. R. Civ. P. 9(b)) (alteration in original).

"Rule 9(b)'s more demanding pleading requirements apply to suits brought under the [FCA]." *Id*. "A plaintiff ordinarily must describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper.'" *United States ex rel. Presser v. Acacia Mental*

*Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)). "Nonetheless, courts and litigants should not take an overly rigid view of the formulation; the allegation must be precise and substantiated, but the specific details that are needed to support a plausible claim of fraud will depend on the facts of the case." *Molina*, 17 F.4th at 739 (cleaned up). "Rule 9(b) requires specificity, but it does not insist that a plaintiff literally prove his case in the complaint." *Id.* at 741.

Upon review of their briefing The MCE Defendants' and Hospital Defendants' arguments can be categorized as follows: they argue that Relators' Second Amended Complaint does not sufficiently plead with particularity as required by Rule 9(b) because (1) the Relators do not identify specific false claims or "individualized transactional" claims and thus, do not satisfy the "who, what, when, where, and how" of the fraud, and (2) Relators engaged in improper group pleading ([Filing No. 173 at 22](#)–29, [Filing No. 176 at 31-37](#)). The Court will address each in turn.

### 1. **Specific False Claims**

"False claim allegations must relate to actual money that was or might have been doled out by the government based upon actual and particularly-identified false representations." *United States ex rel. Gross v. Aids Research Alliance-Chicago*, 415 F.3d 601, 605 (7th Cir. 2005). "Specific dates, amounts, and contents of false claims or statements must be provided, as well as specific facts showing that a specific payment of money by the Government was conditioned on those claims or statements." *United States ex rel. Lusby v. Rolls-Royce Corp.*, 1:03-cv-680, 2007 U.S. Dist. LEXIS 94144, at *12 (S.D. Ind. Dec. 20, 2007) (citing cases). "Actual claims must be specifically identified because it is the claim for payment that is actionable under the Act, not the underlying fraudulent or improper conduct. *Id.* (citing *United States ex rel. Clausen v. Lab'y Corp. of Am., Inc.*, 290 F.3d 1302, 1311 (11th Cir. 2002)).

The MCE Defendants argue that Relators must allege facts on "an individualized level to demonstrate liability," and that by alleging only *potentially* duplicate hospital in-patient claims, *potential* overpayments and *potentially* duplicate in-patient claims they have failed this standard (Filing No. 173 at 22 (quoting *United States ex rel. Watkins v. KBR, Inc.*, 106 F. Supp. 3d 946, 967 (C.D. Ill. 2015)). The Hospital Defendants also argue that Rule 9(b) demands that Relators must allege "specific facts demonstrating what occurred at the individualized transactional level" but Relators fail to do so (Filing No. 176 at 33 (citing *Lanahan*, 41 F.4th at 862)). The Court disagrees.

First, while the Seventh Circuit stated that Rule 9(b) requires Relators to allege specific facts demonstrating what occurred at the individualized transactional level, *Lanahan*, 41 F.4th at 862, the Seventh Circuit then expanded on this as "include[ing] the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the [Government]." *Id.* (internal quotations and citations omitted). The Court finds that Relators have satisfied this burden.

As discussed previously, Relators identify the MCE Defendants and allege various violations against each of them separately including specific examples such as Anthem misusing Medicaid funds to make payments on 1,004 claims for individuals who were readmitted to the same facility for the same condition within 72 hours of the discharge date with the payments of such claims totaling nearly $6.4 million (Filing No. 67 at 32 ¶ 105). Relators include materially the same allegations against every MCE Defendant separately. *See, e.g.*, *Id.* at 32–33 ¶¶ 106–110.

Relators also identify the Hospital Defendants and allege various violations against each of them separately including specific examples such as IU Health's Riley Hospital submitting 89 claims for separate payments that involved a beneficiary's readmission to the same facility within 72 hours of the discharge date on an earlier claim obtaining a total of more than $946,000 in

26

Medicaid payments. *Id*. at 55 ¶ 227. Relators include materially the same allegations against each of the Hospital Defendants. *See*, *e.g.*, *Id*. at 55–56 ¶ 228–234.

In addition, *Watkins* is distinguishable from the case before the Court. In *Watkins*, the court found it necessary to assess factual allegations at an "individual transaction" level where the relator did not "provide[] information that can be used to discern how much, if any, of any individual invoice or voucher submitted to the Government . . . was artificially inflated" by the defendants and then submitted to the Government. 106 F. Supp. 3d at 968. Here, the Relators allege non-compliance with specific billing requirements and "any invoice or voucher submitted to the Government" are detailed to a specific dollar amount. These allegations can be used to discern the overpayment for each of the defendants. Accordingly, *Watkins* is inapplicable.

*Lanahan* is also inapplicable as the Seventh Circuit held that the Relator's conclusory assertions that the defendant profited from "reimbursement of WIC false claims" and that co-defendant was reimbursed "[d]espite the falsity of the underlying claims" should be dismissed. 41 F.4th at 862. The Seventh Circuit determined that the relator's assertions did not identify any statement or claim, false or otherwise, that the defendant made to the Government. In contrast, the Relators in this case identify specific violations tied to a specific number of claims resulting in a detailed dollar amount loss to the Government.

The MCE Defendants also cite *United States ex rel. Fowler v. Caremark RX, LLC*, 496 F.3d 730 (7th Cir. 2007) arguing that this individualized transactional level standard also applies in cases concerning medical reimbursements such as the case before the Court (Filing No. 173 at 23). The MCE Defendants contend that Relators' allegations fall short of the "who, what, when, where, and how" required by Rule 9(b) because they do not comply with *Fowler's* requirement of specific allegations "at an individualized transactional level." 496 F.3d at 742. However, *Fowler* is also

27

inapplicable because the relators in that case merely worked at Caremark distribution centers and assumed that Caremark kept the proceeds of all returned drugs. *Id*. The plaintiffs in *Fowler* also "lacked any knowledge" about Caremark's financial activities beyond merely speculating that "once a prescription was returned, Caremark automatically either kept the money or continued to bill without providing an appropriate credit to the government or replacement prescription to federal employees." *Id*. On the other hand, this case concerns allegations directly based on both the MCE Defendants' and Hospital Defendants' financial activities. As Relators point out, to identify hospital claims without the required transfer modifier, IBM compared claims submitted by the transferring hospital against those from the receiving hospitals. Similarly, to identify unallowable dental suture claims that should have been bundled with tooth extractions, IBM examined claims with the "same dates of service and same tooth numbers." (Filing No. 67 at 50–51 ¶¶ 202–205). Relators' allegations are therefore specifically tied to the MCE Defendants and Hospital Defendants financial activities in relation to the specific alleged violations and *Fowler* is inapplicable. *See Abner v. Jewish Hosp. Health Care Servs.*, 4:05-cv-0106, 2008 U.S. Dist. LEXIS 61985, at *15 n.2 (S.D. Ind. Aug. 13, 2008) ("To the extent that *Fowler* can be read to require evidence in hand at the pleadings stage, however, any such requirement would be inconsistent with modern civil practice.").

Next, the Hospital Defendants argue that Relators have not sufficiently plead the "who" involved in the fraud (Filing No. 176 at 34). Specifically, the Hospital Defendants contend that Relators "do not name any individuals who submitted claims on behalf of the Hospital Defendants, signed certifications on behalf of the Hospital Defendants, made any statements that reflect the knowledge or subjective belief of the Hospital Defendants, or took any actions that would suggest

knowledge, ignorance, or recklessness on behalf of the Hospital Defendants." *Id*. This is not the standard.

While Rule 9(b) requires specificity, "it does not insist that a plaintiff literally prove his case in the complaint." *Molina*, 17 F.4th at 741. The Hospital Defendants do not cite, and the Court did not locate, case law requiring a plaintiff bringing a *qui tam* action against multiple large corporations to name every individual who submitted or certified each of the claims on behalf of the corporations. Indeed, requiring as much would be akin to requiring the Relators to prove their case at the pleading stage without discovery or access to confidential claims information they would need to do so. Rule 9(b) is not so stringent. *See Emery v. Am. Gen. Fin. Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998) (finding that Rule 9 requires flexibility when information lies outside of a plaintiff's control). At this stage of the litigation, Relators' specific identification of each of the MCE Defendants and Hospital Defendants is sufficient under the circumstances. This satisfies the "who" of Relators' fraud claims.

By specifically alleging what Medicaid billing requirements were violated by which specific Defendant based on the submission of incorrect claims to Indiana Medicaid resulting in the payment of a detailed and specific dollar amount, Relators have sufficiently pleaded the "who, what, when, where and how" of the fraud. Accordingly, Relators have satisfied Rule 9(b).

### 2. **Group Pleading**

The Hospital Defendants also argue that the Relators engage in improper "group pleading" because the Second Amended Complaint frequently uses the term "Defendants" without identifying which defendants took which alleged actions and grouping the "Hospital Defendants" together, implying knowledge, action, and culpability to the group at large (Filing No. 176 at 36).

"Under Rule 9(b), a claimant must make specific and separate allegations against each defendant; '[a] complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient.'" *Winforge, Inc. v. Coachmen Indus., Inc.*, 1:06-cv-619, 2007 U.S. Dist. 18360, at *16 (S.D. Ind. March 13, 2007) (quoting *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990)). Here, Relators have made specific and separate allegations against each of the Hospital Defendants.[1]

As the Court discussed above, the Relators specifically alleged violations on the part of each of the Hospital Defendants separately. While the Hospital Defendants are correct that Relators refer to the them as "each of the Hospital Defendants," the paragraphs following such language throughout the Second Amended Complaint go on to list a specific violation for each of the Hospital Defendants separately detailing how each of the Hospital Defendants specifically violated the Medicaid billing requirements, how many claims each of them violated, and how much money each of them separately received due to their respective violations. (*See, e.g.*, Filing No. 67 at 55–57 ¶¶ 225–234).

The Hospital Defendants point the Court to *In re Crop Inputs Antitrust Litigation*, 749 F. Supp. 3d 992, 1012 (E.D. Mo. Sept. 13, 2024) arguing "[w]here 'the group allegations, combined with any individual allegations and reasonable inferences, fail to put a specific defendant on notice as to their alleged personal involvement in the injury, the Court must grant that defendant's motion to dismiss.'" (Filing No. 176 at 36 (quoting *Id.* (citing *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013))). Relators have put each of the Hospital Defendants on notice as to their alleged involvement in the injury. In addition to the above examples, Relators specifically state which of the hospitals in each of the Hospital Defendants networks caused the injuries (*See, e.g.*,

---

[1] Relators have also made specific and separate allegations against each of the MCE Defendants, but the MCE Defendants do not challenge the Second Amended Complaint on grounds of improper group pleading.

Filing No. 67 at 58 ¶ 239) ("For Defendant Ascension, IBM [] found that Ascension's St. Vincent Hospital West 86th Street in Indianapolis submitted 13 fee-for-service claims for full DRG payments without using the transfer code and improperly obtained more than $94,000 in Medicaid payments.").

Such allegations sufficiently put each of the Hospital Defendants on notice as to their alleged involvement and provide sufficient detail to allow them to defend the allegations. Accordingly, Relators have not engaged in improper group pleading.

**D.    The Constitutionality of *Qui Tam* Actions**

The MCE Defendants argue that the FCA's *qui tam* provisions violate three separate provisions of the Constitution (Filing No. 173 at 29–30). The Hospital Defendants contend that the constitutionality of *qui tam* actions remains in question, and they reserve the right to challenge Relators' standing should the Seventh Circuit or Supreme Court rule that such actions are unconstitutional (Filing No. 176 at 37). The United States of America intervened for the limited purpose of defending the constitutionality of the *qui tam* provisions of the FCA, (Filing No. 180), and filed a Response in Opposition to Defendants' Motions to Dismiss (Filing No. 181). The Court concludes that *qui tam* actions are constitutional.

First, both the MCE Defendants and the Hospital Defendants base their assertions on the dissent of Justice Thomas and the concurrence of Justice Kavanaugh in *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419 (2023). Justice Thomas wrote in his dissent that "there are substantial arguments that the *qui tam* device is inconsistent with Article II and that private relators may not represent the interests of the United States in litigation." *Id*. at 449 (Thomas, J., dissenting). Justice Kavanaugh joined the majority opinion but wrote separately to

add that he agreed with Justice Thomas on the point of whether *qui tam* actions were consistent with Article II. *Id*. at 442 (Kavanaugh, J., concurring, joined by Barrett, J.).

Second, both the MCE Defendants and the Hospital Defendants note that a federal district court held that the *qui tam* provision of the FCA is unconstitutional and dismissed the underlying *qui tam* suit because the relator lacked standing under the FCA. *See United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293, 1324 (M.D. Fla. Sept. 30, 2024) ("An FCA relator's authority markedly deviates from the constitutional norm. The provision permits anyone—wherever situated, however motivated, and however financed—to perform a 'traditional, exclusive [state] function' by appointing themselves as the federal government's 'avatar in litigation.' [*Yates v. Pinellas Hematology & Oncoloy, P.A.*, 21 F.4th 1288, 1310 (11th Cir. 2021)]. That arrangement directly defies the Appointments Clause by permitting unaccountable, unsworn, private actors to exercise core executive power with substantial consequences to members of the public.").

Here, as Relators' point out, every circuit court that has examined this issued has upheld the constitutionality of the FCA. *See United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148 (2d Cir. 1993); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993); *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002). In addition, while the Seventh Circuit has not squarely addressed this issue, it has indicated skepticism towards such arguments as those put forth by the MCE Defendants and the Hospital Defendants. *See United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*, 970 F.3d 835, 847 (7th Cir. 2020) ("Their ancient pedigree, however, together with their widespread use at the time of the Founding, suggests that the [FCA]

as a whole is not in imminent danger of unconstitutionally usurping the executive power."). District courts in this Circuit have also considered such constitutional challenges and "have already squarely rejected [these] precise arguments." *Bantsolas v. Superior Air & Ground Ambulance Transp., Inc.*, 2004 U.S. Dist. LEXIS 4540, at *13 (N.D. Ill. March 18, 2004) (citing cases).

Based on the above cited cases, the Court rejects the arguments asserted by the MCE Defendants and Hospital Defendants. While *Zafirov* is persuasive authority in the technical sense, the Court is not persuaded in substance, nor is it binding authority. Instead, absent binding authority, the Court agrees with the many district courts in the Seventh Circuit, and the many Circuit Courts that have upheld *qui tam* actions.

## E.    Dismissal Without Prejudice

Having determined that dismissal is warranted because Relators have failed to sufficiently plead that the violations were material to the Government's decision to pay the claims, the Court must determine whether dismissal is with or without prejudice. Federal Rule of Civil Procedure 15 directs that courts should "freely" grant leave to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[A] plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *Runnion v. Girl Scouts of Greater Chi. & Nw Ind.*, 786 F.3d 510, 519 (7th Cir. 2015). While the Relators have amended their original complaint twice, (Filing No. 12, Filing No. 67), this is the first instance where the Court has ruled on their claims. As such, "[u]nless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the [Court] should grant leave to amend after granting a motion to dismiss." *Runnion*, 786 F.3d at 519–520.

Both the MCE Defendants and the Hospital Defendants argue that any amendment would be futile (Filing No. 173 at 31, Filing No. 176 at 37). The Court disagrees for Counts I, II, IV, and V. As the Court concludes above, Relators' claims are not barred by the public disclosure doctrine, do not lack specificity under Rule 9(b), and are not barred as unconstitutional. Dismissal is premised only on Relators' inability to state a claim for relief for failure to plead materiality. As noted by the State of Indiana in their Statement of Interest,

> Expanding materiality analysis to encompass reports of possible or suspected fraud, as Defendants suggest, is an invitation for the court to impermissibly assess the veracity and credibility of evidence when ruling upon a motion to dismiss. *Kilborn v. Amiridis*, 131 F.4th 550, 562 (7th Cir. 2025) ("At this stage, we accept the well-pleaded facts in the complaint as true and draw reasonable inferences in Kilborn's favor.") (citing *Cielak v. Nicolet Union High Sch. Dist.*, 112 F.4th 472, 475 (7th Cir. 2024)).

(Filing No. 192 at 3). The Court concludes that it is not evident from the face of the Second Amended Complaint that any amendment on materiality grounds would be futile. In the interest of justice, if the Relators believe they can amend Counts I, II, IV, and V to sufficiently plead materiality, the Court affords them a final attempt to do so. However, because Counts III and VI are redundant, any amendment would be futile, and those claims are dismissed with prejudice.

## IV.    CONCLUSION

For the reasons explained above, the MCE Defendants' Motion to Dismiss (Filing No. 172) and the Hospital Defendants' Motion to Dismiss (Filing No. 175)  are **GRANTED.** Counts III and VI are **dismissed with prejudice,** because these counts are duplicitous. Counts I, II, IV, and V, are **dismissed without prejudice**. If Relators believe they can amend their Second Amended Complaint to sufficiently plead materiality as to Counts I, II, IV, and V, then they may file a Third Amended Complaint within **45 days** of this Order. If no Third Amended Complaint is filed within **45 days**, this order will be converted to dismissal with prejudice.

**SO ORDERED**.

Date:  9/30/2025

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Jennifer A L Battle,
Carpenter Lipps LLP
battle@carpenterlipps.com

Jonathan A. Bont
Frost Brown Todd LLP
jbont@fbtlaw.com

Neal Anthony Brackett
BARNES & THORNBURG LLP
nbrackett@btlaw.com

Lawrence J. Carcare, II
OFFICE OF THE INDIANA ATTORNEY GENERAL
Lawrence.Carcare@atg.in.gov

Tanner Cook
Husch Blackwell LLP
tanner.cook@huschblackwell.com

Jonathan Z DeSantis
Walden Macht Haran & Williams LLP
jdesantis@wmhwlaw.com

Kristin Leigh Froehle
Barnes & Thornburg LLP
kristin.froehle@btlaw.com

Amanda Jane Gallagher
Barnes & Thornburg LLP
Amanda.Gallagher@btlaw.com

Lori Garber
Foley & Lardner LLP
lori.garber@foley.com

35

Catherine Lucille Hanaway
Husch Blackwell, LLP
catherine.hanaway@huschblackwell.com

Kandi Kilkelly Hidde
Frost Brown Todd LLP
khidde@fbtlaw.com

David Benjamin Honig
HALL, RENDER, KILLIAN, HEATH & LYMAN, PC (Indianapolis)
dhonig@hallrender.com

Jeremy L. Johnson
Office of Indiana Attorney General
jeremy.johnson@atg.in.gov

Kristopher N Kazmierczak
Frost Brown Todd LLP
kkazmierczak@fbtlaw.com

John Kelly, Jr
Barnes & Thornburg LLP
jkelly@btlaw.com

Molly Beth Knobler
DiCello Levitt LLP
mknobler@dicellolevitt.com

Kate Ledden
Husch Blackwell LLP
kate.ledden@huschblackwell.com

Jeffrey Alan Lipps, Sr
Carpenter Lipps LLP
lipps@carpenterlipps.com

Kathleen L. Matsoukas
BARNES & THORNBURG, LLP (Indianapolis)
kmatsoukas@btlaw.com

Daniel Robert Miller
Walden Macht Haran & Williams LLP
dmiller@wmhwlaw.com

Josh J. Minkler
Barnes & Thornburg LLP

jminkler@btlaw.com

Theresa Mullineaux
Husch Blackwell LLP
theresa.mullineaux@huschblackwell.com

Lisa Noller
Foley & Lardner LLP
lnoller@foley.com

Lisa Anne Ottolini
Husch Blackwell, LLP
lisa.ottolini@huschblackwell.com

Jacquelyn E. Papish
Barnes & Thornburg LLP
jackie.papish@btlaw.com

Jonathan Alan Porter
Husch Blackwell LLP
jonathan.porter@huschblackwell.com

Steven H. Pratt
Hall, Render, Killian, Health & Lyman, P.C.
spratt@hallrender.com

Christopher S. Wolcott
The Wolcott Law Firm LLC
indy2buck@hotmail.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
shelese.woods@usdoj.gov

Li Yu
Bernstein Litowitz Berger & Grossmann LLP
Li.Yu@blbglaw.com